# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

DAVIDSON OIL COMPANY,

      Plaintiff,

v.                                                                                          No. CIV 20-0838 RB/JHR

CITY OF ALBUQUERQUE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

In January 2020, Davidson Oil Company entered into a fixed-price requirements contract with the City of Albuquerque to supply the City's fuel needs to begin in July 2020. In preparation for the Contract, Davidson Oil bought twelve one-month contracts to purchase fuel with the prices locked in as of January 31, 2020. Within weeks, the oil industry experienced an unprecedented decline in oil prices. Shortly thereafter, the City notified Davidson Oil that it was terminating the Contract to secure better pricing with another vendor. Davidson Oil has sued the City and asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. The City moves to dismiss and argues that because the Contract contained a Termination for Convenience (TFC) clause, the City had a right to terminate. Considering the facts and the relevant law, the Court will deny the City's motion to dismiss the claims for breach of contract and breach of the implied covenant of good faith and fair dealing and grant the motion to dismiss the claim for promissory estoppel.

**I.    Factual Background**

Davidson Oil Company is a fuel oil distributor incorporated in Texas. (Doc. 1 (Compl.) ¶¶ 1, 8.) In December 2019, the City issued a Request for Bids, seeking an agreement "for the

purchase and delivery of its fuel oil requirements" with "pricing for fuel [to] remain firm during the first year of the contract." (*Id.* ¶ 9.) The City awarded the Contract to Davidson Oil. (*Id.* ¶ 10.) The parties entered into Contract No. SHR000022076, which "is governed by the laws of the State of New Mexico and the City of Albuquerque[,]" on January 21, 2020. (*Id.* ¶ 11; *see also* Doc. 8-A at 7.) "The Contract provides for Davidson Oil to supply the City's fuel oil requirements for one year beginning July 1, 2020[,] with two one year options to renew." (Compl. ¶ 11.) The Contract contains a TFC clause that provides:

> **Termination for Convenience**: City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by the City, if ordered or accepted by City prior to the effective date of termination.

(Doc. 8-A at 7.)

In reliance on the Contract, "Davidson Oil bought 12 one-month contracts [("hedge contracts")] to purchase fuel on the open market" with prices "locked-in on January 31, 2020." (Compl. ¶ 15.) Within weeks, "[o]il prices plunged to a 17-year low" due to "the combined economic impact of the COVID-19 virus and a price war between Saudi Arabia and Russia."[1] (*Id.* ¶ 16.) "On March 18, 2020, the City notified Davidson Oil that it was terminating the Contract effective May 19, 2020. The following day, this notice was amended to state that the termination was issued pursuant to the [TFC] clause in the Contract." (*Id.* ¶ 18.) When "Davidson Oil attempted to persuade the City to keep the Contract in place[,] the City refused[,]" citing budgetary concerns and "informing Davidson Oil that it would seek more favorable fuel oil pricing elsewhere in the oil market." (*Id.* ¶ 19.)

---

[1] The parties agree that the Court may take judicial notice of this decrease in oil prices. (*See* Docs. 8 at 9 n.4 (gathering sources); 12 at 5–6.)

The Complaint alleges that the City, as "a sophisticated buyer of fuel oil[,]" knew that Davidson Oil would have to purchase hedge contracts in advance to supply the City's fuel requirements at a fixed price and that Davidson Oil would incur losses on these contracts when the City canceled the Contract. (*Id.* ¶ 20.) Davidson Oil has incurred losses due to the City's termination of the Contract, and the City has not compensated Davison Oil for these losses. (*Id.* ¶¶ 22–23.) As a result, Davidson Oil brings claims against the City for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. (*See* Compl.)

## II. Legal Standards

### A. Motion to Dismiss Standard

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (citation omitted). To survive a motion to dismiss, the complaint does not need to contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

### B. Judicial Notice

"[W]hile ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the complaint, *see* Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect . . . ." *Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1122 (D.N.M. 2011) (citation omitted). Documents that a plaintiff refers to in the complaint fall into this limited exception if they "are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."

3

*Jacobsen v. Deseret Book Co.*, 298 F.3d 936, 941 (10th Cir. 2002) (citation omitted). Here, the City attached the Contract to its motion. (Doc. 8-A.) Davidson Oil does not dispute the Contract's authenticity and agrees that it is central to its claims. (Doc. 12 at 5.) Thus, the Court will consider the Contract. *See Raja v. Ohio Sec. Ins. Co.*, 305 F. Supp. 3d 1206, 1238 n.9 (D.N.M. 2018).

"A court may also take judicial notice of facts reported in newspaper articles where those facts were generally known within the local jurisdiction or were capable of a sufficiently accurate and ready determination." *Padilla v. City of Gallup*, No. CV 05-00505 MV/KBM, 2006 WL 8444138, at *3 (D.N.M. June 28, 2006) (gathering cases). "Judicial notice of newspaper articles is not appropriate, however, when the reported facts are not capable of easy verification." *Id.* (citation omitted). The City asks the Court to take judicial notice of two matters. First, the City cites two articles regarding the decline in oil prices. (Doc. 8 at 9 n.4.) Davidson Oil acknowledges that this matter is raised in the Complaint and is central to the claims. (Doc. 12 at 5.) Consequently, it does not oppose introduction of the articles. (*Id.*) The Court will take notice of these articles.

The City also asks the Court to take judicial notice of an article regarding the City's budgetary concerns amidst the pandemic. (*See* Doc. 8 at 10 n.6 (citing KRQE Staff, *City of Albuquerque expecting $27 [million] budget shortfall amid COVID-19 outbreak* [hereinafter *City Budget Shortfall*], KRQE, Apr. 17, 2020, https://www.krqe.com/health/coronavirus-new-mexico/mayor-keller-city-officials-to-provide-update-to-albuquerque-coronavirus-response-2/).) The City contends that this matter is contained within the Complaint and is central to the claims. (*See id.* at 10 (citing Compl. ¶ 19).) In the Complaint, Davidson Oil averred that "the City refused [to keep the Contract in place due to] . . . budgetary reasons . . . ." (Compl. ¶ 19.) Davidson Oil opposes introduction of the article as evidence to support the City's "putative reasons for terminating the Contract." (Doc. 12 at 6.) It argues that the article does not relate to allegations

made in the Complaint—that the City canceled the Contract for budgetary reasons. (*See id.*) The Court agrees for two reasons. First, the article is dated April 17, 2020, one month after the City canceled the Contract. Second, while the article discusses the City's pandemic-related budgetary concerns and notes that the City saved money by "cutting back on . . . fuel and other office costs[,]" it does not directly pertain to the City's purported reasons for canceling the Contract. *See City Budget Shortfall*. Under these circumstances, the Court finds it inappropriate to take judicial notice of this article in considering the City's motion to dismiss.[2]

### III. Analysis

#### A. Count I: Breach of Contract

Davidson Oil alleges that "[t]he City breached the Contract by terminating it only for the purpose of obtaining more favorable fuel oil pricing elsewhere and then refusing to compensate Davidson Oil for the monetary losses caused by the termination." (Compl. ¶ 27.) "Under New Mexico law, '[t]he elements of a breach-of-contract action are the existence of the contract, breach of the contract, causation, and damages.'" *Anderson Living Tr. v. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979, 1030 (D.N.M. 2013) (quoting *Abreu v. N.M. Children, Youth & Families Dep't*, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)). The City argues that Davidson Oil cannot show breach because the City had a right to terminate the Contract under the TFC clause. (*See* Doc. 8 at 6.) Davidson Oil contends that "the City's reading of the Contract to confer upon it an unlimited right to terminate would dispense with mutual consideration[,]" rendering the Contract illusory and void. (*See* Doc. 12 at 8.)

"A [TFC] clause is generally understood to be a risk-allocating tool, intended to permit a

---

[2] Similarly, the Court declines to consider the City's brief mention of the Contract's Force Majeure clause as justification for its termination. (*See* Doc. 13 at 8 (noting that "epidemics" and "quarantine restrictions" are "triggering events for the Force Majeure clause").)

government to 'terminate a contract, even in the absence of fault or breach by the other party, without incurring the usual financial consequences of breach.'" *Mb Oil Ltd., Co. v. City of Albuquerque*, 392 P.3d 975, 976 (N.M. Ct. App. 2016) (quoting *Mark Dunning Indus. v. Cheney*, 934 F.2d 266, 267 n.1 (11th Cir. 1991) (per curiam)). TFC clauses are rooted in Civil War-era procurement contracts. *See A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, 95 N.E.3d 547, 553 (Mass. 2018); *Krygoski Const. Co. v. United States*, 94 F.3d 1537, 1540 (Fed. Cir. 1996). As the war ended, the government terminated unnecessary wartime contracts and settled with contractors for partial performance. *See Krygoski*, 94 F.3d at 1540. Eventually, Congress passed legislation that explicitly allowed the termination of contracts for the convenience of the government. *See id.* at 1541 (citation omitted). After World War II, TFC clauses "became common features of" a wide variety of governmental contracts, and they are now standard "in almost all federal procurement contracts." *A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, No. 1677CV01366, 2017 WL 1312005, at *3 (Mass. Super. Mar. 3, 2017), *remanded by* 95 N.E.3d 547 (Mass. 2018) (citations omitted). As a result, much of the law on TFC "clauses in government contracts has developed primarily in the Federal Circuit Court of Appeals and its predecessor the Court of Claims." *See id.* at *4.

Taking the federal government's lead, states and municipalities also typically include TFC clauses in their own contracts. *See id.* And although such contracts are subject to state law, state courts—including the New Mexico Court of Appeals—"have looked to federal case law for guidance in determining whether such a provision was properly invoked in the context of state or local government procurement contracts." *Id.* (gathering cases). Although "a clause that provides only one party the right to terminate for convenience might seem unfair[] or . . . illusory[,]" the New Mexico Court of Appeals observed that "there are good reasons to allow the government to

6

include a nonmutual [TFC] clause in its supply contracts." *Mb Oil*, 392 P.3d at 978 (internal citation omitted). First, the New Mexico Legislature has expressly authorized public bodies to include TFC clauses in contracts. *Id.* (citing N.M. Stat. Ann. § 13-1-170(A) (1997)). Second, as the City "contract[s] for the benefit of its citizens[, t]he flexibility provided by a TFC clause allows it to limit expenditures without binding successor governments to contractual obligations that are not in the best interests of the citizenry." *Id.* at 979 (citation omitted).

Courts have imposed limits on the government's right to terminate federal contracts for convenience "to ensure that government contracts with nonmutual [TFC] clauses are not illusory." *Mb Oil*, 382 P.3d at 979 (citing *Torncello v. United States*, 681 F.2d 756, 769 (Ct. Cl. 1982)). Courts recognize two competing standards when analyzing whether termination under a TFC clause constitutes a breach. *See id.* The *Torncello* court, in a plurality opinion, announced the first standard, which considers whether the parties experienced changed circumstances, either in the "bargain" or in their own expectations. 681 F.2d at 766. The second standard, primarily attributed to *Krygoski*, requires simply "that the government does not abuse its discretion or act in bad faith." *Mb Oil*, 382 P.3d at 979 (discussing *Krygoski*, 94 F.3d at 1543). The parties agree that these standards govern the outcome of this case.[3] (*See* Docs. 8 at 8–11; 12 at 7–16; 13 at 3–10.)

    **1.**    **Dismissal is not warranted under the changed circumstances standard.**

The United States Court of Claims originated the "changed circumstances" test in *Torncello*, which was "the first court decision to hold that a termination for convenience was

---

[3] The New Mexico Court of Appeals recognized that federal courts have "abandoned" *Torncello*'s changed circumstances test, "but state courts have nevertheless adopted it in cases the [New Mexico state] district court relied upon when it authored its conclusions of law" prior to the *Mb Oil* appeal. 392 P.3d at 980 (gathering cases); *see also Krygoski*, 94 F.3d at 1545 (noting that "*Torncello* applies only when the Government enters a contract with no intention of fulfilling its promises") (citation omitted). The *Mb Oil* court, citing *Torncello*, then found that the City was justified in terminating the contract for convenience due to changed circumstances. *See* 392 P.3d at 980. Accordingly, the Court will examine the *Torncello* standard here.

7

improper and therefore constituted a breach of contract." Joseph J. Petrillo & William E. Conner, *From Torncello to Krygoski: 25 Years of the Government's Termination for Convenience Power*, 7 Fed. Circuit B.J. 337, 337 (1997). In that case, the Navy solicited bids for a grounds-maintenance requirements contract that covered 12 types of work, including pest control services. 681 F.2d at 758. The Navy awarded the contract to Soledad Enterprises, even though Soledad's bid itemization specified a charge for pest control services that far exceeded that of other bidders. *See id.* When the Navy needed pest control work, it did not honor its contract with Soledad, but instead called another vendor who charged a lower price. *See id.* Torncello alleged that this amounted to breach, but the Navy argued that its conduct was appropriate as a constructive termination for convenience. *See id.* at 758–59. A plurality of the court concluded that based on "the historical limits on the use of the [TFC] clause[,]" the government may properly invoke the clause only when there is "some kind of change from the circumstances of the bargain or in the expectations of the parties." *Id.* at 772. Because the Navy invoked the TFC clause "to take advantage of a price [it] had known about at the award date and where" there were no changed circumstances fundamental to the contract, the Navy's conduct rendered its original promise illusory. *Id.* at 760.

"Although the three other sitting judges of the [*Torncello*] court concurred in the result, each wrote a separate opinion. The difficulty in harmonizing these four opinions has led to confusion and controversy." Petrillo, *From Torncello to Krygoski*, *supra*, 7 Fed. Circuit B.J. at 347. The crux of the *Torncello* opinion requires the government to show some type of "changed circumstances," but the concept is amorphous. *See id.* Regardless, later decisions from the Federal Circuit[4] and elsewhere have largely confined *Torncello*'s test to the specific factual circumstances

---

[4] The Court of Claims, which decided *Torncello*, is "the predecessor court to the Federal Circuit," which decided both *Krygoski* and *Salsbury*. *See* Joseph J. Petrillo, *From Torncello to Krygoski*, *supra*, 7 Fed. Circuit B.J. at 362.

8

at play in that case: that is, termination for convenience to take advantage of a better price that the government knew about in advance constitutes a breach. *See, e.g.*, *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990) (*Torncello* "stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause."); *see also Appeal of Fed. Data Corp.*, DOTCAB No. 2389, 91-3 B.C.A. (CCH) ¶ 24063 (June 7, 1991) ("About all that can be said of *Torncello* is . . . that when the government enters into a requirements contract, knowing that it will violate its terms in order to accept a lower price which it knows is available from another source," it cannot thereafter constructively terminate the contract for convenience).

Closer to home, the New Mexico Court of Appeals found a change of circumstances sufficient to justify invocation of a TFC clause in a contract much like the one at bar. *See Mb Oil*, 382 P.3d at 980. There, the City of Albuquerque contracted with a wholesale fuel distributor (Mb Oil) to supply the City's fuel needs, and the contract contained a TFC clause identical to the one here. *See id.* at 976. By the time Mb Oil began performing under the contract, the City had elected a new mayor. *See id.* at 979. During the first year of the contract, the City's new administration "directed the City's fleet management to convert its fleet" to use unleaded fuel, rather than the E85 fuel it previously used, due to price and efficiency concerns. *See id.* Faced with providing an increased amount of unleaded fuel, Mb Oil failed to timely deliver fuel to the City on several occasions, and the City provided written notice that its "fuel requirements were not being met." *Id.* at 977, 979. Eventually, the City "terminated the contract for default and/or convenience[,]" and Mb Oil sued. *Id.* at 977. The district court held a bench trial and ruled in favor of Mb Oil, finding in relevant part that the City "wrongfully terminated [the contract] for convenience, since

9

[Mb Oil] showed 'an absence of valid grounds for invocation of the [TFC] clause.'" *Id.* The appellate court reversed because under the "plain wording" of the contract, "the City was not required to have any good cause or persuasive reason for terminating the Contract" pursuant to the TFC clause. *Id.* at 978. Instead, the City's changed fuel requirements, which rendered Mb Oil unable to meet the City's needs, constituted new circumstances that made termination under the TFC clause appropriate. *Id.* at 980.

Here, the City argues in relevant part that the steep decline in oil prices represented a change in circumstances sufficient to invoke the TFC clause.[5] (*See* Doc. 13 at 6–7.) Although this occurred after the parties signed the Contract, the City has not persuaded the Court that a price decline in the context of a fixed-price contract is a change in circumstances as contemplated by *Torncello*. In fact, one of the judges who authored a concurring opinion in *Torncello* remarked that the plurality opinion "suggest[s] that a post-contract change in the price situation should not be enough to trigger the convenience termination clause."[6] *See Torncello*, 681 F.2d at 774 (Davis, concurring). Instead, the *Torncello* plurality opinion intimates that the government agency must be able to show "a change in the circumstances from the reasonable expectations of the parties at the time of the agreement." *See Ram Eng'g & Const., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 583 (Ky. 2003) (citing *Torncello*, 681 F.2d at 766). Here, Davidson Oil has adequately demonstrated that a price decline was within the parties' reasonable expectations at the time they

---

[5] The City also contends that it faced changed circumstances due to pandemic-related budgetary concerns. (*See* Docs. 8 at 10; 13 at 7–8.) As discussed above, the Court will not take judicial notice of this issue. *See supra* Sec. II(B) at 4–5.

[6] Notably, while Judge Davis agreed that the government should not be allowed to terminate under a TFC clause if it knew in advance that better pricing was available elsewhere, he indicated that he would not find bad faith if the government learned of the lower pricing only after the parties signed the contract. *See Torncello*, 681 F.2d at 773–74 (Davis, concurring). Of course, Judge Davis was not considering the factual scenario present here, where a vendor had expended funds to prepare for performance of the contract.

signed the contract. As Davidson Oil posits, "unforeseen price changes in a commodity market are precisely the type of unanticipated risks that cause parties to enter into fixed-price supply contracts."[7] (Doc. 12 at 16.) *See also Natural Gas Contracts* § 103 Contractual Arrangements in the Natural Gas Industry, 2003 WL 24954746 ("fixed-price contracts[] can be used to manage price risk by eliminating price uncertainty"). Consequently, the Court is unconvinced that a price change is a "substantial change in circumstances" according to the *Torncello* standard.

Davidson Oil further asserts that to read the TFC clause to cover these circumstances—where it has expended resources in preparation for performance and the City has not given anything in exchange—would render the Contract illusory. (Doc. 12 at 11–14.) This argument is compelling, and the City did not fully respond to it. (*See* Doc. 13 at 10 (mistakenly asserting that "Plaintiff has not raised [the issue of consideration] in this matter").) Instead, the City simply stated that its obligation "to pay for any goods actually provided and any work actually performed . . . is adequate consideration for an enforceable agreement and does not make the contract illusory." (Doc. 13 at 10.) The City cites two cases in support, but both are distinguishable. (*Id.* (citing *EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447 (10th Cir. 1990); *Salsbury Indus. v. United States*, 17 Cl. Ct. 47 (1989), *aff'd*, 905 F.2d 1518 (Fed. Cir. 1990)).) In *Salsbury*, a lawsuit involving a federal contract,[8] the plaintiff had already begun performance and was owed partial payment. *See*

---

[7] Davidson Oil also points to the Contract's Price Adjustment provision, which allows the parties to renegotiate the renewal price. (*See* Doc. 12 at 17 (citing Doc. 8-A at 2).) The Price Escalation provision, however, does not mandate that the City request a price adjustment before invoking the TFC clause, nor does it offer a remedy for a price adjustment before renewal of the Contract term. Instead, it provides that "the City *may* request and Davidson Oil shall provide a written indication of its fixed pricing *for the renewal period* . . . ." (Doc. 8-A at 2 (emphasis added).)

[8] Notably, if this had been a federal contract, it does not appear that consideration would be an issue. Federal legislation provides that where a federal governmental agency terminates a fixed-price contract for convenience, the contractor may receive, in relevant part, "[t]he costs incurred in the performance of the work terminated, including initial costs and **preparatory expense allocable thereto** . . . ." 48 C.F.R. § 52.249-2 (emphasis added). As the Contract here did not include a similar provision, the City's argument regarding consideration is not so clear.

11

905 F.2d at 1519. Thus, there was no question about whether the United States had provided consideration for the contract. In *EDO*, two private parties "entered into a series of research and development contracts . . . ." 911 F.2d at 1448. Beech later terminated the contract for convenience when it became dissatisfied with EDO's work. *Id.* at 1449. EDO sued for breach of contract, and the Tenth Circuit observed that the circumstances therein

> differ[ed] markedly from those that concerned the court in *Torncello*. Beech could not terminate the EDO contracts with impunity. From the moment the contracts were entered into, Beech incurred obligations thereunder, unlike in *Torncello*, where the government never ordered—nor was it required by the contract to order—any services from the plaintiff.

*Id.* at 1453. The Tenth Circuit opined that the *Torncello* court's main concern was "that the obligations of the party possessing the unilateral right of termination [were] illusory due to want of consideration . . . ." *Id.* The City has not adequately shown that it possessed an obligation sufficient to supply consideration where Davidson Oil had already expended resources to prepare for the contract. Ultimately, the Court finds that the City has not established that dismissal is appropriate under the "changed circumstances" standard.

### 2. Dismissal is not warranted under the bad faith standard.

The *Krygoski* court outlined the most widely-used standard—that of bad faith. *See* 94 F.3d at 1543–45. A plaintiff may plausibly allege bad faith or abuse of discretion under this "narrow standard" if it demonstrates "that the contracting officer was (1) motivated by malice; (2) involved in a conspiracy to get rid of the plaintiff; (3) sought only to secure a better bargain from a competing supplier in a requirements contract; or (4) never intended to keep its promise when the promise was made." *See Mb Oil*, 382 P.3d at 979–80 (discussing *Krygoski*, 94 F.3d at 1543–45 (internal citations omitted)). Only the third scenario is at issue here: Davidson Oil asserts that the City terminated the contract merely to secure better fuel oil pricing. (*See* Doc. 12 at 9–12.)

The *Krygoski* court cited *Torncello* in support of the third scenario. The City argues that Davidson Oil "has not alleged that the City never intended to honor the Contract," as the *Torncello* court found of the Navy. (Doc. 13 at 4.) The City's argument, however, suffers from the same defect as before—it has not adequately established consideration under these circumstances. *See, e.g.*, *Torncello*, 681 F.2d at 764 (observing that while "parties to a contract may freely agree to various forms of risk allocation, . . . it is just as clear that parties may not agree that one or both may walk away from all obligations without rendering the contract unenforceable" as illusory). The *Torncello* plurality observed that the concept of "abuse of discretion" depends on "the existence of other limits"—*i.e.*, the government's ability to invoke a TFC clause must be predicated on "an obligation sufficient to uphold a contract . . . ." *See id.* at 771; *see also Sigal Constr. Corp. v. Gen. Servs. Admin.*, CBCA 508, 10-1 BCA ¶ 34,442 (May 13, 2010) (finding that the GSA breached contract in bad faith when it solicited a competing contractor to complete work items contemplated by the contract but at a lower price); *Northrop Grumman Corp. v. U.S.*, 46 Fed. Cl. 622, 627 (2000) (where agency cancelled contract under TFC clause, court found no bad faith and emphasized that the agency did *not* terminate simply to get a better price from a competitor). As with the "changed circumstances" standard, the Court finds that dismissal is not appropriate at this time.

B. **Count II: Breach of Implied Promise of Good Faith and Fair Dealing**

In Count II, Davidson Oil alleges that "[t]he City terminated the Contract only for the purpose of obtaining more favorable fuel oil pricing elsewhere and then refused to compensate Davidson Oil for the monetary losses caused by the termination." (Compl. ¶ 32.) "[E]very contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Watson Truck & Supply Co. v. Males*, 801 P.2d 639, 642 (N.M. 1990) (citing *Spencer v. J.P. White*

*Bldg.*, 585 P.2d 1092, 1095 (N.M. 1978); Restatement (Second) of Contracts § 205 (1979)). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Id.* (quoting *Romero v. Mervyn's*, 784 P.2d 992, 1000 (N.M. 1989)).

The City argues that "it would be incongruous to hold that a party acted in bad faith by acting in accordance with an express contractual provision." (Doc. 8 at 14 (citing *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 83 (N.M. 1993)).) If the City later establishes that consideration existed for the TFC clause and that the City appropriately terminated the Contract for convenience, then the Court agrees that the claim for breach of the implied covenant of good faith and fair dealing will necessarily fail. In *Mb Oil*, the New Mexico Court of Appeals held that as the City did not breach the parties' contract by invoking the TFC clause, neither did it breach the covenant of good faith and fair dealing. *See* 382 P.3d at 980 (citing *Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1110 (N.M. 1988) ("We align . . . with those courts that have refused to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract."); *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A.*, Inc., 113 P.3d 347, 359 (N.M. 2005) ("The implied duty of good faith does not confer on a district court a roving commission to do whatever it[ ] wishes in the name of fairness.")). For now, however, the claim will remain.

C. **Count III: Promissory Estoppel**

Finally, Davidson Oil alleges that "the City promised to purchase its fuel oil requirements from Davidson Oil at fixed prices and that Davidson reasonably relied on that promise in purchasing hedge contracts so it could meet the City's needs." (Doc. 12 at 22 (citing Compl. ¶¶ 11, 12, 15).) It further asserts that "[t]he City knew that Davidson Oil would purchase these

14

hedges" but broke its promise to seek lower prices elsewhere. (*Id.* at 22–23 (citing Compl. ¶ 17–18, 20).)

The New Mexico Supreme Court has described the doctrine of promissory estoppel as one "used by courts to justify relief when no formal contract was concluded . . . ." *Planning & Design Sols. v. City of Santa Fe*, 885 P.2d 628, 636 n.2 (N.M. 1994) (citation omitted); *see also Wells Fargo Bank, N.A. v. Ortega*, 494 F. App'x 912, 914 (10th Cir. 2012) ("promissory estoppel applies only when there is no contract, although it 'may arise from the conduct of parties after the execution of a written contract'") (quoting *Baker v. Ayres & Baker Pole & Post, Inc.*, 170 P.3d 1247, 1251 (Wyo. 2007)); *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 598 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019) ("Promissory estoppel is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason.") (quotation and quotation marks omitted).

The City calls this claim a "curious" one, as it appears that Davidson Oil must be arguing that the City made some further promise to purchase its fuel requirements outside of the written Contract. (Doc. 8 at 14.) The City argues that such a claim must fail, because by statute, a plaintiff may not bring a contract claim against the government unless there is a valid written contract. (*Id.*) *See also* N.M. Stat. Ann. § 37-1-23(A) ("Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract."). "By limiting lawsuits to valid written contracts, the legislature placed the risk of loss on a party who transacts business with a governmental entity without a valid written contract." *Campos de Suenos, Ltd. v. Cty. of Bernalillo*, 28 P.3d 1104, 1109 (N.M. Ct. App. 2001) (citation omitted). Thus, to the extent that Davidson Oil attempts to bring a promissory estoppel claim against the City based on an unwritten promise, its claim would fail.

Davidson Oil responds that its promissory estoppel claim "arises directly from a promise made in a valid written contract . . . ." (Doc. 12 at 22.) In support of its theory, Davidson Oil cites to *May v. Cockman*, No. CV 13-1021 GBW/KK, 2016 WL 10591979, at *18 (D.N.M. Jan. 28, 2016), but the case is inapposite. In *May*, the plaintiff alleged that his supervisor made an *oral* promise to continue the plaintiff's employment. *See* 2016 WL 10591979, at *18. The plaintiff argued that an oral promise made in the context of a written employment contract would circumvent any immunity granted to the government under § 37-1-23(A). *See id.* Here, Davidson Oil argues that the City's promise is contained within the Contract itself, not from any oral promise made outside of the Contract. Yet, if the claim is based on the language of the Contract, it is not a claim for promissory estoppel, but for breach. Davidson Oil has not established that its promissory estoppel claim is appropriate, and the Court will grant the City's motion to dismiss with respect to Count III.

**THEREFORE**,

**IT IS ORDERED** that Defendant City of Albuquerque's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 8) is **GRANTED in part**, and Davidson Oil's claim for promissory estoppel (Count III) is dismissed. The motion to dismiss is otherwise **DENIED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE