IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**DAVIDSON OIL COMPANY,**             §
                                       §
**Plaintiff,**                         §
                                       §
**vs.**                                §     Case No. 1:20-CV-00838-RCB-JHR
                                       §
**CITY OF ALBUQUERQUE,**               §
                                       §
**Defendant.**                         §


**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
SUPPORTING MEMORANDUM**

COMES NOW, the City of Albuquerque, Defendant, (the "City" or "the Defendant") through counsel, and hereby moves for summary judgment. As further grounds for this Motion[1] Defendant states:

**I.  INTRODUCTION**

Plaintiff voluntarily participated in a procurement process to provide the City with bulk fuel, resulting in an contract agreement ("Contract"). That Contract did not require the City to purchase any specific amount of fuel from the Plaintiff, and did not contain an exclusivity clause. The City bargained for and expressly reserved the right to terminate the contract at its convenience which it did before any fuel was delivered to the City by the Plaintiff. The standard notice requirement for termination for convenience by the City was 30 days. The Plaintiff, however, bargained for and received an enlargement of the notice requirement from 30 days to 60 days. This is sufficient consideration to make the Contract binding. The Contract was terminated at time the

---

[1] As allowed by D.N.M.LR-Civ. 7.5(a), the City combined this Motion with the memorandum in support thereof. Moreover, as required by D.N.M.LR-Civ. 7.1(a), the City attempted to
settle this motion before it was filed. Undersigned counsel contacted Plaintiff's counsel via telephone on March 9, 2022 to determine if the motion was opposed. Plaintiff opposes the motion.

extent of COVID-19 virus pandemic's negative impact on City revenues and on City standard operating procedures was becoming known, and oil prices had fallen to unprecedented levels which was symptomatic of a massive downturn of the economy. The world turned upside down, and the City, along with every other institution and person in the country, faced an uncertain future. The City invoked its right under the Contract, to which it and the Plaintiff had freely agreed, to terminate the contract and did so after giving 60 days of notice. The City acted in good faith and only terminated the Contract because it was in the best interests of the City to do so due to the unexpected changed circumstances created by the pandemic and the economic uncertainly it created. Consequently, the City had no obligations to the Plaintiff which the Plaintiff can show were breached. Additionally, the Plaintiff's other two theories of recovery based on breach of implied promise of good faith and fair dealing and promissory estoppel must fail because no breach of the Contract occurred. Therefore, Plaintiff's claims should be dismissed with prejudice.

## II.   UNDISPUTED MATERIAL FACTS

1. Plaintiff voluntarily participated in a procurement process to provide the City with bulk fuel (diesel and regular unleaded gasoline). Compl. [Doc. 1] at ¶¶ 9-10.

2. On or about January 21, 2020, the City and the Plaintiff entered into Contract No. SHR000022076 (the "Contract"). Compl. [Doc. 1] at ¶ 11.

3. The Contract covered a one-year period with deliveries to begin on July 1, 2020, and continue to June 30, 2021. *See* Doc.8-1, pg. 1

4. The Contract did not require the City to purchase its fuel from the Plaintiff exclusively. Motion to Dismiss, Ex. A [Doc. 1]

5. The Contract did not require the City to purchase any set amount fuel from the Plaintiff. Motion to Dismiss, Ex. A [Doc. 8-1]

6. The Contract in the Terms and Conditions section, ¶ 11, contains a Termination for Convenience clause that states:

> 11. Termination for Convenience: City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

Compl. [Doc. 1] at ¶ 13; Ex. A, at ¶ 11.

7. When Plaintiff was contacted and informed that they won the Procurement Contract. Plaintiff then negotiated for and was granted a change in "Termination for Convenience Clause" that increased the notice requirement from 30 days to 60 days. For almost all COA procurement contracts, the "Termination for Convenience Clause" has the provision for giving notice to terminate a contract as 30 days.

8 The Contract in the Terms and Conditions section, ¶ 11, contains a Termination for Lack of Appropriations clause and it states:

> 11. Termination for Convenience: City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

Compl. [Doc. 1] at ¶ 13; Ex. A, at ¶ 11.

9. Plaintiff did not do a study of the City's sources of revenue or how an unexpected change to those sources might have income/revenue elasticity of demand for fuel during the contract period. Ex. B, Boydstun Dep., 37: 24-25, 38:1-25, 39:1-17.

10. Plaintiff purchased 12 monthly hedge contracts, on January 30, 2020. Ex. B, Boydstun Dep., 17: 2-7.

11. The purchase of these hedge contracts by Plaintiff were without the knowledge, consent, permission or participation of the City.

12. Christopher Daniel, Chief Investment Officer for City, using the Bloomberg Information Service Terminal, does daily reviews of the leading economic indicators including regarding fuel oil prices and other commodities markets.

13. In addition, every workday, Daniel reviews fixed income investment indicators such as Commercial Paper rates, U.S. Treasury and Agency rates, Overnight Repurchase Agreements rates, credit markets, and other indicators.

14. In late January 2020, Daniel was reviewing the prices of fuel oil and noticed a precipitous declining trend in fuel oil prices.

15. The COA budget can be volatile because it is based in large part on gross receipts tax revenue, and retail spending had decreased in the first calendar quarter of 2020 due to the pandemic. Daniel discussed with City of Albuquerque Chief Financial Officer Sanjay Bhakta concerns about a possible revenue shortfall.

16. Plaintiff did not do a study of the City's sources of revenue or how an unexpected change to those sources might have income/revenue elasticity of demand for fuel during the contract period. Ex. B, Boydstun Dep., 39: 3-12

17. Plaintiff was contacted and asked if they could lower their fuel oil prices in the FY21 agreement because of the chaos with the pandemic; Plaintiff refused.

18. On March 16, 2020, a few days before the termination notice was sent to Plaintiff, the New Mexico Department of Finance and Administration, Local Government Division, issued memorandum BFB #20-04 to allow municipalities to submit their FY/20 budget as their FY/21 rollover budget until a FY/21 budget could be meaningfully forecasted. This "rollover" budget would allow municipalities and other local governments to operate on a month-to-month basis until revenues could be reasonably estimated and an adjusted budget could be proposed to structurally realign the budget to anticipated resources. Council adopted O-20-7, which provided special procedures for the City's FY/21 budget.

19. Attached is the official state FY/21 Budget process and the memo form NM DFA dated March 18, 2020 that was sent to COA and other local governments. This is one day before the 60 day notice of termination of the Contract was sent to Plaintiff. Ex. C.

20. No budget process like this had ever happened before in the history of the City.

21. The Coronavirus Disease 2019 (COVID-19) public health emergency has not only had a devastating impact on the health of individuals throughout the world as well as in the City, and has also had ripple effects on the City's and state's economy and way of life.

22. As a result of this public health emergency, the City had to reassess the revenue impact from FY/20 forward.

23. In March of 2020 the Mayor proposed a rollover budget that only incorporated technical adjustments needed to structurally balance the budget to the FY/20's pre-public health emergency revenue estimations (O-20-31). Council approved the rollover budget on April 13, 2020 and the Mayor signed the budget legislation on April 22, 2020.

24.     On September 3, 2020, the Mayor transmitted legislation to adjust the Fiscal Year 2021 "rollover" budget (O-20-98).  Council approved the adjusted Fiscal Year 2021 budget on October 19, 2020 and the Mayor signed the budget legislation on November 6, 2020.

25.     This time table deviated radically from the normal budgetary process in prior years.

26.     What austerity measures the City would have taken to conserve fuel if forced to buy at the higher prices of is not known to any degree of certainty and would be pure speculation but it is certain there were a wide spectrum of measures the City could have adopted ranging from shortening or even eliminating some bus routes, and reducing bus schedules and run times, reduction in garbage pick ups, etc.

27.     Due to the pandemic, the City purchased less fuel oil during contract period than the years previous.

## III.    DISCUSSION

### A.  THE LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038 (1977). When considering a motion for summary judgment, this Court should grant such motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) states in pertinent part that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c)(2). The movant bears the initial burden of "show[ing] that

there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991) (internal quotation marks omitted). *See Celotex Corp. v. Catrett*, 477 U.S. 317,323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.") (internal quotation marks omitted). Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir.1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.") (internal quotation marks omitted).

    The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256. *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir.1990); *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980) ( "However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but

must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008) (citing Fed.R.Civ.P. 56(e) and *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir.2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.' " *Colony Nat'l Ins. Co. v. Omer*, 2008 WL 2309005, at *1 (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988)).

Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A mere "scintilla" of evidence will not avoid summary judgment. *Vitkus v. Beatrice Co.*, 11 F.3d at 1539. Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251 (quoting *Schuylkill & Dauphin Improv. Co. v. Munson*, 81 U.S. 442, 448 (1871)); *Vitkus v. Beatrice Co.*, 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable ... or is not significantly probative, ... summary judgment may be granted ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (internal citations omitted).

### B. THE CITY PROPERLY INVOKED THE TERMINATION FOR CONVENIENCE CLAUSE AND THEREFORE THERE IS NO BREACH OF CONTRACT

Plaintiff alleges that "[t]he City breached the Contract by terminating it only for the purpose of obtaining more favorable fuel oil pricing elsewhere and then refusing to compensate

Davidson Oil for the monetary losses caused by the termination." (Compl. ¶ 27.) The undisputed material facts in this case demonstrate that the City had a right to terminate the Contract under the termination for convenience clause (TFC).

"A [TFC] clause is generally understood to be a risk-allocating tool, intended to permit a government to 'terminate a contract, even in the absence of fault or breach by the other party, without incurring the usual financial consequences of breach.'" *Mb Oil Ltd., Co. v. City of Albuquerque*, 2016-NMCA-090, ¶ 4 (quoting *Mark Dunning Indus. v. Cheney*, 934 F.2d 266, 267 n.1 (11th Cir. 1991) (*per curiam*)). The use of the TFC was originated by the federal government and dates back to the Civil War. This history is also well articulated in *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1540 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1210 (1997); *see also, A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, 479 Mass. 419, 95 N.E.3d 547, 553-554 (Mass. 2018). Although contracts containing a TFC are subject to state law, state courts—including the New Mexico courts—"have looked to federal case law for guidance in determining whether such a provision was properly invoked in the context of state or local government procurement contracts." *Id.* (collecting the cases). As the New Mexico Court of Appeals noted, "there are good reasons to allow include a nonmutual [TFC] clause in its supply contracts." *Mb Oil*, 2016-NMCA-090, ¶ 17 (internal citation omitted). These good reasons include: (1) the state expressly authorized local governments to include TFC clauses in contracts. *Id.* (citing N.M. Stat. Ann. § 13-1-170(A) (1997)); and (2) since the City "contract[s] for the benefit of its citizens[, t]he flexibility provided by a TFC clause allows it to limit expenditures without binding successor governments to contractual obligations that are not in the best interests of the citizenry." *Id.* at ¶ 18 (citation omitted).

There are limits on the government's right to terminate contracts for convenience "to ensure that government contracts with nonmutual [TFC] clauses are not illusory." *Mb Oil*, 2016-NMCA-090, ¶ 21 (citing *Torncello v. United States*, 681 F.2d 756, 769 (Ct. Cl. 1982)). Courts recognize two (2) competing standards when analyzing whether termination under a TFC clause constitutes a breach. *See id.* The first standard as found by *Torncello* court, in a plurality opinion, announced considers whether the parties experienced changed circumstances, either in the "bargain" or in their own expectations. 681 F.2d at 766. The second standard requires "that the government does not abuse its discretion or act in bad faith." *Mb Oil*, 2016-NMCA-090, ¶ 22 (discussing *Krygoski*, 94 F.3d at 1543). Under either standard the City prevails.

Starting with the second standard first, "[a]ny analysis of a question of Governmental bad faith must begin with the presumption that public officials act conscientiously in discharge of their duties." *Kalvar Corp. Inc. v. United States*, , 211 Ct. Cl. 192, 543 F.2d 1298, (1976), *cert. denied*, 434 U.S. 830 (1977). To overcome this presumption, Plaintiff must produce "clear and convincing" evidence of bad faith on the part of the government. A challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a specific intent to injure the plaintiff by clear and convincing evidence. *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 345 (2013) (citing *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed.Cir.2002)) (internal quotation marks omitted). The record is completely absent of any bad faith on the part of the City.

The second standard concerning change in circumstances is met by the City's evidence that it was reacting to a worldwide pandemic and the threat of a collapsing economy. The price of fuel was only symptomatic of this larger concern.

### C. THE CONTRACT HAS PROPER CONSIDERATION

The doctrine of termination for convenience arose as an exception to the common-law requirement of mutuality of contract. Because of this, there naturally arises a question as to whether a contract containing a termination for convenience clause has sufficient consideration to make the contract valid and binding. While the notion of mutuality of obligation has long been discredited, at a minimum both parties must have made a promise or engaged in a solicited performance in order for a contract to exist. *See* 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, Corbin on Contracts § 6.1, at 204 (rev. ed. 1995). Only where parties do not have this modicum of consideration, their promises are said to be illusory and the contract a mere *nudum pactum*. *Id.* at 207. The mere option to cancel or terminate 'does not wholly defeat consideration', the agreement does not automatically become a *nudum pactum*. Arthur L. Corbin, *The Effect of Options on Consideration*, 34 Yale L.J. 571, 585 (1925). Courts have found consideration present merely through the requirement that the contractor be provided notice in the event of a convenience termination. *See Sylvan Crest Sand & Gravel Co. v. United States*, 150 F.2d 642, 645 (2d Cir. 1945) (government's requirement that it provide reasonable notice of termination was sufficient to fulfill consideration requirement); *Van Engers v. Perini Corp.*, 1993 WL 235911, at *8-9 (E.D. Pa. June 28, 1993) (in a private contract the party must meet the condition precedent of proper notice before the termination for convenience clause bars anticipated future profits or else the contract will be illusory). This fully comports with New Mexico's broad definition of consideration. *See* NMRA, Civ. UJI 13-814 (Consideration; Definition). Not only does the Contract provide a requirement of notice, but the Plaintiff bargained for enlargement of the notice period from 30 days to 60 days. Compare that to, e.g., *Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F. Supp. 1308, 1316 (N.D.N.Y. 1979) (in private contract two-day notice

provision rendered a contract non-illusory and enforceable).  This lengthy notice requirement fully clothes the Contract with consideration so that it is no *nudum pactum*, but fully enforceable.

      In addition, the termination for convenience clause   It reads:

> Termination for Convenience: City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. *In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.*

Ex. A, at ¶ 11.  The ability to terminate for convenience does not constitute lack of consideration where the contract, like the Contract here, requires the City to notify the contractor of the termination and pay for goods and services ordered or accepted by the City prior to the termination date. *See EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447, 1452-53 (10th Cir. 1990) (consideration existed as termination for convenience clause required both notice of termination and provision for convenience termination costs).

   "New Mexico ... has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals." *Berlangieri v. Running Elk Corp.*, 2003–NMSC–024, ¶ 20, 134 N.M. 341, 76 P.3d 1098 (internal quotation marks and citation omitted); *see also Gen. Elec. Credit Corp. v. Tidenberg*, 78 N.M. 59, 62, 428 P.2d 33, 36 (1967) ("[P]ublic policy encourages freedom between competent parties of the right to contract, and requires the enforcement of contracts, unless they clearly contravene some positive law or rule of public morals.").  *See EDO Corp.*, 911 F.2d at 1453 (stating that the court will enforce termination for convenience provision freely entered into by two parties).  The Contract entered into by the Parties had sufficient consideration.

## IV.   CONCLUSION

Defendant's burden in seeking summary judgment to show there was not a breach of contract and there was sufficient consideration for this Contract. Defendant contends that based on the argument and authorities laid out above, that the Defendant had met its burden, and so respectfully request that this court enter summary judgment against Plaintiff Davidson Oil in the Defendant's favor.

WHEREFORE the City of Albuquerque respectfully requests the Court grant its motion for summary judgment, dismiss Plaintiff's case in its entirety, and any other such relief as this Court deems necessary.

Respectfully submitted,

**CITY OF ALBUQUERQUE**
**Esteban A. Aguilar Jr., City Attorney**

*/s/ John E. DuBois*
John E. DuBois
Assistant City Attorney
Devon P. King
Managing Assistant City Attorney
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500 / F: (505) 768-4525
jdubois@cabq.gov
dking@cabq.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this 11th day of March 2022, I served a copy of the foregoing pleading to the party listed below through the Court's case management and electronic filing system ("CM-ECF").

Ross L. Crown
Lewis Roca Rothgerber Christie LLP
201 3rd St NW Ste 500
Albuquerque, NM 87102-3366
505.764.5402
rcrown@lrrc.com

*/s/ John E. DuBois*
John E. DuBois