5057684505        LG Litig. LGJNH06        City of Albuquerque – LG        03:41:00 p.m        03-11-2022        2 /39

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **DAVIDSON OIL COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case No. 1:20-CV-00838-RCB-JHR** |
| | § | |
| **CITY OF ALBUQUERQUE,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT CITY OF ALBUQUERQUE'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM

COMES NOW, the City of Albuquerque, Defendant, (the "City" or "the Defendant") through counsel, and hereby moves for summary judgment. As further grounds for this Motion[1] Defendant states:

### I.  INTRODUCTION

Plaintiff voluntarily participated in a procurement process to provide the City with bulk fuel, resulting in an contract agreement ("Contract"). That Contract did not require the City to purchase any specific amount of fuel from the Plaintiff, and did not contain an exclusivity clause. The City bargained for and expressly reserved the right to terminate the contract at its convenience which it did before any fuel was delivered to the City by the Plaintiff.  The standard notice requirement for termination for convenience by the City was 30 days.  The Plaintiff, however, bargained for and received an enlargement of the notice requirement from 30 days to 60 days.  This is sufficient consideration to make the Contract binding.  The Contract was terminated at time the

---

[1] As allowed by D.N.M.LR-Civ. 7.5(a), the City combined this Motion with the memorandum in support thereof. Moreover, as required by D.N.M.LR-Civ. 7.1(a), the City attempted to settle this motion before it was filed. Undersigned counsel contacted Plaintiff's counsel via telephone on March 9, 2022 to determine if the motion was opposed.  Plaintiff opposes the motion.

5057684505     LG Litig. LGJNH06     City of Albuquerque – LG     03:41:33 p.m     03-11-2022     3 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 2 of 38

extent of COVID-19 virus pandemic's negative impact on City revenues and on City standard operating procedures was becoming known, and oil prices had fallen to unprecedented levels which was symptomatic of a massive downturn of the economy. The world turned upside down, and the City, along with every other institution and person in the country, faced an uncertain future. The City invoked its right under the Contract, to which it and the Plaintiff had freely agreed, to terminate the contract and did so after giving 60 days of notice. The City acted in good faith and only terminated the Contract because it was in the best interests of the City to do so due to the unexpected changed circumstances created by the pandemic and the economic uncertainly it created. Consequently, the City had no obligations to the Plaintiff which the Plaintiff can show were breached. Additionally, the Plaintiff's other two theories of recovery based on breach of implied promise of good faith and fair dealing and promissory estoppel must fail because no breach of the Contract occurred. Therefore, Plaintiff's claims should be dismissed with prejudice.

## II.  UNDISPUTED MATERIAL FACTS

1.      Plaintiff voluntarily participated in a procurement process to provide the City with bulk fuel (diesel and regular unleaded gasoline). Compl. [Doc. 1] at ¶¶ 9-10.

2.      On or about January 21, 2020, the City and the Plaintiff entered into Contract No. SHR000022076 (the "Contract"). Compl. [Doc. 1] at ¶ 11.

3.      The Contract covered a one-year period with deliveries to begin on July 1, 2020, and continue to June 30, 2021. *See* Doc.8-1,  pg. 1

4.      The Contract did not require the City to purchase its fuel from the Plaintiff exclusively. Motion to Dismiss, Ex. A [Doc. 1]

5.      The Contract did not require the City to purchase any set amount fuel from the Plaintiff. Motion to Dismiss, Ex. A [Doc. 8-1]

6.      The Contract in the Terms and Conditions section, ¶ 11, contains a Termination for Convenience clause that states:

> 11. Termination for Convenience: City may terminate the Contract at any time by
> giving at least 60 days' written notice to the Vendor. In such event, vendor shall be
> paid under the terms of the Contract for all goods and/or services provided to and
> accepted by City, if ordered or accepted by City prior to the effective date of
> termination.

Compl. [Doc. 1] at ¶ 13; Ex. A, at ¶ 11.

7.      When Plaintiff was contacted and informed that they won the Procurement Contract. Plaintiff then negotiated for and was granted a change in "Termination for Convenience Clause" that increased the notice requirement from 30 days to 60 days. For almost all COA procurement contracts, the "Termination for Convenience Clause" has the provision for giving notice to terminate a contract as 30 days.

8       The Contract in the Terms and Conditions section, ¶ 11, contains a Termination for Lack of Appropriations clause and it states:

> 11. Termination for Convenience: City may terminate the Contract at any time by
> giving at least 60 days' written notice to the Vendor. In such event, vendor shall be
> paid under the terms of the Contract for all goods and/or services provided to and
> accepted by City, if ordered or accepted by City prior to the effective date of
> termination.

Compl. [Doc. 1] at ¶ 13; Ex. A, at ¶ 11.

9.   Plaintiff did not do a study of the City's sources of revenue or how an unexpected change to those sources might have income/revenue elasticity of demand for fuel during the contract period. Ex. B, Boydstun Dep., 37: 24-25, 38:1-25, 39:1-17.

10.  Plaintiff purchased 12 monthly hedge contracts, on January 30, 2020. Ex. B, Boydstun Dep., 17: 2-7.

11.  The purchase of these hedge contracts by Plaintiff were without the knowledge, consent, permission or participation of the City.

12.  Christopher Daniel, Chief Investment Officer for City, using the Bloomberg Information Service Terminal, does daily reviews of the leading economic indicators including regarding fuel oil prices and other commodities markets.

13.  In addition, every workday, Daniel reviews fixed income investment indicators such as Commercial Paper rates, U.S. Treasury and Agency rates, Overnight Repurchase Agreements rates, credit markets, and other indicators.

14.  In late January 2020, Daniel was reviewing the prices of fuel oil and noticed a precipitous declining trend in fuel oil prices.

15.  The COA budget can be volatile because it is based in large part on gross receipts tax revenue, and retail spending had decreased in the first calendar quarter of 2020 due to the pandemic. Daniel discussed with City of Albuquerque Chief Financial Officer Sanjay Bhakta concerns about a possible revenue shortfall.

16.  Plaintiff did not do a study of the City's sources of revenue or how an unexpected change to those sources might have income/revenue elasticity of demand for fuel during the contract period. Ex. B, Boydstun Dep.,  39: 3-12

5057684505    LG Litig. LG|NH06    City of Albuquerque – LG    03:43:07 p.m.    03-11-2022    6 /39

Case 1:20-cv-00838-RB-JHR    Document 51    Filed 03/11/22    Page 5 of 38

17.     Plaintiff was contacted and asked if they could lower their fuel oil prices in the FY21 agreement because of the chaos with the pandemic; Plaintiff refused.

18.     On March 16, 2020, a few days before the termination notice was sent to Plaintiff, the New Mexico Department of Finance and Administration, Local Government Division, issued memorandum BFB #20-04 to allow municipalities to submit their FY/20 budget as their FY/21 rollover budget until a FY/21 budget could be meaningfully forecasted. This "rollover" budget would allow municipalities and other local governments to operate on a month-to-month basis until revenues could be reasonably estimated and an adjusted budget could be proposed to structurally realign the budget to anticipated resources. Council adopted O-20-7, which provided special procedures for the City's FY/21 budget.

19.     Attached is the official state FY/21 Budget process and the memo form NM DFA dated March 18, 2020 that was sent to COA and other local governments.   This is one day before the 60 day notice of termination of the Contract was sent to Plaintiff. Ex. C.

20.     No budget process like this had ever happened before in the history of the City.

21.     The Coronavirus Disease 2019 (COVID-19) public health emergency has not only had a devastating impact on the health of individuals throughout the world as well as in the City, and has also had ripple effects on the City's and state's economy and way of life.

22.     As a result of this public health emergency, the City had to reassess the revenue impact from FY/20 forward.

23.     In March of 2020 the Mayor proposed a rollover budget that only incorporated technical adjustments needed to structurally balance the budget to the FY/20's pre-public health emergency revenue estimations (O-20-31). Council approved the rollover budget on April 13, 2020 and the Mayor signed the budget legislation on April 22, 2020.

5057684505          LG Litig. LGINH06          City of Albuquerque – LG          03-43-43 p.m          03-11-2022          7 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 6 of 38

24.     On September 3, 2020, the Mayor transmitted legislation to adjust the Fiscal Year 2021

"rollover" budget (O-20-98).  Council approved the adjusted Fiscal Year 2021 budget on October

19, 2020 and the Mayor signed the budget legislation on November 6, 2020.

25.     This time table deviated radically from the normal budgetary process in prior years.

26.     What austerity measures the City would have taken to conserve fuel if forced to buy at the

higher prices of is not known to any degree of certainty and would be pure speculation but it is

certain there were a wide spectrum of measures the City could have adopted ranging from

shortening or even eliminating some bus routes, and reducing bus schedules and run times,

reduction in garbage pick ups, etc.

27.     Due to the pandemic, the City purchased less fuel oil during contract period than the years

previous.

### III.   DISCUSSION

### A. THE LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

The purpose of summary judgment is to avoid a pointless trial in cases where it is

unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d

566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038 (1977). When considering a motion for

summary judgment, this Court should grant such motion "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed.R.Civ.P. 56(c). Rule 56(c) states in pertinent part that summary judgment "should be

rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." Fed.R.Civ. P. 56(c)(2). The movant bears the initial burden of "show[ing] that

there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991) (internal quotation marks omitted). *See Celotex Corp. v. Catrett*, 477 U.S. 317,323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.") (internal quotation marks omitted). Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir.1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.") (internal quotation marks omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule— set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256. *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir.1990); *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980) ( "However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but

must respond with specific facts showing the existence of a genuine factual issue to be tried.'"

(citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions,

allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, 2008 WL

2309005, at *1 (D. Kan. June 2, 2008) (citing Fed.R.Civ.P. 56(e) and *Argo v. Blue Cross & Blue

Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir.2006)). "In responding to a motion for summary

judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not

escape summary judgment in the mere hope that something will turn up at trial.' " *Colony Nat'l

Ins. Co. v. Omer*, 2008 WL 2309005, at *1 (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th

Cir.1988)).

Where a rational trier of fact, considering the record as a whole, could not find for the non-

moving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986). A mere "scintilla" of evidence will not avoid summary judgment.

*Vitkus v. Beatrice Co.*, 11 F.3d at 1539. Rather, there must be sufficient evidence on which the

fact-finder could reasonably find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. at 251 (quoting *Schuylkill & Dauphin Improv. Co. v. Munson*, 81 U.S. 442, 448 (1871));

*Vitkus v. Beatrice Co.*, 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence

is merely colorable ... or is not significantly probative, ... summary judgment may be granted ."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (internal citations omitted).

## B. THE CITY PROPERLY INVOKED THE TERMINATION FOR CONVENIENCE CLAUSE AND THEREFORE THERE IS NO BREACH OF CONTRACT

Plaintiff alleges that "[t]he City breached the Contract by terminating it only for the

purpose of obtaining more favorable fuel oil pricing elsewhere and then refusing to compensate

Davidson Oil for the monetary losses caused by the termination." (Compl. ¶ 27.)  The undisputed material facts in this case demonstrate that the City had a right to terminate the Contract under the termination for convenience clause (TFC).

"A [TFC] clause is generally understood to be a risk-allocating tool, intended to permit a government to 'terminate a contract, even in the absence of fault or breach by the other party, without incurring the usual financial consequences of breach.'" *Mb Oil Ltd., Co. v. City of Albuquerque*, 2016-NMCA-090, ¶ 4 (quoting *Mark Dunning Indus. v. Cheney*, 934 F.2d 266, 267 n.1 (11th Cir. 1991) (*per curiam*)).  The use of the TFC was originated by the federal government and dates back to the Civil War.  This history is also well articulated in *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1540 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1210 (1997); *see also, A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, 479 Mass. 419, 95 N.E.3d 547, 553-554 (Mass. 2018).  Although contracts containing a TFC are subject to state law, state courts—including the New Mexico courts—"have looked to federal case law for guidance in determining whether such a provision was properly invoked in the context of state or local government procurement contracts." *Id.* (collecting the cases). As the New Mexico Court of Appeals noted, "there are good reasons to allow include a nonmutual [TFC] clause in its supply contracts." *Mb Oil*, 2016-NMCA-090, ¶ 17 (internal citation omitted). These good reasons include: (1) the state expressly authorized local governments to include TFC clauses in contracts. *Id.* (citing N.M. Stat. Ann. § 13-1-170(A) (1997)); and (2) since the City "contract[s] for the benefit of its citizens[, t]he flexibility provided by a TFC clause allows it to limit expenditures without binding successor governments to contractual obligations that are not in the best interests of the citizenry." *Id.* at ¶ 18 (citation omitted).

There are limits on the government's right to terminate contracts for convenience "to ensure that government contracts with nonmutual [TFC] clauses are not illusory." *Mb Oil*, 2016-NMCA-090, ¶ 21 (citing *Torncello v. United States*, 681 F.2d 756, 769 (Ct. Cl. 1982)). Courts recognize two (2) competing standards when analyzing whether termination under a TFC clause constitutes a breach. *See id.* The first standard as found by *Torncello* court, in a plurality opinion, announced considers whether the parties experienced changed circumstances, either in the "bargain" or in their own expectations. 681 F.2d at 766. The second standard requires "that the government does not abuse its discretion or act in bad faith." *Mb Oil*, 2016-NMCA-090, ¶ 22 (discussing *Krygoski*, 94 F.3d at 1543). Under either standard the City prevails.

Starting with the second standard first, "[a]ny analysis of a question of Governmental bad faith must begin with the presumption that public officials act conscientiously in discharge of their duties." *Kalvar Corp. Inc. v. United States*, , 211 Ct. Cl. 192, 543 F.2d 1298, (1976), *cert. denied*, 434 U.S. 830 (1977). To overcome this presumption, Plaintiff must produce "clear and convincing" evidence of bad faith on the part of the government. A challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a specific intent to injure the plaintiff by clear and convincing evidence. *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 345 (2013) (citing *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed.Cir.2002)) (internal quotation marks omitted). The record is completely absent of any bad faith on the part of the City.

The second standard concerning change in circumstances is met by the City's evidence that it was reacting to a worldwide pandemic and the threat of a collapsing economy. The price of fuel was only symptomatic of this larger concern.

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    03-46-46 p.m.    03-11-2022    12 /39

Case 1:20-cv-00838-RB-JHR    Document 51    Filed 03/11/22    Page 11 of 38

## C. THE CONTRACT HAS PROPER CONSIDERATION

The doctrine of termination for convenience arose as an exception to the common-law requirement of mutuality of contract. Because of this, there naturally arises a question as to whether a contract containing a termination for convenience clause has sufficient consideration to make the contract valid and binding. While the notion of mutuality of obligation has long been discredited, at a minimum both parties must have made a promise or engaged in a solicited performance in order for a contract to exist. *See* 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, Corbin on Contracts § 6.1, at 204 (rev. ed. 1995). Only where parties do not have this modicum of consideration, their promises are said to be illusory and the contract a mere *nudum pactum. Id.* at 207. The mere option to cancel or terminate 'does not wholly defeat consideration', the agreement does not automatically become a *nudum pactum.* Arthur L. Corbin, *The Effect of Options on Consideration*, 34 Yale L.J. 571, 585 (1925). Courts have found consideration present merely through the requirement that the contractor be provided notice in the event of a convenience termination. *See Sylvan Crest Sand & Gravel Co. v. United States*, 150 F.2d 642, 645 (2d Cir. 1945) (government's requirement that it provide reasonable notice of termination was sufficient to fulfill consideration requirement); *Van Engers v. Perini Corp.*, 1993 WL 235911, at *8-9 (E.D. Pa. June 28, 1993) (in a private contract the party must meet the condition precedent of proper notice before the termination for convenience clause bars anticipated future profits or else the contract will be illusory). This fully comports with New Mexico's broad definition of consideration. *See* NMRA, Civ. UJI 13-814 (Consideration; Definition). Not only does the Contract provide a requirement of notice, but the Plaintiff bargained for enlargement of the notice period from 30 days to 60 days. Compare that to, e.g., *Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F. Supp. 1308, 1316 (N.D.N.Y. 1979) (in private contract two-day notice

provision rendered a contract non-illusory and enforceable). This lengthy notice requirement fully clothes the Contract with consideration so that it is no *nudum pactum*, but fully enforceable.

In addition, the termination for convenience clause   It reads:

Termination for Convenience: City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. *In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.*

Ex. A, at ¶ 11. The ability to terminate for convenience does not constitute lack of consideration where the contract, like the Contract here, requires the City to notify the contractor of the termination and pay for goods and services ordered or accepted by the City prior to the termination date. *See EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447, 1452-53 (10th Cir. 1990) (consideration existed as termination for convenience clause required both notice of termination and provision for convenience termination costs).

"New Mexico ... has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals." *Berlangieri v. Running Elk Corp.*, 2003–NMSC–024, ¶ 20, 134 N.M. 341, 76 P.3d 1098 (internal quotation marks and citation omitted); *see also Gen. Elec. Credit Corp. v. Tidenberg*, 78 N.M. 59, 62, 428 P.2d 33, 36 (1967) ("[P]ublic policy encourages freedom between competent parties of the right to contract, and requires the enforcement of contracts, unless they clearly contravene some positive law or rule of public morals."). *See EDO Corp.*, 911 F.2d at 1453 (stating that the court will enforce termination for convenience provision freely entered into by two parties). The Contract entered into by the Parties had sufficient consideration.

5057684505   LG Litig. LGLNH06       City of Albuquerque – LG        03:47:59 p.m.    03–11–2022      14 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 13 of 38

## IV.   CONCLUSION

Defendant's burden in seeking summary judgment to show there was not a breach of contract and there was sufficient consideration for this Contract has been met. Defendant contends that based on the argument and authorities laid out above, that the Defendant had met its burden, and so respectfully request that this court enter summary judgment against Plaintiff Davidson Oil in the Defendant's favor.

WHEREFORE the City of Albuquerque respectfully requests the Court grant its motion for summary judgment, dismiss Plaintiff's case in its entirety, and any other such relief as this Court deems necessary.

Respectfully submitted,

**CITY OF ALBUQUERQUE**
**Esteban A. Aguilar Jr., City Attorney**

*/s/ John E. DuBois*
John E. DuBois
Assistant City Attorney
Devon P. King
Managing Assistant City Attorney
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500 / F: (505) 768-4525
jdubois@cabq.gov
dking@cabq.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this 11th day of March 2022, I served a copy of the foregoing pleading to the party listed below through the Court's case management and electronic filing system ("CM-ECF").

Ross L. Crown
Lewis Roca Rothgerber Christie LLP
201 3rd St NW Ste 500
Albuquerque, NM 87102-3366
505.764.5402
rcrown@lrrc.com

*/s/ John E. DuBois*
John E. DuBois

Case 1:20-cv-00838-RB-JHR    Document 51    Filed 03/11/22    Page 15 of 38

Exhibit A

**City of Albuquerque**
**Procurement Contract**

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
|---|---|
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 1 of 7 | |

**Description: Purchase and Delivery of Fuel**

| ITEM # | ITEM DESCRIPTION | Category | QTY | UOM | UNIT PRICE |
|---|---|---|---|---|---|
| 1 | Unleaded Regular Gasoline (Per Gallon) | 92845 | - | GAL | 1.7732 |
| 2 | No. 2 Diesel (Per Gallon) | 92845 | - | GAL | 1.9798 |
| 3 | Emergency Fee (Per Hour) | 92845 | - | HR | 80.00 |
| 4 | Non Emergency Fee After Hours Fee (Per Hour) | 92845 | - | HR | 80.00 |
| 5 | Holiday Deliver Fee (Per Hour) | 92845 | - | HR | 80.00 |
| 6 | Unleaded Regular Gasoline Federal Lust Tax | 92845 | - | EA | 0.001 |
| 7 | No. 2 Diesel Federal Lust Tax | 92845 | - | EA | 0.001 |
| 8 | Diesel B5 Federal Lust Tax | 92845 | - | EA | 0.001 |
| 9 | Unleaded Regular Gasoline Federal Oil Spill Recovery Tax | 92845 | - | EA | 0.002143 |
| 10 | No. 2 Diesel Federal Oil Spill Recovery Tax | 92845 | - | EA | 0.002143 |
| 11 | Diesel B5 Federal Oil Spill Recovery Tax | 92845 | - | EA | 0.0020358 |
| 12 | Unleaded Regular Gasoline NM Gas Excise Tax | 92845 | - | EA | 0.17 |
| 13 | No. 2 Diesel NM Gas Excise Tax | 92845 | - | EA | 0.21 |
| 14 | Diesel B5 NM Gas Excise Tax | 92845 | - | EA | 0.21 |
| 15 | Unleaded Regular Gasoline NM UST Clean-up Tax | 92845 | - | EA | 0.01875 |
| 16 | No. 2 Diesel NM UST Clean-up Tax | 92845 | - | EA | 0.01875 |
| 17 | Diesel B5 NM UST Clean-up Tax | 92845 | - | EA | 0.01875 |
| 18 | Unleaded Regular Gasoline Environmental Fee | 92845 | - | EA | 0.01875 |
| 19 | No. 2 Diesel Environmental Fee | 92845 | - | EA | 0.01875 |
| 20 | Diesel B5 Environmental Fee | 92845 | - | EA | 0.01875 |
| 21 | Unleaded Regular Gasoline Pump off Fee (CPG) | 92845 | - | EA | 0.0063 |
| 22 | No. 2 Diesel Pump off Fee (CPG) | 92845 | - | EA | 0.0067 |
| 23 | Diesel B5 Pump off Fee (CPG) | 92845 | - | EA | 0.0067 |
| 24 | Unleaded Regular Gasoline Tank Wagon Delivery | 92845 | - | EA | 0.25 |
| 25 | No. 2 Diesel Tank Wagon Delivery | 92845 | - | EA | 0.25 |
| 26 | Unleaded Regular Gasoline Transport Delivery | 92845 | - | EA | 0.0268 |
| 27 | No. 2 Diesel Transport Delivery | 92845 | - | EA | 0.0302 |

**Term: 07/01/2020 - 06/30/2022**

**The term of the contract shall be for two (2) years, with two (2) one (1) year options to renew. Renewal is at the discretion of the City and shall be by mutual written agreement of both parties.**

Purchasing Office Signature:

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     03:49:55 p.m     03-11-2022     17 /39

Case 1:20-cv-00838-RB-JHR    Document 51    Filed 03/11/22    Page 16 of 38

**City of Albuquerque**
**Procurement Contract**

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
|---|---|
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 2 of 7 | |

**Pricing:**
Pricing submitted for City-wide fuel usage, to include that of the Solid Waste Department, Transit Department, Department of Finance and Administrative Services, Fleet Division, and other City departments as needed shall remain firm throughout the first year term beginning July 1, 2020 and ending June 30, 2021, pricing for year 2 term beginning July 1, 2021 and ending June 30, 2022 shall be provided to the City by December 31, 2020.

**Price Escalation:**
At any time prior to, but not less than ninety (90)-days prior to each renewal period, the City may request and Davidson Oil shall provide a written indication of its fixed pricing for the renewal period, based on market conditions or changes to taxes. The City will then have seven (7) calendar days to decide on the renewal. Up to the time the renewal decision is made, the City reserves the right to request additional pricing indications up to the 90-day limit. The City reserves the right to cancel the contract and solicit a new contract if a requested price is unacceptable to the City. Cancellation of the contract shall not affect any outstanding orders.

**Invoicing/Payment:**
1) Invoicing will contain, at a minimum, unit price, delivery date, delivery location, contract number, Purchase Order Release (POR)number, number of net gallons and fuel type delivered, any applicable fees and taxes, and location delivered.

2) Each department from the City will provide one POR each for diesel fuel and unleaded fuel. The amounts on each POR will be based on estimated dollar usage and will not reflect a bulk order at the time of dispatch of the POR. The City will be responsible for updating the POR as needed.

3) No additional taxes, fees, costs or terms that were not include
ed in the original Bid shall be added to invoices.

4) Payment terms shall be Net 30.

5) Invoices should be sent through the City's electronic invoice service provider Transcepta.

**Bill of Lading:**
An original Bill of Lading shall be provided by Davidson Oil with every shipment containing the following information:
- Bill of Lading Number
- Deliver Date/Time (Hour/Minute)
- Customer Name and Address
- Truck Number with License Plate
- Product code and name
- Bio-diesel blending data
- Fuel terminal name/number
- Carrier Name

Purchasing Office Signature:

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     03:51:08 p.m.     03-11-2022     18 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 17 of 38

## City of Albuquerque
## Procurement Contract

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
|---|---|
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 3 of 7 | |

- Temperature
- Signature of authorized City of Albuquerque Employee
- Signature of Driver
- Gravity at 60 degrees
- StickReading Before and After delivery
- Net Gallons
- Gross Gallons
- Description
- Octane Rating
- Oxygenate Concentration (Volume %), as applicable

**Delivery:**
Deliveries of ordered product must be made within twenty-four (24)hours of order placement, and during normal operating hours (Monday thru Friday -7:30AM - 3:00) for the ordering entity, unless different parameters are mutually agreed upon, in writing, between Davidson Oil and the City's authorized representatives. Any shipment to the City or other entity that is under contract to the City via Memorandum of Understanding (MOU), which is delayed due to the fault of Davidson Oil shall be paid for at the originally ordered quoted price. The City will pay only for net gallons.

**Fuel Quality:**
Fuel furnished under the contract shall be visibly free of un-dissolved water, sediment and suspended matter, and shall be clear and bright at ambient temperatures of 70 degrees F. The finished gasoline shall conform to the applicable test methods of ANSI/ASTM specifications and shall meet EPA standards and regulations for Bernalillo County as outlined in ASTM D4814-92A, or the latest revision thereof.

**Required Fuel Types** - Davidson Oil is required to furnish the following fuel types:

**Unleaded Regular Gasoline** - All fuel shall meet ASTM 4814-14B, or latest revision, and shall be unleaded anti-knock index (RON+MON)/2, and shall not have an octane level less than 86 with reductions for altitude allowed per ASTM specifications for North 34degree latitude.

**No. 2 Diesel** - All fuel shall meet ASTM D975-15A, or latest revision. All diesel fuel shall not have a cetane level of less than 40.

**Testing:**
Should there be any question as to the quality of fuel furnished under the contract, the City reserves the right to require testing of products furnished. If it is determined that any products purchased do not meet the specifications provided herein, the product shall be picked up immediately by Davidson Oil and a full credit shall be given to the City. Testing shall be ordered by the City using a certified laboratory. If City vehicles require repairs to the fueling system or engine as a result of using fuels provided under the contract awarded, Davidson Oil shall be liable for any consequential damages

Purchasing Office Signature:

*Jennifer Lee Bradley*

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     03:52:21 p.m     03-11-2022     19 /39

Case 1:20-cv-00838-RB-JHR    Document 51    Filed 03/11/22    Page 18 of 38

**City of Albuquerque**
**Procurement Contract**

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
|---|---|
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 4 of 7 | |

including fees or charges incurred for testing if product fails and all repairs necessary to return any City vehicles affected to good, operating condition.

**Responsibility for Contaminated Fuel:**
In the event contaminated fuel is delivered to the City, or cross contamination occurs during delivery, Davidson Oil shall be responsible for the immediate removal and replacement of the contaminated product at no cost to the City. Should Davidson Oil fail to take immediate action, the City may contract with a third party to accomplish the required cleanup actions and will hold Davidson Oil responsible for the cost incurred plus legal fees, attorney costs and court costs.

**Spillage:**
Davidson Oil shall take all necessary precautions to prevent spillage of products during delivery. Proper equipment maintenance, regular inspection and, when necessary, the use of collection pans during the fuel transfer will be employed to avoid leaks and/or spills. In the event of a spill, Davidson Oil shall be responsible for the immediate containment, mitigation of spill and cleanup of the spilled product at no cost to the City. Should Davidson Oil fail to take immediate action, the City may contract with a third party to accomplish the required control actions and will hold Davidson Oil responsible for the cost incurred plus legal fees, attorney costs and court costs.

**Emergency, After Hours or Holiday Deliveries:**
The City may require fuel deliveries outside of normal operating hours (herein defined as 7:30AM - 3:00 PM Monday through Friday). Should a fuel delivery outside of the normal operating hours be required, an authorized City representative will contact Davidson Oil with instructions on delivery time, location, address, product needed, number of gallons for delivery and the contact person's name and phone number. Emergency deliveries are defined as requests to deliver within four (4) hours of a call to Davidson Oil or deliveries required by a natural or man-made disaster. In the case of holidays, the City will use its best efforts to avoid such requests by employing proper management and oversight procedures.

**Licensing and Regulations:**
Davidson Oil shall be fully licensed as may be required by local, state and federal regulations and shall comply at all times with local, state and federal rules, regulations, laws, ordinances and statutes in the performance of the contract awarded. Failure to do so may be deemed a material breach of contract and constitute cause for immediate termination of the contract at the sole discretion of the City.

**Shortage:**
If Davidson Oil foresees a shortage of gasoline and/or diesel supplies during the term of the contract awarded, it must allocate quantities of product, as determined by the City, to support the City¿s requirements. Davidson Oil shall notify the City in writing of an anticipated shortage as soon as it becomes aware. The City may elect, for public safety reasons, to reserve a specific quantity
and delivery schedule for which Davidson Oil will be required to provide.

**Locations, Capacity and Fuel Schedule:**

| Purchasing Office Signature: |
|---|
| *Jennifer Lee Bradley* |

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    03:53:45 p.m.    03-11-2022    20 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 19 of 38

## City of Albuquerque
### Procurement Contract

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
|---|---|
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 5 of 7 | |

Fuel deliveries to the City may not exceed ninety percent (90%) of the tank capacity. Before the fuel drop is made, a dipstick reading must be taken and documented and if a Veedor Root is available, a reading shall be taken.

The City reserves the right to add or discontinue fuel locations and add, remove, or change tank sizes and types over the course of the contract awarded. The City will provide written notification of any such changes.

<u>Compliance with Law:</u>
Davidson Oil shall comply with all federal, state, county, and local regulations relevant to the delivery of fuels requested under the awarded contract when delivering. Vapor recovery is required on all fuel delivered in Bernalillo County. It is Davidson Oil's responsibility to adhere to this and all other applicable regulations. In the event of a fine being levied for Davidson Oil's failure to adhere to any of regulations, the successful Bidder shall be responsible for the payment of said fine.



Purchasing Office Signature:

*Jennifer Lee Bradley*

5057684505   LG Litig. LGLNH06      City of Albuquerque – LG      03-54-46 p.m.   03–11–2022      21 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 20 of 38

**City of Albuquerque**
**Procurement Contract**

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| | |
|---|---|
| Contract ID | SHR000022076 |
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 6 of 7 | |

**Instructions to Supplier:**

- Do not fill orders for goods/services not listed in this Procurement Contract.
- Orders against this Procurement Contract must be placed with a Purchase Order Release (POR).
- Do not fill orders without a POR.
- POR number must be on all invoices.

**Please forward all original invoice(s) to:**
**City of Albuquerque**
**Accounting Division**
**PO Box 1985**
**Albuquerque, NM 87103**

**Instructions to End-User:**
Do Not place orders for goods/services not listed on this Procurement Contract.
To place an order against this Procurement Contract, issue a POR prior to placing the order with the Supplier.

IMPORTANT NOTICE:  BY COMMENCING WORK UNDER THIS PROCUREMENT CONTRACT, SUPPLIER ACCEPTS ALL TERMS AND CONDITIONS WITHIN AND ATTACHED TO THIS PROCUREMENT CONTRACT AND AGREES THAT, TO THE EXTENT ANY VENDOR TERMS CONFLICT, THE CITY'S TERMS AND CONDITIONS SHALL GOVERN.  VALID ONLY WITH OFFICIAL CITY OF ALBUQUERQUE PURCHASING DIVISION SIGNATURE.  WHEN ACCEPTING A HAND-CARRIED PROCUREMENT CONTRACT, SUPPLIER SHOULD CALL THE PURCHASING DIVISION TO CERTIFY THE VALIDITY OF THE PROCUREMENT CONTRACT OR REQUEST PHOTO IDENTIFICATION FROM THE PERSON PRESENTING THE PROCUREMENT CONTRACT AND MAINTAIN FOR ITS RECORDS THE DRIVER'S LICENSE NUMBER, SOCIAL SECURITY NUMBER, OR CITY ID NUMBER OF THAT PERSON.  THE CITY WILL NOT BE LIABLE FOR PURCHASES MADE BY UNAUTHORIZED INDIVIDUALS.   CALL 505-768-3320 WITH ANY QUESTIONS.

Purchasing Office Signature:

Exhibit A

## CITY OF ALBUQUERQUE TERMS AND CONDITIONS

Direct all inquiries to: City of Albuquerque, Purchasing Division, P.O. Box 1293, Albuquerque, NM 87103 or call (505) 768-3320.

**1. Contract:** By commencing work, vendor accepts all Terms and Conditions herein and agrees that, to the extent vendor terms conflict, these Terms and Conditions shall govern. These Terms and Conditions and any non-conflicting vendor terms and conditions shall constitute the Contract.

**2. Invoicing:** Department name AND purchase order number MUST be on all invoices, packing slips, shipping notices, freight bills, and correspondence concerning the order. **Send invoice original and duplicate to: Accounting. P.O. Box 1985, Albuquerque, NM 87103.**

**3. Payment:** City's payment terms are net 30 days unless otherwise stated. City shall not pay late fees, finance fees, or collection fees. Any vendor that accepts payments by credit card on behalf of City must be Payment Card Industry Data Security Standard compliant.

**4. FOB Destination and Inspection:** The risk of loss, injury and destruction, and legal title to the goods remains with vendor until the goods reach the location of the City. All goods delivered are subject to inspection upon receipt by City. Department's count will be accepted by vendor as final and conclusive on all shipments not accompanied by a packing slip. All rejected goods shall remain the property of vendor and will be returned at vendor's expense.

**5. Taxes:** Vendor is responsible for determining whether taxes are applicable to the order and for payment of the tax. Applicable taxes are to be included in each invoice due and may not be billed more than sixty (60) days after providing the goods or services to which the taxes apply.

**6. Warranty:** Vendor warrants that the goods and services furnished shall (a) conform to the specifications; (b) be free from defects in materials and workmanship; (c) be suitable for the purpose intended; (d) be new and of most current production; (e) be free from security interests or liens; and (f) not infringe upon or violate any copyrights or patent rights.

**7. Insurance:** Vendor agrees to comply with its state's law pertaining to workers' compensation benefits for its employees. If vendor fails to comply with the applicable workers compensation law when required to do so, the Contract may be terminated by City. Vendor also agrees to procure and maintain the insurance at https://www.cabq.gov/dfa/purchasing/vendor-services/general-instructions-terms-and-conditions (Section 28) and any additional insurance coverage requested by City.

**8. Default:** City reserves the right to cancel all or any part of the Contract without cost to the City if vendor fails to meet the provisions of the Contract and, and except as otherwise provided herein, to hold Vendor liable for any excess cost incurred by City due to vendor default.

**9. Force Majeure:** Neither Vendor nor City shall be liable for failure to perform its obligations under the Contract due to causes beyond the control and without the fault or negligence of either party. Such causes include, but are not restricted to, acts of God or the public enemy, acts of the State or federal government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather and defaults of subcontractors due to any of the above, unless City shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit vendor to meet the required delivery scheduled. The rights and remedies of the City provided in this paragraph shall not be exclusive and are in addition to any other rights now being provided by law or under the Contract.

**10. Termination for Lack of Appropriations:** Notwithstanding any provision in the Contract to the contrary, payments hereunder are contingent upon the Albuquerque City Council making the necessary appropriations. If sufficient appropriations are not made, the Contract may be terminated at the end of City's' then current fiscal year upon written notice given by City to vendor. Such event shall not constitute an event of default and any payment obligations of City and all of its interest in the Contract will cease upon the date of termination. City's determination regarding appropriation shall be accepted by vendor and shall be final.

**11. Termination for Convenience:** City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

**12. Contract Changes:** In no case shall the Contract be changed without the prior written approval of City's Chief Procurement Officer.

**13. Assignment:** Neither the Contract, nor any interest therein, nor claim thereunder, shall be assigned or transferred by vendor, except as expressly authorized in writing by City's Chief Procurement Officer or designee. No such assignment or transfer shall relieve vendor from the obligations and liabilities under the Contract.

**14. City Furnished Property:** City furnished property shall be returned to City upon request in the same condition as received except for ordinary wear, tear, and modifications ordered hereunder.

**15. Indemnity:** Vendor agrees to defend, indemnify and hold harmless City from any and all claims, actions, suits or proceedings brought against City because of any injury or damage received or sustained by any person or property arising out of or resulting from the Contract or by reason of any asserted act or omission, neglect or misconduct of vendor or its agents or employees or any subcontractor or its agents or employees. This indemnity shall not be limited by reason of the specification of any particular insurance coverage in the Contract. City shall not indemnify vendor.

**16. Debarment, Suspension, Ineligibility and Exclusion Compliance:** Vendor certifies (a) that it has not been debarred, suspended or otherwise found ineligible to receive funds by any agency of the executive branch of the federal government, the State of New Mexico, any local public body of the State, or any state of the United States; and (b) should any notice of debarment, suspension, ineligibility or exclusion be received by vendor, vendor will notify City immediately.

**17. Conflict of Interest:** No officer, agent or employee of City will participate in any decision relating to the Contract which affects that person's financial interest, the financial interest of his or her spouse or minor child or the financial interest of any business in which he or she has a direct or indirect financial interest.

**18. Interest of Contractor:** Vendor agrees that it presently does not have, and shall acquire no direct or indirect interest which conflicts in any manner or degree with the performance of the terms of the Contract. Vendor will not employ any person who has any such conflict of interest to assist Vendor in performing the services.

**19. No Collusion:** Vendor represents that it has entered into the Contract without collusion on the part of Vendor with any person or firm, without fraud and in good faith. Vendor also represents that no gratuities, in the form of entertainment, gifts or otherwise, were, or during the term of the Contract, will be offered or given by vendor or any agent or representative of vendor to any officer or employee of the City with a view towards securing the Contract or for securing more favorable treatment with respect to making any determinations with respect to performing the Contract.

**20. Audits and Inspections:** At any time during normal business hours and as often as City may deem necessary, there shall be made available to City for examination all of vendor's records with respect to all matters covered by the Contract. Vendor shall permit City to audit, examine, and make excerpts or transcripts from such records, and to make audits of all contracts, invoices, materials, payrolls, records of personnel, conditions of employment and other data relating to all matters covered by the Contract. Vendor understands and will comply with City's Accountability in Government Ordinance, §2-10-1 et seq. and Inspector General Ordinance, §2-17-1 et seq. R.O.A. 1994, and also agrees to provide requested information and records and appear as a witness in hearings for City's Board of Ethics and Campaign Practices pursuant to Article XII, Section 8 of the Albuquerque City Charter.

**21. Compliance With Ethics Provisions:** Vendor certifies that it has not, either directly or indirectly, entered into action in restraint of free competitive bidding and is in compliance with the Ethical Conduct provisions of City's Public Purchases Ordinance. 5-5-22 R.O.A 1994.

**22. Non-discrimination:** In performing the Contract, vendor shall comply with the Federal Civil Rights Act of 1964 and Title VII of the Act and the Americans with Disabilities Act of 1990.

**23. Compliance With Laws:** In performing the Contract vendor shall comply with all applicable laws, ordinances and codes of the federal, state and local governments.

**24. Governing Law:** The Contract is governed by the laws of the State of New Mexico and the City of Albuquerque. The venue for actions arising out of the Contract is Bernalillo County, New Mexico.

**25. Federal Funding:** Procurements involving the expenditure of federal funds may be subject to mandatory applicable federal law and regulations.

Version Date: August 2018

Exhibit B

Davidson Oil Company v. City of Albuquerque
Jayson Boydstun

December 16, 2021
No. 1:20-CV-00838-RCB-JHR

Page 11

1    margin, that Davidson Oil would like to protect, and

2    arrived at -- at a price to present to the City.

3        Q.    And what -- what was that margin?

4        A.    The margin that Davidson Oil was looking

5    at to obtain was two cents -- two cents per gallon.

6        Q.    Would it be fair to say take Davidson

7    Oil -- again, we're just at the bid -- we're just at

8    the very beginning of the bid process, but Davidson

9    Oil was looking to make two cents a gallon profit,

10   is what they were --

11       A.    Yes, that was what we were -- that was

12   what we set out to make, yes, sir.

13       Q.    Well -- and I'm going to do this anyway,

14   I'm going to skip ahead just a little bit, but we'll

15   go back.  All right?

16       A.    Okay.

17       Q.    Eventually, a contract was signed in

18   January of 2020, is that your understanding?

19       A.    Yes.

20       Q.    And the contract with the City of

21   Albuquerque between Davidson Oil and -- and the City

22   was to cover a period between July of 2020, right?

23       A.    Yes.

24       Q.    July 1st to the end of June of 2021; is

25   that correct?

Davidson Oil Company v. City of Albuquerque                                    December 16, 2021
Jayson Boydstun                                                              No. 1:20-CV-00838-RCB-JHR

Page 14

1      Mr. Boydstun.

2          A.     I was going to answer, I would not know.

3      I don't have the information for what the City did

4      during that time period.

5          Q.     (Mr. Dubois) Let me ask you, on the years

6      that you looked at in order to develop your bid, was

7      there a worldwide pandemic going on during -- during

8      those years?

9          A.     No, there was not.  And there was not --

10     no, there was not.

11         Q.     All right.  Okay.  So Davidson Oil is

12     chasing $107,000 profit, so you're going to come up

13     with hedge fund contracts, right?  You're working

14     with an expert on that; is that correct?

15         A.     That is correct.

16         Q.     All right.  And, so, describe, for me,

17     just as a ignorant layperson, what the strategy was.

18         A.     Can you clarify what -- when you're refer

19     to "the strategy," the strategy for what?

20         Q.     How does the hedge contract protect

21     Davidson Oil in -- in making a bid on this

22     Albuquerque contract if it was awarded?

23         A.     Well, the -- the City asked for a firm,

24     fixed price for that 12 months.  So, in order to

25     provide a firm, fixed price, you have to go to the

Page 17

1    Q.    But you ended up purchasing 12 separate

2    hedge contracts, one for each month?

3    **A.    One for each month, yes, sir.  We have to**

4    **do that because the market settles on a monthly**

5    **basis, so you have to have -- each contract settles**

6    **monthly.**

7    Q.    Okay.  So tell me, what does a

8    contract -- what would the contract bind -- bind

9    Davidson Oil to do?  And you could pick a sample

10   month -- let's say, September -- for the month of

11   September 2020, what was, you know, Davidson Oil --

12   what did the contract insist that Davidson Oil do?

13   **A.    So this is a pure -- purely a paper and**

14   **financial transaction at this point.  So what it**

15   **bound Davidson to do was to -- based upon the amount**

16   **of gallons for that -- that month, we're obliged to**

17   **settle with the market at that price, be it above or**

18   **below our fixed price.  So using your -- your**

19   **example of gasoline at 1.75, if that's our price in**

20   **the market, we have to guarantee the market that**

21   **we're going to pay 1.75 for that gas.**

22   Q.    All right.

23   **A.    So, if the market -- the market drops to**

24   **1.70, Davidson is obligated to pay that five-cent**

25   **difference to the market at that point.  If the**

Page 22

1     **A.**    **May you restate the question, please.**

2     Q.    (Mr. Dubois) Were you -- at the time you

3    were analyzing the -- I mean, for Davidson Oil, the

4    contract, were you unaware that the City of

5    Albuquerque could, under the terms of the contract,

6    purchase fuel oil from other sources?

7         MR. CROWN:  Same objection.

8     **A.**    **Was I aware?**

9         MR. DUBOIS:  Did the court reporter

10    get that?

11    (Note:  Reporter responds, and reads back the answer

12       and question.)

13     Q.    (Mr. Dubois) Yes, that's my question,

14    were you aware of that?

15     **A.**    **No.**

16     Q.    All right.  Now, as part of your

17    analysis, do you know what Bayesian statistics

18    are -- B-A-Y-E-S-I-A-N?

19     **A.**    **No.**

20     Q.    Bayesian statistics, it's a common --

21    okay.  As part of your analysis, did you -- did you

22    do a statistical analysis of the probabilities

23    that -- that the City of Albuquerque's demand for

24    fuel oil -- total amount of fuel oil could go down

25    from the averages that you were using in order to

Davidson Oil Company v. City of Albuquerque                     December 16, 2021
Jayson Boydstun                                         No. 1:20-CV-00838-RCB-JHR

Page 23

1       buy the hedge fund contracts and -- and to calculate

2       your profit, and all that?

3           A.    No, we did not.

4           Q.    So your assumption was that two previous

5       years would -- was the best indicator for what

6       the -- the future calendar year would be, and that

7       was your -- that was your presumption for all of

8       your analysis; is that correct?

9           A.    That is correct.

10          Q.    So how much did these hedge funds

11      contracts end up costing Davidson Oil -- because you

12      mentioned that some months they might actually make

13      money, and then some months, they might, you know,

14      end up paying money -- just on the hedge contracts?

15          A.    Can you clarify what you mean by "cost."

16          Q.    Yeah, out-of-pocket expenses to Davidson

17      Oil.

18          A.    The total loss that Davidson Oil incurred

19      with these hedge fund contracts over that 12-month

20      period was $601,858.99.

21          Q.    Would that have occurred -- that -- that

22      loss, I'm just going to round it off, 601,000 --

23      have occurred regardless of whether or not the

24      contract had been terminated?

25          A.    When you ask about "terminated,"

Davidson Oil Company v. City of Albuquerque
Jayson Boydstun

December 16, 2021
No. 1:20-CV-00838-RCB-JHR

Page 24

1      terminated when?

2          Q.    Well, in March of 2020, as -- in other

3      words, it turned out, correct, that the City of

4      Albuquerque didn't purchase any fuel oil from

5      Davidson Oil during the period of July the 1st of

6      2020 to June 30th of 2021, correct?

7          A.    That is correct.

8          Q.    Did that make any difference in -- I

9      mean, the hedge fund contracts weren't based on

10     whether or not a third-party was going to -- on what

11     the City of Albuquerque was doing, correct?

12         A.    If you're referring, specifically, to the

13     hedge -- no, it does not rely upon what the City

14     ultimately did.  But the City engaged Davidson Oil

15     with a legitimate contract to provide them with a

16     fixed price from July of 2020 through June of '21,

17     and in order to perform that contract, Davidson Oil

18     entered into hedge contracts to provide the City the

19     fixed price that they asked for.

20         Q.    And that resulted in Davidson Oil losing

21     $601,000 chasing a profit of $107,000, is that a

22     fair statement?

23         A.    The two are not correlated, no, sir.  You

24     can't draw a correlation between what the -- what

25     the hedge did and what the profits of Davidson Oil

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    04:01:27 p.m.    03-11-2022    29 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 28 of 38

Davidson Oil Company v. City of Albuquerque         December 16, 2021
Jayson Boydstun                                         No. 1:20-CV-00838-RCB-JHR

Page 37

1      A.    Yes.

2      Q.    And -- and what's -- your understanding

3   is the same as mine, basically what that is, is,

4   it's a measurement that economists use to measure --

5   the measurement of the sensitivity of a consumer to

6   changes in price as to how much that they will buy

7   of a certain commodity, correct?

8      **A.    Correct.**

9      Q.    Did you do any calculations, or was it

10   part of your formula, to try to calculate what the

11   elasticity of the demand of the City of Albuquerque

12   was for fuel oil?

13      **A.    No. Part of our calculation included**

14   **looking at the market differential for the City of**

15   **Albuquerque, or the Albuquerque racks in particular,**

16   **which would have included some of that elasticity**

17   **depending on if the market was under or**

18   **over-supplied at that point in time. But**

19   **specifically saying, "Let's look and see if it**

20   **changes here in each month," no, there was no**

21   **elasticity of demand included in our formula.**

22      Q.    And you're familiar just with the basics

23   of -- the supply and demand curve?

24      **A.    Yes.**

25      Q.    And the elasticity of demand is really

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    04:02:04 p.m.    03–11–2022    30 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 29 of 38

Davidson Oil Company v. City of Albuquerque        December 16, 2021
Jayson Boydstun                                       No. 1:20-CV-00838-RCB-JHR

Page 38

1     kind of the measurement of the slope of the demand

2     curve, correct?

3     **A.**    **Correct.**

4     Q.    At no time did you assume that the -- the

5     demand curve for fuel oil for the City of

6     Albuquerque was -- was completely vertical, did you?

7     **A.**    **No.**

8     Q.    So -- so you realize that the City of

9     Albuquerque -- the amount of fuel oil the City of

10    Albuquerque would -- would purchase would be

11    dependent upon the -- the price it would have to

12    pay, correct?

13    **A.**    **Well, I would have to argue that the City**

14    **asked for a firm, fixed price so the City knew the**

15    **price they were going to pay, so why would the**

16    **demand elasticity be involved?**

17    Q.    Good question. And -- but since I'm

18    asking the questions, I don't get to answer. But

19    let me ask you this: It's not just, in a sense,

20    that it measures sensitivity to changes in price,

21    but it could also measure sensitivity to revenue

22    sources, right, how much money I -- I have. In

23    other words, the price of a commodity could stay the

24    same but if my income goes down, I still might want

25    to purchase less of that -- of that product, even

Davidson Oil Company v. City of Albuquerque                    December 16, 2021
Jayson Boydstun                                               No. 1:20-CV-00838-RCB-JHR

Page 39

1      though it's stayed at the same price, correct?

2          A.    That's correct.

3          Q.    What studies did you do on the -- or what

4      the City of Albuquerque's revenue sources were?

5          A.    We -- we did not feel that those were

6      relevant to our analysis of providing the City with

7      a bid price for their fuel oil. The assumption is

8      that the City was asking for a price in order to

9      formulate their budget for the upcoming year. And

10     that's typically why people ask for a fixed price,

11     is able to put a budgeted price, and that's what

12     they budget.

13         Q.    Would you take a look again at Exhibit 2

14     of -- of the -- that's been provided to you, which

15     is the -- which you've identified as being the

16     executed contract --

17         A.    Yes, sir.

18         Q.    -- to Davidson Oil and the City of

19     Albuquerque. Would you look at paragraph 10.

20         A.    Yes, sir.

21         Q.    The terms and conditions on that.

22         A.    Umm-hmm.

23         Q.    What was your understanding of -- of that

24     paragraph, how it operated?

25         A.    It's -- it goes into the budgeting

Davidson Oil Company v. City of Albuquerque
Jayson Boydstun

December 16, 2021
No. 1:20-CV-00838-RCB-JHR

Page 44

1    that we paid in interest to be able to fund the

2    market requirements of the hedge contract.  And then

3    there were anticipated fuel profits and

4    transportation profits that we're -- you know, we're

5    seeking damages for.

6         Q.    And how much were those?

7         A.    The fuel profits, 107,567, and then we

8    had freight profits, the $62,154.

9         Q.    Again, those freight profits were

10   predicted on the basis that the City of Albuquerque

11   would buy the same, or more, total amount of fuel

12   oil from it?

13        A.    Right.

14        Q.    As it had on the average of the two

15   previous years, correct?

16        A.    That is correct.  Yes.

17        Q.    What other losses, or damages, do you

18   claim?

19        A.    Those are all the claim -- I mean, the

20   claimed damages that we can -- I mean, we have other

21   expenses that -- that are not allowed.

22        Q.    And do you have, handy, a -- I could have

23   done it myself, but do you have, handy, a total?

24        A.    Yes, the total losses that we presented

25   are $785,464.83.

5057684505          LG Litig. LGLNH06          City of Albuquerque – LG          04:04:03 p.m.     03–11–2022          33 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 32 of 38

Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVIDSON OIL COMPANY,**

**Plaintiff,**

**vs.**                                                    **Case No. 1:20-CV-00838-RCB-JHR**

**CITY OF ALBUQUERQUE,**

**Defendant.**

## AFFIDAVIT OF SANJAY BHAKTA
## CITY OF ALBUQUERQUE CHIEF FINANCIAL OFFICER

**COMES NOW** Sanjay Bhakta, City of Albuquerque (COA) Chief Financial Officer
(CFO), and having been duly sworn, states:

1.     My educational background is a bachelors in advanced accounting and auditing
from Sardar Patel University (SPU), India, a master's degree in managerial accounting and
international banking from Maharaja Sayajirao University (MSU), India. Also, I am a Certified
Public Accountant (CPA), licensed in New Mexico. I became a licensed CPA in 2010.
Additionally, I have following certifications: Certified Government Financial Manager (CGFM),
Certified Fraud Examiner (CFE) and Charter Global Financial Manager (CGMA). I was employed
with the COA in 2017 as the Chief Financial Officer and have continued in that position until the
present.

2.     The Procurement Contract between the COA and Davidson Oil was signed on
January 21, 2020.

3.     Notice of termination of the Contract for convenience was sent on March 19, 2020,
which is 60 days prior to its effective date.

4.      During the FY/21 Budget process there was concern regarding the cost of fuel during the pandemic.

5.      The Procurement Contract had a provision called the "Termination for Convenience" which states:

> **11. Termination for Convenience:** City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

6.      The Procurement Contract had a provision called the "Termination for Lack of Appropriations" which states:

> **10. Termination for Lack of Appropriations:** Notwithstanding any provision in the Contract to the contrary, payments hereunder are contingent upon the Albuquerque City Council making the necessary appropriations. If sufficient appropriations are not made, the Contract may be terminated at the end of City's' then current fiscal year upon written notice given by City to vendor. Such event shall not constitute an event of default and all payment obligations of City and all of its interest in the Contract will cease upon the date of termination. City's determination regarding appropriation shall be accepted by vendor and shall be final.

7.      The Procurement Contract did not have an exclusivity clause requiring it to only purchase fuel oil from Davidson Oil Company.

8.      The Procurement Contract did not require the COA to purchase any certain amount of fuel from Davidson Oil Company.

5057684505          LG Litig. LGLNH06          City of Albuquerque – LG          04:05:06 p.m.          03–11–2022          35 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 34 of 38

9.      The COA terminated the Procurement Contract on March 19, 2020 before the time Davidson Oil Company was to start delivering fuel oil which was July 1, 2020.

10.     I believed at the time of the termination and continue to believe to the present time that it was in the best interest of the COA to terminate the Contract.

11.     Attached is the official state FY/21 Budget process and the memo form NM DFA dated March 18, 2020 that was sent to COA and other local governments.   Nothing like had ever happened before to my knowledge.

12.     The Coronavirus Disease 2019 (COVID-19) public health emergency has not only had a devastating impact on the health of individuals throughout the world and our community but has also had ripple effects on our economy and way of life. As a result of this public health emergency, the City had to reassess the revenue impact from FY/20 forward.

13.     On March 16, 2020 the New Mexico Department of Finance and Administration, Local Government Division, issued memorandum BFB #20-04 to allow municipalities to submit their FY/20 budget as their FY/21 rollover budget until a FY/21 budget could be meaningfully forecasted.  This "rollover" budget would allow municipalities and other local governments to operate on a month-to-month basis until revenues could be reasonably estimated and an adjusted budget could be proposed to structurally realign the budget to anticipated resources. Council adopted O-20-7, which provided special procedures for the City's FY/21 budget.

14.     In March of 2020 the Mayor proposed a rollover budget that only incorporated technical adjustments needed to structurally balance the budget to the FY/20's pre-public health emergency revenue estimations (O-20-31). Council approved the rollover budget on April 13, 2020 and the Mayor signed the budget legislation on April 22, 2020.

15.    On September 3, 2020, the Mayor transmitted legislation to adjust the Fiscal Year 2021 "rollover" budget (O-20-98).  Council approved the adjusted Fiscal Year 2021 budget on October 19, 2020 and the Mayor signed the budget legislation on November 6, 2020.

16.    This time table deviated radically from the normal budgetary process in prior years.

17.    To my knowledge the COA has never performed an economic study of on the COA's elasticity of demand for fuel oil.

18.    Davidson Oil Company never sent the hedge contracts for the COA to review, accept, and approve prior to purchasing them, nor at any time prior to the date of termination.

19.    The COA was determined to maintain services within the COA during the pandemic, however, the COA had options to purchase less fuel oil by eliminating some services.

20.    It became clear that the COA's Transit Department, which was a major consumer of fuel, would be using less fuel oil due to the pandemic.  If necessary, the bus running times and routes could have been shortened to save on fuel.

21.    Also, the availability of using Zoom during the pandemic assisted in COA employees in using less fuel by not having to attend meetings in person during the pandemic.

Sanjay Bhakta
Chief Financial Officer
City of Albuquerque

SUBSCRIBED AND SWORN the 9th day of March, 2022 by Sanjay Bhakta, City of Albuquerque Chief Financial Officer.

NOTARY PUBLIC

OFFICIAL SEAL
Janice C. Wright
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires:

740029

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    04:06:22 p.m.    03-11-2022    37 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 36 of 38

**MICHELLE LUJAN GRISHAM**
GOVERNOR

**OLIVIA PADILLA - JACKSON**
CABINET SECRETARY

**DONNIE J. QUINTANA**
DIRECTOR



**STATE OF NEW MEXICO**
**DEPARTMENT OF FINANCE AND ADMINISTRATION**
**LOCAL GOVERNMENT DIVISION**
Bataan Memorial Building ♦ 407 Galisteo St. ♦ Suite 202 ♦ Santa Fe, NM 87501
PHONE (505) 827-4950 ♦ FAX (505) 827-4948

**Dear: Local Government Partner**

18 March 2020

As we plan, prepare and respond for the impact of the COVID-19 public health emergency, we face various uncertainties and unknowns, as they pertain to the economic and financial conditions at the state and local level. Accordingly, Local Government Division ("LGD") recognizes the need to temporarily adjust and amend our budget approval process and guidelines. Specifically, as they relate to: 1) FY-2021 local governments budget submittal and 2) their ability to meet the previous issued guidance (Memorandum BFB #20-02, dtd 2 March 2020) of maintaining the state required reserve as applicable to your respective entity.

Therefore, LGD has published (Attachment #1 Memorandum BFB #20-04, dtd 16 March 2020) providing updated FY-2021 Budget Preparation & Submission Guidelines. For an entity that may not have the data to adequately forecast revenue, we are allowing for the submission of your approved FY-2020 budget as you're FY-2021 budget. In addition, for our partners that may not have the resources to maintain the state required reserve, LGD will temporary modify the Local Government Budget Management System ("LGBMS") to allow for the waiver of this requirement.

If you have any questions, and/or concerns please feel free to contact me at 505-490-5788.

Thank you for your continued support.

Very respectfully,

Donnie Quintana
Director

ATTACHMENT: #1 Memorandum BFB #20-04 dtd 18 March 2020

xc:    Budget & Finance Bureau Analysts
      Brian Colón, State Auditor
      Regina Romero, New Mexico Municipal League Intergovernmental Relations Director
      Steve Kopelman, New Mexico Association of Counties Executive Director

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     04:07:07 p.m.     03-11-2022     38 /39

Case 1:20-cv-00838-RB-JHR   Document 51   Filed 03/11/22   Page 37 of 38



**MICHELLE LUJAN GRISHAM**
**GOVERNOR**

**DONNIE J. QUINTANA**
**DIRECTOR**



**OLIVIA PADILLA-JACKSON**
**CABINET SECRETARY**

**STATE OF NEW MEXICO**
**DEPARTMENT OF FINANCE AND ADMINISTRATION**
**LOCAL GOVERNMENT DIVISION**
**Bataan Memorial Building ♦ 407 Galisteo St. ♦ Suite 202 ♦ Santa Fe, NM  87501**
**PHONE (505) 827-4950 ♦ FAX (505) 827-4948**

## MEMORANDUM BFB #20-04

TO:          New Mexico Counties and Municipalities

FROM:      Donnie J. Quintana, Director
             Local Government Division

DATE:       March 18, 2020

SUBJECT:   Updated Fiscal Year 2020-21 Budget Preparation & Submission Guidelines

In light of current economic uncertainties due to the impact of the COVID-19 public health emergency, we are temporarily adjusting our budget approval guidelines.

In the event that your local entity has inadequate data to make revenue projections and/or is unable to meet the state required reserves, we offer the following recommendations in preparing and submitting an interim budget by the June 1, 2020 statutory deadline:

- You can download your local entity's FY2019-2020 budget from the Local Government Budget Management System (LGBMS) and then upload the exact budget, with any changes you deem necessary, into LGBMS as the FY2020-2021 interim budget using the following steps:
  1. Navigate to the LGBMS Reporting Module and open any of the completed quarters for FY2019-2020 (for example you can go into period "FY2020 Q2" or FY2020 Q3").
  2. Click on the "My Budget" button at the top of the screen.



  3. An Excel file with your entity's FY2019-2020 budget line items will appear on the screen and you can make changes to any of the amounts if you wish.
  4. Using the "Save As" option in Excel, save the file with a new file name denoting it as the FY2020-2021 budget and select "CSV (Comma delimited)" as the file type.

5. Navigate to the LGBMS Budget Module for FY2020-2021 and follow the instructions beginning on page 22 of the *LGMBS Entity User Guide* to upload the CSV file.

- A governing body resolution approving the annual budget is not required until July 31, 2020; therefore, it is based on your local entity's internal policy as to whether the interim budget will be presented to the governing body.

- After the current fiscal year closes on June 30, 2020, reconcile all Funds so that you can complete the FY2020 Q4 report and have beginning balances as of July 1, 2020 to report on the final budget on LGBMS.

- Use the year-to-date actuals on the FY2020 Q4 report to decide what budget line items require revision for the final budget and then contact your assigned LGD Budget Analyst (analyst) to coordinate the revisions.

- We are working with our vendor to temporarily modify LGBMS to allow submittal of budgets not meeting the state required reserves; however, please have a conversation with your analyst if your local entity is unable to meet the state required reserves.

- For questions that come up that are not specifically addressed in this guidance memo, be sure to contact your assigned analyst via email to get direction specific to your local entity's needs.

- Because the impact of the current health emergency is evolving each day, be sure to read all email correspondence coming from your assigned analyst.

You can find the LGBMS User Guide, LGBMS FAQ document, and other information on our website: http://www.nmdfa.state.nm.us/lgbms.aspx

If you have any further questions, please contact your assigned analyst or the main number at (505)827-4975. We appreciate your patience and flexibility as we all navigate through these challenging times together.

xc:   Local Government Division, Budget & Finance Bureau Analysts
      Brian Colón, State Auditor
      Regina Romero, New Mexico Municipal League Intergovernmental Relations Director
      Steve Kopelman, New Mexico Counties Executive Director