5057684505          LG Litig. LG\NH06          City of Albuquerque – LG          02:10:20 p.m          03–11–2022          2 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 1 of 65

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **DAVIDSON OIL COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case No. 1:20-CV-00838-RCB-JHR** |
| | § | |
| **CITY OF ALBUQUERQUE,** | § | |
| | § | |
| **Defendant.** | § | |

### DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DAMAGES AND SUPPORTING MEMORANDUM

CITY OF ALBUQUERQUE
Esteban A. Aguilar Jr., City Attorney

John E. DuBois
Assistant City Attorney
Devon P. King
Managing Assistant City Attorney
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500 / F: (505) 768-4525
jdubois@cabq.gov
dking@cabq.gov

*Attorneys for Defendant*

## TABLE OF CONTENTS

I. INTRODUCTION...................................................................................................... 1

II. UNDISPUTED MATERIAL FACTS.....................................................................33

III. DISCUSSION.........................................................................................................6

      A.     THE LEGAL STANDARD FOR MOTIONS FOR SUMMARY
             JUDGMENT.................................................................................................6

      B.     THE COURT SHOULD DISMISS PLAINTIFF'S CLAIM FOR DIRECT OR
             GENERAL  DAMAGES BECAUSE PLAINTIFF CANNOT PROVE SUCH
             DAMAGES UNDER THE TERMS OF THE CONTRACT TO THE REQUISITE
             DEGREE OF CERTAINTY THAT THE LAW REQUIRES...............................8

      C.     THE COURT SHOULD DISMISS PLAINTIFF'S OTHER CLAIMS FOR
             DAMAGES BECAUSE SUCH DAMAGES WERE NOT CONTEMPLATED
             OR ALLOWED OR FORESEEABLE AT THE TIME OF THE MAKING OF
             THE CONTRACT,  AND, IN ADDITION, PLAINTIFF CANNOT SHOW
             PROXIMATE CAUSE OF ITS LOSSES DUE TO THE TERMINATION OF
             CONTRACT.................................................................................................11

IV. CONCLUSION.......................................................................................................12

CERTIFICATE OF SERVICE.....................................................................................13

5057684505     LG Litig. LG\NH06     City of Albuquerque – LG     02:11:06 p.m.     03–11–2022     4 /66

Case 1:20-cv-00838-RB-JHR    Document 52    Filed 03/11/22    Page 3 of 65

# TABLE OF AUTHORITIES

**Cases**

*Abercrombie v. City of Catoosa*, 896 F.2d 1228 (10th Cir.1990) ................................7

*Abreu v. N.M. Children, Youth & Families Dep't*, 797 F. Supp. 2d 1199 (D.N.M. 2011) ..............8

*Allen v. Allen Title Co.*, 1967-NMSC-113, 77 N.M. 796 ................................8

*Anderson Living Tr. v. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979 (D.N.M. 2013) ..............8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................6, 7, 8

*Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238 (10th Cir.1990)..............7

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193 (10th Cir.2006) ........................7

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887 (10th Cir.1991) ........................6

*Blair v. U.S. for Use and Benefit of Gregory-Hogan*, 150 F.2d 676 (8th Cir. 1945) ....................9

*Brown v. Newton*, 1955-NMSC-029, 59 N.M. 274 ................................8

*Camino Real Mobile Home Park P'ship v. Wolfe*, 1995-NMSC-013, 119 N.M. 436 ................11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................6

*Colony Nat'l Ins. Co. v. Omer*, No. 07–2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)...7

*Conaway v. Smith*, 853 F.2d 789 (10th Cir.1988) ................................7

*Eccher v. Small Bus. Admin.*, 643 F.2d 1388 (10th Cir. 1981).....................................11

*Ed S. Michelson, Inc. v. Nebraska Tire & Rubber Co.*, 63 F.2d 597 (8th Cir. 1933).....................9

*Electrical Products Consol. v. Sweet*, 83 F.2d 6 (10th Cir. 1936).....................................9

*G4S Technology LLC v. Massachusetts Technology Park Corporation*, 479 Mass. 721, 99 N.E.3d
    728 (2018) ................................8

*Louis Lyster, Gen. Contractor, Inc. v. Town of Las Vegas*, 1965-NMSC-097, 75 N.M. 427 .......11

*Maness v. K & A Enterprises of Mississippi*, LLC, 250 So. 3d 402 (Miss. 2018) ........................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................................7

*Mitchell v. Intermountain Cas. Co.*, 1961-NMSC-138, 69 N.M. 150 ........................12

*Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980) ................................7

*Schuylkill & Dauphin Improv. Co. v. Munson*, 81 U.S. 442 (1871).....................................8

*Spring Creek Exploration & Production Company, LLC v. Hess Bakken Investment, II, LLC*, 887
    F.3d 1003, 100 Fed. R. Serv. 3d 840 (10th Cir. 2018).....................................9

*State Farm Gen. Ins. Co. v. Clifton*, 1974-NMSC-081, 86 N.M. 757 ................................12

*Sunnyland Farms v. Cent. N.M. Elec. Coop., Inc.*, 2013-NMSC-017, 301 P.3d 387...................11

*Telecor Communications, Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002) ...............10

*Vitkus v. Beatrice Co.*, 11 F.3d 1535 (10th Cir.1993) ................................6, 8

**Federal Rules of Civil Procedure**

Fed.R.Civ. P. 56(c)(2)....................................................................6

Fed.R.Civ.P 56(e)(2)....................................................................6

Fed.R.Civ.P. 56(e) ....................................................................7

**Legal Treatises**

Restatement Second, Contracts § 347 ................................9

Richard A. Lord, Williston on Contracts § 64:1 at 7 (4th ed. 2009) ................................9

5057684505          LG Litig. LG\NH06          City of Albuquerque – LG          02:11:52 p.m          03–11–2022          5 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 4 of 65

**<u>Jury Instructions</u>**

NMRA, Civ. UJI 13-843 (Contracts; Measure of Damages; General Instruction)

**<u>Internet Resources</u>**

https://en.wikipedia.org/wiki/Price_elasticity_of_demand

5057684505    LG Litig. LG|NH06    City of Albuquerque – LG    02-12-06 p.m    03-11-2022    6 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 5 of 65

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **DAVIDSON OIL COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case No. 1:20-CV-00838-RCB-JHR** |
| | § | |
| **CITY OF ALBUQUERQUE,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN WHOLE OR IN PART AS TO DAMAGES AND SUPPORTING MEMORANDUM

COMES NOW, the City of Albuquerque, Defendant, ("the City" or "the Defendant") through counsel, and hereby moves for partial summary judgment on the element of damages in the claim of breach of contract claim because of lack of proper proof for damages. As further grounds for this motion[1] Defendant states:

### I.  INTRODUCTION

Even if Davidson Oil Company ("Plaintiff") were to avoid summary judgment on the issue of whether the contract was properly terminated by the City, in order to prevail Plaintiff must prove damages to an acceptable degree of certainty as a necessary element of its breach of contract claim. This Plaintiff cannot do given the evidence adduced.

---

[1] As allowed by D.N.M.LR-Civ. 7.5(a), the City combined this Motion with the memorandum in support thereof. Moreover, as required by D.N.M.LR-Civ. 7.1(a), the City attempted to settle this motion before it was filed. Undersigned counsel contacted Plaintiff's counsel via (telephone) on March 9, 2022 to determine if the motion was opposed. As of the filing of this Motion and Plaintiff opposes the motion

1

5057684505  LG Litig. LGI NH06  City of Albuquerque – LG  02:12:35 p.m.  03-11-2022  7 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 6 of 65

New Mexico law recognizes three (3) types of damages in contract cases: *general or direct damages*, which would give the plaintiff whatever value he or she would have obtained from the contract if it had not been breached (loss of profit); *consequential or special damages*, which are not based on the capital or present value of the promised performance but upon benefits it can produce or losses that may be caused by its absence (recoverable only in special circumstances not applicable in this case); and *incidental damages*, which include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction. Plaintiff has not alleged incidental damages.

The obstacle which cannot be overcome to Plaintiff's recovery of general or direct damages arises from the fact that the Contract did not require the City to purchase any specific amount of fuel from Plaintiff. The Contract did not even require the City to purchase bulk fuel exclusively from Plaintiff. Critically, Plaintiff failed to undertake any economic study to calculate the City's elasticity of demand for fuel. Thus, Plaintiff cannot show how much fuel the City would have purchased from Plaintiff at the inflated price called for in the Contract. Plaintiff calculated its profit as two (2) cents for each gallon of fuel oil sold to the City, plus about one (1) cent per gallon for transportation cost. Without knowing the City's elasticity of demand for fuel during the period in question, it cannot be known how many gallons of fuel oil the City would have purchased at the Contract price. In addition, without knowing how many gallons of fuel oil the City would have purchased at the Contract price, it is impossible to calculate any profit Plaintiff may have made on transportation fees. Any amount claimed would be pure speculation or conjecture and cannot be supported by evidence.

As to the other monetary claims of damages made by Plaintiff, such damages were not contemplated by the parties at the time of the signing of contract. Plaintiff had agreed to only being

compensated for goods or services delivered to or accepted by the City prior to the effective date of any termination for convenience.

Ultimately, Plaintiff would have lost money on its hedge contracts with or without the City Contract in place. These hedge contract losses and the other costs to Plaintiff that resulted from them are not explicitly discussed in the Contract and were not contemplated by the parties at the time of the signing of Contract. In fact, the City was not wholly aware of Plaintiff's hedge contracts until after the Contract was terminated.

## II.   UNDISPUTED MATERIAL FACTS

1.      Plaintiff voluntarily participated in a procurement process to provide the City with bulk fuel (diesel and regular unleaded gasoline). Complaint [Doc. 1] at ¶¶ 9-10.

2.      On or about January 21, 2020, the City and the Plaintiff entered into Contract No. SHR000022076 (the "Contract"). Compl. [Doc. 1] at ¶ 11.

3.      The Plaintiff did not attach a copy of the Contract to its Complaint. A copy of the contract is attached hereto as Ex. A.

4.      The Contract covered a twelve month period with deliveries to begin on July 1, 2020, and continue to June 30, 2021. Ex. A, pg. 1

5.      The Contract did not require the City to purchase its fuel from the Plaintiff exclusively. Ex. A in its entirety.

6.      The Contract did not require the City to purchase any specific amount of fuel from the Plaintiff. Ex. A in its entirety.

7.      The Contract contains a Termination for Convenience clause which states:

11. Termination for Convenience: City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of

5057684505     LG Litig. LGI NH06     City of Albuquerque – LG     02 13 47 p.m    03 11 2022    9 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 8 of 65

termination.

Compl. [Doc. 1] at ¶ 13; Ex. A, at ¶ 11.

8.    Plaintiff never sought prior approval for any goods and/or services prior to the effective date of termination.

9.    The City gave notice to Plaintiff of termination of the contract for convenience on March 19, 2020, which terminated the Contract sixty days later on April 19, 2020.

10.    During the procurement process, Plaintiff calculated it would make two cent profit per gallon of fuel sold to the City. *See* Ex. B, Boydstun Dep. 11: 3-12.

11.    During the procurement process, Plaintiff calculated that with a two (2) cent per gallon profit, it would make approximately $107,000.00 of profit over the entire contract period by the sale of fuel and an additional profit of $68,000.00 on transportation costs for an approximate total profit of $ 785,465.00. *Id.* at 44: 24-25.

12.    The two (2) sample years Plaintiff used to estimate this profit were ones prior to 2020 in which there was no worldwide pandemic going on. *Id.* at 14: 5-10.

13.    Plaintiff estimated, based on the two (2) sample years, that the City would purchase a monthly average for the gasoline, of 155,117 gallons, and for diesel, 293,079 gallons, for a total of 5,378,352 gallons of fuel for the entire contract period.

14.    Plaintiff did not do a statistical study to determine the risk or statistical likelihood that the City's usage of fuel oil might deviate significantly from the two sample years. *Id.* at 22:23, 23:20-25, 24:1-3.

15.    Plaintiff purchased 12 monthly hedge contracts, on January 31, 2020. *Id.* at 17: 2-7.

16.    The purchase of these hedge contracts by the Plaintiff were without the knowledge, consent, permission or participation of the City. Ex. C Aff. Sanjay Bhakta

5057684505          LG Litig. LG|NH06          City of Albuquerque – LG          02:14:19 p.m          03-11-2022          10 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 9 of 65

17.     Plaintiff lost $601,858.99 on those hedge contracts. Ex. B, Boydstun Dep. 24:18-20.

18.     Plaintiff did not make an economic study of the City's price elasticity of demand for fuel during the contract period nor an economic study of the City's income elasticity of demand for fuel but admits that the City's elasticity of demand was not totally inelastic. *Id*. at 37: 24-25, 38:1-25, 39:1-17.

19.     Plaintiff did not do a study of the City's sources of revenue or how an unexpected change to those sources might have income/revenue elasticity of demand for fuel during the contract period. *Id*. at 39: 3-12.

20.     The City has not tried to calculate the City's elasticity of demand for fuel during the contract period but is certain that if forced to buy at a higher price, the City like any other rational consumer would have reduced its consumption of fuel not only due to price sensitivity but also due to sensitivity to the threat of budget revenue reduction. Ex. C Aff. Sanjay Bhakta ¶ 11

21.     For the first 6 months of COA's 2021 fiscal year, which spanned the period from July 1, 2020 through December 31, 2020, the City consumed 1.5 million gallons of diesel fuel at an average price of $1.45 per gallon, for a total cost of $2.1 million, excluding fees and taxes. For the same period, COA also consumed 1.0 million gallons of gasoline at an average price of $1.44 per gallon, for a total cost of $1.5 million, again excluding fees and taxes. Ex. D, AFF Daniel, ¶ 8

22.     If the Contract had not been terminated, the prices the City would have had to pay to Plaintiff under the terms of the Contract were $ 1.7732 per gallon for regular gasoline and $ 1.9798 per gallon for the diesel.

23.     What austerity measures the City would have taken to conserve fuel if forced to buy at the higher prices of is not known to any degree of certainty and would be pure speculation but it is certain there were a wide spectrum of measures the City could have adopted ranging from

shortening or even eliminating some bus routes, and reducing bus schedules and run times, reduction in garbage pick ups, and so forth. Ex. C, ¶¶ 20-21.

24.     Due to the pandemic, the City purchased less fuel oil during contract period than the year previous.

25.     For the full fiscal year 2021 COA saved $800,000, net of hedging costs, compared to what it would've paid under the Davidson Oil agreement. Ex. D AFF. Daniel. ¶ 8

## III.   DISCUSSION

### A.  THE LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) states in pertinent part that summary judgment "should be rendered if the leadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c)(2). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.") (internal quotation marks omitted). Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir.1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.") (internal quotation marks omitted).

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:15:31 p.m.    03–11–2022    12 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 11 of 65

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule— set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256. *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir.1990); *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980) ("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, No. 07– 2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008) (citing Fed.R.Civ.P. 56(e) and *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir.2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" *Colony Nat'l Ins. Co. v. Omer*, 2008 WL 2309005, at *1 (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988)

Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A mere "scintilla" of evidence will not avoid summary judgment.

*Vitkus v. Beatrice Co.*, 11 F.3d at 1539. Rather, there must be sufficient evidence on which the

fact-finder could reasonably find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. at 251 (quoting *Schuylkill & Dauphin Improv. Co. v. Munson*, 81 U.S. 442, 448 (1871));

*Vitkus v. Beatrice Co.*, 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence

is merely colorable ... or is not significantly probative, ... summary judgment may be granted ."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (internal citations omitted).

### B. THE COURT SHOULD DISMISS PLAINTIFF'S CLAIM FOR DIRECT OR GENERAL DAMAGES BECAUSE PLAINTIFF CANNOT PROVE SUCH DAMAGES UNDER THE TERMS OF THE CONTRACT TO THE REQUISITE DEGREE OF CERTAINTY THAT THE LAW REQUIRES

Proving damages is a necessary element in a breach of contract claim. "Under New Mexico

law, '[t]he elements of a breach-of-contract action are the existence of the contract, breach of the

contract, causation, *and damages.*' " *Anderson Living Tr. v. ConocoPhillips Co., LLC*, 952 F.

Supp. 2d 979, 1030 (D.N.M. 2013) (quoting *Abreu v. N.M. Children, Youth & Families Dep't*, 797

F. Supp. 2d 1199, 1247 (D.N.M. 2011)) (emphasis added).

The purpose of allowing damages for breach of contract is to restore to the injured party what

was lost by the breach and what he or she reasonably could have expected to gain had there been

no breach. *Allen v. Allen Title Co.*, 1967-NMSC-113, 77 N.M. 796; *Brown v. Newton*, 1955-

NMSC-029, 59 N.M. 274. It is not the policy of the law to award damages which would put the

nonbreaching party to a contract in a better position than if the breaching party had carried out its

contract. *G4S Technology LLC v. Massachusetts Technology Park Corporation*, 479 Mass. 721,

99 N.E.3d 728 (2018). Breach of contract damages should be the amount that would place the

nonbreaching party in the position where it would have been but for the breach, no more and no

less. *Maness v. K & A Enterprises of Mississippi*, LLC, 250 So. 3d 402 (Miss. 2018); *see also*, Restatement Second, Contracts § 347. A plaintiff is not entitled to a windfall. Richard A. Lord, Williston on Contracts § 64:1 at 7 (4th ed. 2009). The general rule of contract damages is that the person who is injured is to be placed in the position he would have been in had the contract been performed, but not in a better position. Therefore, Plaintiff may entitled to contract damages in an amount equivalent to the difference between the benefits it actually received and those to which it was due under the Contract—but no more. *Blair v. U.S. for Use and Benefit of Gregory-Hogan*, 150 F.2d 676, 678 (8th Cir. 1945) *Ed S. Michelson, Inc. v. Nebraska Tire & Rubber Co.*, 63 F.2d 597, 601 (8th Cir. 1933); *Spring Creek Exploration & Production Company, LLC v. Hess Bakken Investment, II, LLC*, 887 F.3d 1003, 1026, 100 Fed. R. Serv. 3d 840 (10th Cir. 2018), *as revised*, (Apr. 13, 2018) (the root purpose of a contract remedy is to place the plaintiff-promisee in as good a position as it would have occupied had the defendant-promisor not breached the contract); *Electrical Products Consol. v. Sweet*, 83 F.2d 6, 9 (10th Cir. 1936).

Thus, under the circumstances of present matter, the law requires the fact-finder to create an alternative universe in which the City did not terminate the Contract and determine what would have happened, i.e., what profits would the Plaintiff have made. It is not permitted to posit a perfect universe in which there was no pandemic. The alternative universe must contain all the facts and circumstance of the historical universe with one exception only, the City did not terminate the Contract. In other words, how many gallons of fuel would the City have purchased from the Plaintiff under the terms of the Contract? Take that number times the two (2) cents per gallon profit Plaintiff claims it would have made, and you have the direct damages owed to Plaintiff. Simple, right? Except the City under the Contract was not obligated to purchase any specific

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02-17-24 p.m    03-11-2022    15 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 14 of 65

amount of fuel from Plaintiff. It is not known how many gallons of fuel the City would have purchased from the Plaintiff, and any guess or estimate would be unlawful speculation.

It is known how many gallons of fuel the City purchased from TAC during period covered by Contract, but that was at prices far less than the Contract price. Common sense and basic economic theory tells us the City would have purchased less fuel at the higher than Contract price, but how much less? This can only be rationally calculated if the City price elasticity of demand for fuel is known for the period in question.

A good's price elasticity of demand (PED) is a measure of how sensitive the quantity demanded of a product is to its price.[2] When the price rises, quantity demanded falls for almost any good including fuel.[3] This can be shown with a simple diagram:



Plaintiff admits that the City's PED, was not perfectly inelastic. "A market is elastic if demand goes down as price goes up." *Telecor Communications, Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002). In the diagram, P2 would the TAC price, and P1 would the Contract price. Q2 is the amount of fuel purchased from TAC, and Q1 would be the amount of fuel the City would have purchased from Plaintiff at the Contract price. P1, P2, and Q2 are known. Q1 cannot be

---

[2] Many economics texts and articles describe the factors influencing the elasticity of demand for particular products and services. See, e.g., McEachern, William A., *Economics* (4th edition); and Pindyck, Robert S. and Rubinfeld, Daniel, L., *Microeconomics* (5th edition), Prentice Hall, Chapter 2 and Chapter 14.

[3] https://en.wikipedia.org/wiki/Price_elasticity_of_demand

5057684505          LG Litig. LGLNH06          City of Albuquerque – LG          02:17:57 p.m.          03-11-2022          16 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 15 of 65

determined because the slope of the demand is not known. Plaintiff failed to conduct an economic study to determine the City's PED which can be thought of as the slope of demand curve. How many gallons of fuel would the City have purchased from Plaintiff under the inflated prices of the Contract in July of 2020? It is not known. The only thing that be said for certain is that the amount would have been less than what the City purchased from TAC at a cheaper price during that same period. How much less is pure speculation. Put in concrete terms, how many gallons of fuel would the City have purchased from the Plaintiff in August of 2020, or September of 2020, or January of 2021? Who knows? One guess is as good as another. It could even be zero because the City was not obligated to purchase exclusively from Plaintiff.

Damages based on a "rough estimate" by a witness are insufficient to support a judgment. Rather damages must be of a kind and character susceptible of proof, and the amount of damages allowed must be subject to reasonable ascertainment and not based on speculation or guesswork. *Louis Lyster, Gen. Contractor, Inc. v. Town of Las Vegas,* 1965-NMSC-097, 75 N.M. 427. Even though the amount of damages need not be proven with mathematical certainty, *Eccher v. Small Bus. Admin.*, 643 F.2d 1388, 1392 (10th Cir. 1981), neither can it be based on surmise, conjecture, or speculation. *Camino Real Mobile Home Park P'ship v. Wolfe*, 1995-NMSC-013, ¶ 32, 119 N.M. 436, *overruled in part on other grounds, Sunnyland Farms v. Cent. N.M. Elec. Coop., Inc.*, 2013-NMSC-017, 301 P.3d 387. Therefore, Plaintiff's claim for damages in the form of lost profits should be dismissed.

C. **THE COURT SHOULD DISMISS PLAINTIFF'S OTHER CLAIMS FOR DAMAGES BECAUSE SUCH DAMAGES WERE NOT CONTEMPLATED OR ALLOWED OR FORESEEABLE AT THE TIME OF THE MAKING OF THE CONTRACT, AND, IN ADDITION, PLAINTIFF CANNOT SHOW PROXIMATE CAUSE OF ITS LOSSES DUE TO THE TERMINATION OF THE CONTRACT**

The elements of damages must be the natural and foreseeable consequences of the breach, as contemplated by the parties at the time of making the contract. *State Farm Gen. Ins. Co. v. Clifton,* 1974-NMSC-081, 86 N.M. 757; *Mitchell v. Intermountain Cas. Co.,* 1961-NMSC-138, 69 N.M. 150. Plaintiff's losses due to its hedge contracts was not contemplated at the time of the signing of the Contract. In addition, those losses would have occurred even if the Contract had not been terminated. Thus, Plaintiff cannot show that these unauthorized expenses were proximately caused by the City's termination of the Contract.

## IV.   CONCLUSION

Since the Plaintiff will bear the burden of proof at trial on the essential element of damages, the City can prevail merely by pointing out to the court that there is an absence of evidence to support the Plaintiff's case on the issue of damages . Based on the argument and authorities laid out above, the Defendant City has met its burden, and so respectfully request that this court enter partial summary judgment against Plaintiff Davidson Oil in the City's favor. The only issue left would be to determine if Plaintiff was due nominal damages.

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     02:19:01 p.m.     03–11–2022     18 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 17 of 65

Respectfully submitted,

**CITY OF ALBUQUERQUE**
**Esteban A. Aguilar Jr., City Attorney**

*/s/ John E. DuBois*
John E. DuBois
Assistant City Attorney
Devon P. King
Managing Assistant City Attorney
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500 / F: (505) 768-4525
jdubois@cabq.gov
dking@cabq.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this 11th day of March 2022, I served a copy of the foregoing pleading to the party listed below through the Court's case management and electronic filing system ("CM-ECF").

Ross L. Crown
Lewis Roca Rothgerber Christie LLP
201 3rd St NW Ste 500
Albuquerque, NM 87102-3366
505.764.5402
rcrown@lrrc.com

*/s/ John E. DuBois*
John E. DuBois

267456

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02-19-22 p.m    03–11–2022    19 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 18 of 65

**Exhibit A**

**City of Albuquerque**
**Procurement Contract**

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

| | |
|---|---|
| **Contract ID** | **SHR000022076** |
| **Contract Dates** | **07/01/2020 - 06/30/2022** |
| **Contract Reference** | **RFB0009IC** |
| **Contract Maximum** | **$0.00** |
| **Contract Print Date** | **01/21/2020** |
| **Origin** | **VAR** |
| **Page 1 of 7** | |

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

**Description: Purchase and Delivery of Fuel**

| ITEM # | ITEM DESCRIPTION | Category | QTY | UOM | UNIT PRICE |
|---|---|---|---|---|---|
| 1 | Unleaded Regular Gasoline (Per Gallon) | 92845 | - | GAL | 1.7732 |
| 2 | No. 2 Diesel (Per Gallon) | 92845 | - | GAL | 1.9798 |
| 3 | Emergency Fee (Per Hour) | 92845 | - | HR | 80.00 |
| 4 | Non Emergency Fee After Hours Fee (Per Hour) | 92845 | - | HR | 80.00 |
| 5 | Holiday Deliver Fee (Per Hour) | 92845 | - | HR | 80.00 |
| 6 | Unleaded Regular Gasoline Federal Lust Tax | 92845 | - | EA | 0.001 |
| 7 | No. 2 Diesel Federal Lust Tax | 92845 | - | EA | 0.001 |
| 8 | Diesel B5 Federal Lust Tax | 92845 | - | EA | 0.001 |
| 9 | Unleaded Regular Gasoline Federal Oil Spill Recovery Tax | 92845 | - | EA | 0.002143 |
| 10 | No. 2 Diesel Federal Oil Spill Recovery Tax | 92845 | - | EA | 0.002143 |
| 11 | Diesel B5 Federal Oil Spill Recovery Tax | 92845 | - | EA | 0.0020358 |
| 12 | Unleaded Regular Gasoline NM Gas Excise Tax | 92845 | - | EA | 0.17 |
| 13 | No. 2 Diesel NM Gas Excise Tax | 92845 | - | EA | 0.21 |
| 14 | Diesel B5 NM Gas Excise Tax | 92845 | - | EA | 0.21 |
| 15 | Unleaded Regular Gasoline NM UST Clean-up Tax | 92845 | - | EA | 0.01875 |
| 16 | No. 2 Diesel NM UST Clean-up Tax | 92845 | - | EA | 0.01875 |
| 17 | Diesel B5 NM UST Clean-up Tax | 92845 | - | EA | 0.01875 |
| 18 | Unleaded Regular Gasoline Environmental Fee | 92845 | - | EA | 0.01875 |
| 19 | No. 2 Diesel Environmental Fee | 92845 | - | EA | 0.01875 |
| 20 | Diesel B5 Environmental Fee | 92845 | - | EA | 0.01875 |
| 21 | Unleaded Regular Gasoline Pump off Fee (CPG) | 92845 | - | EA | 0.0063 |
| 22 | No. 2 Diesel Pump off Fee (CPG) | 92845 | - | EA | 0.0067 |
| 23 | Diesel B5 Pump off Fee (CPG) | 92845 | - | EA | 0.0067 |
| 24 | Unleaded Regular Gasoline Tank Wagon Delivery | 92845 | - | EA | 0.25 |
| 25 | No. 2 Diesel Tank Wagon Delivery | 92845 | - | EA | 0.25 |
| 26 | Unleaded Regular Gasoline Transport Delivery | 92845 | - | EA | 0.0268 |
| 27 | No. 2 Diesel Transport Delivery | 92845 | - | EA | 0.0302 |

**Term: 07/01/2020 - 06/30/2022**

**The term of the contract shall be for two (2) years, with two (2) one (1) year options to renew. Renewal is at the discretion of the City and shall be by mutual written agreement of both parties.**

Purchasing Office Signature:

*Jennifer Lee Bradley*

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:20:37 p.m.    03–11–2022    20 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 19 of 65

## City of Albuquerque
## Procurement Contract

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| | |
|---|---|
| Contract ID | SHR000022076 |
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 2 of 7 | |

### Pricing:
Pricing submitted for City-wide fuel usage, to include that of the Solid Waste Department, Transit Department, Department of Finance and Administrative Services, Fleet Division, and other City departments as needed shall remain firm throughout the first year term beginning July 1 2020 and ending June 30, 2021, pricing for year 2 term beginning July 1, 2021 and ending June 30, 2022 shall be provided to the City by December 31, 2020.

### Price Escalation:
At any time prior to, but not less than ninety (90)-days prior to each renewal period, the City may request and Davidson Oil shall provide a written indication of its fixed pricing for the renewal period, based on market conditions or changes to taxes. The City will then have seven (7) calendar days to decide on the renewal. Up to the time the renewal decision is made, the City reserves the right to request additional pricing indications up to the 90-day limit. The City reserves the right to cancel the contract and solicit a new contract if a requested price is unacceptable to the City. Cancellation of the contract shall not affect any outstanding orders.

### Invoicing/Payment:
1) Invoicing will contain, at a minimum, unit price, delivery date, delivery location, contract number, Purchase Order Release (POR)number, number of net gallons and fuel type delivered, any applicable fees and taxes, and location delivered.

2) Each department from the City will provide one POR each for diesel fuel and unleaded fuel. The amounts on each POR will be based on estimated dollar usage and will not reflect a bulk order at the time of dispatch of the POR. The City will be responsible for updating the POR as needed.

3) No additional taxes, fees, costs or terms that were not included in the original Bid shall be added to invoices.

4) Payment terms shall be Net 30.

5) Invoices should be sent through the City's electronic invoice service provider Transcepta.

### Bill of Lading:
An original Bill of Lading shall be provided by Davidson Oil with every shipment containing the following information:
- Bill of Lading Number
- Deliver Date/Time (Hour/Minute)
- Customer Name and Address
- Truck Number with License Plate
- Product code and name
- Bio-diesel blending data
- Fuel terminal name/number
- Carrier Name

Purchasing Office Signature:

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     02:21:55 p.m     03-11-2022     21 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 20 of 65

## City of Albuquerque
### Procurement Contract

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
|---|---|
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 3 of 7 | |

- Temperature
- Signature of authorized City of Albuquerque Employee
- Signature of Driver
- Gravity at 60 degrees
- StickReading Before and After delivery
- Net Gallons
- Gross Gallons
- Description
- Octane Rating
- Oxygenate Concentration (Volume %), as applicable

**Delivery:**
Deliveries of ordered product must be made within twenty-four (24)hours of order placement, and during normal operating hours (Monday thru Friday -7:30AM - 3:00) for the ordering entity, unless different parameters are mutually agreed upon, in writing, between Davidson Oil and the City's authorized representatives. Any shipment to the City or other entity that is under contract to the City via Memorandum of Understanding (MOU), which is delayed due to the fault of Davidson Oil shall be paid for at the originally ordered quoted price. The City will pay only for net gallons.

**Fuel Quality:**
Fuel furnished under the contract shall be visibly free of un-dissolved water, sediment and suspended matter, and shall be clear and bright at ambient temperatures of 70 degrees F. The finished gasoline shall conform to the applicable test methods of ANSI/ASTM specifications and shall meet EPA standards and regulations for Bernalillo County as outlined in ASTM D4814-92A, or the latest revision thereof.

**Required Fuel Types - Davidson Oil is required to furnish the following fuel types:**

**Unleaded Regular Gasoline -** All fuel shall meet ASTM 4814-14B, or latest revision, and shall be unleaded anti-knock index (RON+MON)/2, and shall not have an octane level less than 86 with reductions for altitude allowed per ASTM specifications for North 34degree latitude.

**No. 2 Diesel -** All fuel shall meet ASTM D975-15A, or latest revision. All diesel fuel shall not have a cetane level of less than 40.

**Testing:**
Should there be any question as to the quality of fuel furnished under the contract, the City reserves the right to require testing of products furnished. If it is determined that any products purchased do not meet the specifications provided herein, the product shall be picked up immediately by Davidson Oil and a full credit shall be given to the City. Testing shall be ordered by the City using a certified laboratory. If City vehicles require repairs to the fueling system or engine as a result of using fuels provided under the contract awarded, Davidson Oil shall be liable for any consequential damages

Purchasing Office Signature:

_Jennifer Lee Bradley_

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02-23-13 p.m    03–11–2022    22 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 21 of 65

**City of Albuquerque**
**Procurement Contract**

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
|---|---|
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 4 of 7 | |

including fees or charges incurred for testing if product fails and all repairs necessary to return any City vehicles affected to good, operating condition.

**Responsibility for Contaminated Fuel:**
In the event contaminated fuel is delivered to the City, or cross contamination occurs during delivery, Davidson Oil shall be responsible for the immediate removal and replacement of the contaminated product at no cost to the City. Should Davidson Oil fail to take immediate action, the City may contract with a third party to accomplish the required cleanup actions and will hold Davidson Oil responsible for the cost incurred plus legal fees, attorney costs and court costs.

**Spillage:**
Davidson Oil shall take all necessary precautions to prevent spillage of products during delivery. Proper equipment maintenance, regular inspection and, when necessary, the use of collection pans during the fuel transfer will be employed to avoid leaks and/or spills. In the event of a spill, Davidson Oil shall be responsible for the immediate containment, mitigation of spill and cleanup of the spilled product at no cost to the City. Should Davidson Oil fail to take immediate action, the City may contract with a third party to accomplish the required control actions and will hold Davidson Oil responsible for the cost incurred plus legal fees, attorney costs and court costs.

**Emergency, After Hours or Holiday Deliveries:**
The City may require fuel deliveries outside of normal operating hours (herein defined as 7:30AM - 3:00 PM Monday through Friday). Should a fuel delivery outside of the normal operating hours be required, an authorized City representative will contact Davidson Oil with instructions on delivery time, location, address, product needed, number of gallons for delivery and the contact person's name and phone number. Emergency deliveries are defined as requests to deliver within four (4) hours of a call to Davidson Oil or deliveries required by a natural or man-made disaster. In the case of holidays, the City will use its best efforts to avoid such requests by employing proper management and oversight procedures.

**Licensing and Regulations:**
Davidson Oil shall be fully licensed as may be required by local, state and federal regulations and shall comply at all times with local, state and federal rules, regulations, laws, ordinances and statutes in the performance of the contract awarded. Failure to do so may be deemed a material breach of contract and constitute cause for immediate termination of the contract at the sole discretion of the City.

**Shortage:**
If Davidson Oil foresees a shortage of gasoline and/or diesel supplies during the term of the contract awarded, it must allocate quantities of product, as determined by the City, to support the City¿s requirements. Davidson Oil shall notify the City in writing of an anticipated shortage as soon as it becomes aware. The City may elect, for public safety reasons, to reserve a specific quantity
and delivery schedule for which Davidson Oil will be required to provide.

**Locations, Capacity and Fuel Schedule:**

Purchasing Office Signature:

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG      02:24:33 p.m.    03-11-2022    23 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 22 of 65

## City of Albuquerque
## Procurement Contract

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| Contract ID | SHR000022076 |
| --- | --- |
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 5 of 7 | |

Fuel deliveries to the City may not exceed ninety percent (90%) of the tank capacity. Before the fuel drop is made, a dipstick reading must be taken and documented and if a Veedor Root is available, a reading shall be taken.

The City reserves the right to add or discontinue fuel locations and add, remove, or change tank sizes and types over the course of the contract awarded. The City will provide written notification of any such changes.

<u>Compliance with Law:</u>
Davidson Oil shall comply with all federal, state, county, and local regulations relevant to the delivery of fuels requested under the awarded contract when delivering. Vapor recovery is required on all fuel delivered in Bernalillo County. It is Davidson Oil's responsibility to adhere to this and all other applicable regulations. In the event of a fine being levied for Davidson Oil's failure to adhere to any of regulations, the successful Bidder shall be responsible for the payment of said fine.



Purchasing Office Signature:

*Jennifer Lee Bradley*

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:25:33 p.m.    03–11–2022    24 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 23 of 65

**City of Albuquerque**
**Procurement Contract**

**DAVIDSON OIL COMPANY**
**202 S ARTHUR**
**AMARILLO TX 79102**

**Supplier Contact:**
**Jessica Kemp**
**Regional Sales Manager**
**806-731-4018**
**jkemp@davidsonoil.com**

**Supplier ID: 0000152332**

| | |
|---|---|
| Contract ID | SHR000022076 |
| Contract Dates | 07/01/2020 - 06/30/2022 |
| Contract Reference | RFB0009IC |
| Contract Maximum | $0.00 |
| Contract Print Date | 01/21/2020 |
| Origin | VAR |
| Page 6 of 7 | |

**Instructions to Supplier:**

- Do not fill orders for goods/services not listed in this Procurement Contract.
- Orders against this Procurement Contract must be placed with a Purchase Order Release (POR).
- Do not fill orders without a POR.
- POR number must be on all invoices.

**Please forward all original invoice(s) to:**
**City of Albuquerque**
**Accounting Division**
**PO Box 1985**
**Albuquerque, NM 87103**

**Instructions to End-User:**
Do Not place orders for goods/services not listed on this Procurement Contract.
To place an order against this Procurement Contract, issue a POR prior to placing the order with the Supplier.

IMPORTANT NOTICE: BY COMMENCING WORK UNDER THIS PROCUREMENT CONTRACT, SUPPLIER ACCEPTS ALL TERMS AND CONDITIONS WITHIN AND ATTACHED TO THIS PROCUREMENT CONTRACT AND AGREES THAT, TO THE EXTENT ANY VENDOR TERMS CONFLICT, THE CITY'S TERMS AND CONDITIONS SHALL GOVERN. VALID ONLY WITH OFFICIAL CITY OF ALBUQUERQUE PURCHASING DIVISION SIGNATURE. WHEN ACCEPTING A HAND-CARRIED PROCUREMENT CONTRACT, SUPPLIER SHOULD CALL THE PURCHASING DIVISION TO CERTIFY THE VALIDITY OF THE PROCUREMENT CONTRACT OR REQUEST PHOTO IDENTIFICATION FROM THE PERSON PRESENTING THE PROCUREMENT CONTRACT AND MAINTAIN FOR ITS RECORDS THE DRIVER'S LICENSE NUMBER, SOCIAL SECURITY NUMBER, OR CITY ID NUMBER OF THAT PERSON. THE CITY WILL NOT BE LIABLE FOR PURCHASES MADE BY UNAUTHORIZED INDIVIDUALS. CALL 505-768-3320 WITH ANY QUESTIONS.

Purchasing Office Signature:

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:26:39 p.m.    03–11–2022    25 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 24 of 65

Exhibit A

# CITY OF ALBUQUERQUE TERMS AND CONDITIONS

Direct all inquiries to: City of Albuquerque, Purchasing Division, P.O. Box 1293, Albuquerque, NM 87103 or call (505) 768-3320.

**1. Contract:** By commencing work, vendor accepts all Terms and Conditions herein and agrees that, to the extent vendor terms conflict, these Terms and Conditions shall govern. These Terms and Conditions and any non-conflicting vendor terms and conditions shall constitute the Contract.

**2. Invoicing:** Department name AND purchase order number MUST be on all invoices, packing slips, shipping notices, freight bills, and correspondence concerning the order. **Send invoice original and duplicate to: Accounting. P.O. Box 1985, Albuquerque, NM 87103.**

**3. Payment:** City's payment terms are net 30 days unless otherwise stated. City shall not pay late fees, finance fees, or collection fees. Any vendor that accepts payments by credit card on behalf of City must be Payment Card Industry Data Security Standard compliant.

**4. FOB Destination and Inspection:** The risk of loss, injury and destruction, and legal title to the goods remains with vendor until the goods reach the location of the City. All goods delivered are subject to inspection upon receipt by City. Department's count will be accepted by vendor as final and conclusive on all shipments not accompanied by a packing slip. All rejected goods shall remain the property of vendor and will be returned at vendor's expense.

**5. Taxes:** Vendor is responsible for determining whether taxes are applicable to the order and for payment of the tax. Applicable taxes are to be included in each invoice due and may not be billed more than sixty (60) days after providing the goods or services to which the taxes apply.

**6. Warranty:** Vendor warrants that the goods and services furnished shall (a) conform to the specifications; (b) be free from defects in materials and workmanship; (c) be suitable for the purpose intended; (d) be new and of most current production; (e) be free from security interests or liens; and (f) not infringe upon or violate any copyrights or patent rights.

**7. Insurance:** Vendor agrees to comply with its state's law pertaining to workers' compensation benefits for its employees. If vendor fails to comply with the applicable workers compensation law when required to do so, the Contract may be terminated by City. Vendor also agrees to procure and maintain the insurance at https://www.cabq.gov/dfa/purchasing/vendor-services/general-instructions-terms-and-conditions (Section 28) and any additional insurance coverage requested by City.

**8. Default:** City reserves the right to cancel all or any part of the Contract without cost to the City if vendor fails to meet the provisions of the Contract and, except as otherwise provided herein, to hold Vendor liable for any excess cost incurred by City due to vendor default.

**9. Force Majeure:** Neither Vendor nor City shall be liable for failure to perform its obligations under the Contract due to causes beyond the control and without the fault or negligence of either party. Such causes include, but are not restricted to, acts of God or the public enemy, acts of the State or federal government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather and defaults of subcontractors due to any of the above, unless City shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit vendor to meet the required delivery scheduled. The rights and remedies of the City provided in this paragraph shall not be exclusive and are in addition to any other rights now being provided by law or under the Contract.

**10. Termination for Lack of Appropriations:** Notwithstanding any provision in the Contract to the contrary, payments hereunder are contingent upon the Albuquerque City Council making the necessary appropriations. If sufficient appropriations are not made, the Contract may be terminated at the end of City's' then current fiscal year upon written notice given by City to vendor. Such event shall not constitute an event of default and all payment obligations of City and all of its interest in the Contract will cease upon the date of termination. City's determination regarding appropriation shall be accepted by vendor and shall be final.

**11. Termination for Convenience:** City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

**12. Contract Changes:** In no case shall the Contract be changed without the prior written approval of City's Chief Procurement Officer.

**13. Assignment:** Neither the Contract, nor any interest therein, nor claim thereunder, shall be assigned or transferred by vendor, except as expressly authorized in writing by City's Chief Procurement Officer or designee. No such assignment or transfer shall relieve vendor from the obligations and liabilities under the Contract.

**14. City Furnished Property:** City furnished property shall be returned to City upon request in the same condition as received except for ordinary wear, tear, and modifications ordered hereunder.

**15. Indemnity:** Vendor agrees to defend, indemnify and hold harmless City from any and all claims, actions, suits or proceedings brought against City because of any injury or damage received or sustained by any person or property arising out of or resulting from the Contract or by reason of any asserted act or omission, neglect or misconduct of vendor or its agents or employees or any subcontractor or its agents or employees. This indemnity shall not be limited by reason of the specification of any particular insurance coverage in the Contract. City shall not indemnify vendor.

**16. Debarment, Suspension, Ineligibility and Exclusion Compliance:** Vendor certifies (a) that it has not been debarred, suspended or otherwise found ineligible to receive funds by any agency of the executive branch of the federal government, the State of New Mexico, any local public body of the State, or any state of the United States; and (b) should any notice of debarment, suspension, ineligibility or exclusion be received by vendor, vendor will notify City immediately.

**17. Conflict of Interest:** No officer, agent or employee of City will participate in any decision relating to the Contract which affects that person's financial interest, the financial interest of his or her spouse or minor child or the financial interest of any business in which he or she has a direct or indirect financial interest.

**18. Interest of Contractor:** Vendor agrees that it presently does not have, and shall acquire no direct or indirect interest which conflicts in any manner or degree with the performance of the terms of the Contract. Vendor will not employ any person who has any such conflict of interest to assist Vendor in performing the services.

**19. No Collusion:** Vendor represents that it has entered into the Contract without collusion on the part of Vendor with any person or firm, without fraud and in good faith. Vendor also represents that no gratuities, in the form of entertainment, gifts or otherwise, were, or during the term of the Contract, will be offered or given by vendor or any agent or representative of vendor to any officer or employee of the City with a view towards securing the Contract or for securing more favorable treatment with respect to making any determinations with respect to performing the Contract.

**20. Audits and Inspections:** At any time during normal business hours and as often as City may deem necessary, there shall be made available to City for examination all of vendor's records with respect to all matters covered by the Contract. Vendor shall permit City to audit, examine, and make excerpts or transcripts from such records, and to make audits of all contracts, invoices, materials, payrolls, records of personnel, conditions of employment and other data relating to all matters covered by the Contract. Vendor understands and will comply with City's Accountability in Government Ordinance, §2-10-1 et seq. and Inspector General Ordinance, §2-17-1 et seq., R.O.A. 1994, and also agrees to provide requested information and records and appear as a witness in hearings for City's Board of Ethics and Campaign Practices pursuant to Article XII, Section 8 of the Albuquerque City Charter.

**21. Compliance With Ethics Provisions:** Vendor certifies that it has not, either directly or indirectly, entered into action in restraint of free competitive bidding and is in compliance with the Ethical Conduct provisions of City's Public Purchases Ordinance. 5-5-22 R.O.A 1994.

**22. Non-discrimination:** In performing the Contract, vendor shall comply with the Federal Civil Rights Act of 1964 and Title VII of the Act and the Americans with Disabilities Act of 1990.

**23. Compliance With Laws:** In performing the Contract vendor shall comply with all applicable laws, ordinances and codes of the federal, state and local governments.

**24. Governing Law:** The Contract is governed by the laws of the State of New Mexico and the City of Albuquerque. The venue for actions arising out of the Contract is Bernalillo County, New Mexico.

**25. Federal Funding:** Procurements involving the expenditure of federal funds may be subject to mandatory applicable federal law and regulations.

Version Date: August 2018

Exhibit B

Davidson Oil Company v. City of Albuquerque                   December 16, 2021
Jayson Boydstun                                                 No. 1:20-CV-00838-RCB-JHR

Page 11

1      margin, that Davidson Oil would like to protect, and

2      arrived at -- at a price to present to the City.

3       Q.    And what -- what was that margin?

4       A.    The margin that Davidson Oil was looking

5    at to obtain was two cents -- two cents per gallon.

6       Q.    Would it be fair to say take Davidson

7   Oil -- again, we're just at the bid -- we're just at

8   the very beginning of the bid process, but Davidson

9   Oil was looking to make two cents a gallon profit,

10   is what they were --

11       A.    Yes, that was what we were -- that was

12   what we set out to make, yes, sir.

13       Q.    Well -- and I'm going to do this anyway,

14   I'm going to skip ahead just a little bit, but we'll

15   go back. All right?

16       A.    Okay.

17       Q.    Eventually, a contract was signed in

18   January of 2020, is that your understanding?

19       A.    Yes.

20       Q.    And the contract with the City of

21   Albuquerque between Davidson Oil and -- and the City

22   was to cover a period between July of 2020, right?

23       A.    Yes.

24       Q.    July 1st to the end of June of 2021; is

25   that correct?

Davidson Oil Company v. City of Albuquerque                    December 16, 2021
Jayson Boydstun                                               No. 1:20-CV-00838-RCB-JHR

Page 14

1    Mr. Boydstun.

2         A.    I was going to answer, I would not know.

3    I don't have the information for what the City did

4    during that time period.

5         Q.    (Mr. Dubois) Let me ask you, on the years

6    that you looked at in order to develop your bid, was

7    there a worldwide pandemic going on during -- during

8    those years?

9         A.    No, there was not.  And there was not --

10   no, there was not.

11        Q.    All right.  Okay.  So Davidson Oil is

12   chasing $107,000 profit, so you're going to come up

13   with hedge fund contracts, right?  You're working

14   with an expert on that; is that correct?

15        A.    That is correct.

16        Q.    All right.  And, so, describe, for me,

17   just as a ignorant layperson, what the strategy was.

18        A.    Can you clarify what -- when you're refer

19   to "the strategy," the strategy for what?

20        Q.    How does the hedge contract protect

21   Davidson Oil in -- in making a bid on this

22   Albuquerque contract if it was awarded?

23        A.    Well, the -- the City asked for a firm,

24   fixed price for that 12 months.  So, in order to

25   provide a firm, fixed price, you have to go to the

Davidson Oil Company v. City of Albuquerque                      December 16, 2021
Jayson Boydstun                                      No. 1:20-CV-00838-RCB-JHR

Page 17

1      Q.    But you ended up purchasing 12 separate

2   hedge contracts, one for each month?

3      A.    One for each month, yes, sir.  We have to

4   do that because the market settles on a monthly

5   basis, so you have to have -- each contract settles

6   monthly.

7      Q.    Okay.  So tell me, what does a

8   contract -- what would the contract bind -- bind

9   Davidson Oil to do?  And you could pick a sample

10   month -- let's say, September -- for the month of

11   September 2020, what was, you know, Davidson Oil --

12   what did the contract insist that Davidson Oil do?

13      A.    So this is a pure -- purely a paper and

14   financial transaction at this point.  So what it

15   bound Davidson to do was to -- based upon the amount

16   of gallons for that -- that month, we're obliged to

17   settle with the market at that price, be it above or

18   below our fixed price.  So using your -- your

19   example of gasoline at 1.75, if that's our price in

20   the market, we have to guarantee the market that

21   we're going to pay 1.75 for that gas.

22      Q.    All right.

23      A.    So, if the market -- the market drops to

24   1.70, Davidson is obligated to pay that five-cent

25   difference to the market at that point.  If the

5057684505   LG Litig. LGLNH06   City of Albuquerque – LG   02:30:23 p.m.   03-11-2022   29 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 28 of 65

Davidson Oil Company v. City of Albuquerque
Jayson Boydstun

December 16, 2021
No. 1:20-CV-00838-RCB-JHR

Page 22

1     A.     **May you restate the question, please.**

2     Q.     (Mr. Dubois) Were you -- at the time you

3     were analyzing the -- I mean, for Davidson Oil, the

4     contract, were you unaware that the City of

5     Albuquerque could, under the terms of the contract,

6     purchase fuel oil from other sources?

7            MR. CROWN:  Same objection.

8     A.     **Was I aware?**

9            MR. DUBOIS:  Did the court reporter

10    get that?

11    (Note:  Reporter responds, and reads back the answer

12        and question.)

13    Q.     (Mr. Dubois) Yes, that's my question,

14    were you aware of that?

15    A.     **No.**

16    Q.     All right.  Now, as part of your

17    analysis, do you know what Bayesian statistics

18    are -- B-A-Y-E-S-I-A-N?

19    A.     **No.**

20    Q.     Bayesian statistics, it's a common --

21    okay.  As part of your analysis, did you -- did you

22    do a statistical analysis of the probabilities

23    that -- that the City of Albuquerque's demand for

24    fuel oil -- total amount of fuel oil could go down

25    from the averages that you were using in order to

Davidson Oil Company v. City of Albuquerque                                   December 16, 2021
Jayson Boydstun                                                             No. 1:20-CV-00838-RCB-JHR

Page 23

1      buy the hedge fund contracts and -- and to calculate

2      your profit, and all that?

3           A.    No, we did not.

4           Q.    So your assumption was that two previous

5      years would -- was the best indicator for what

6      the -- the future calendar year would be, and that

7      was your -- that was your presumption for all of

8      your analysis; is that correct?

9           A.    That is correct.

10          Q.    So how much did these hedge funds

11     contracts end up costing Davidson Oil -- because you

12     mentioned that some months they might actually make

13     money, and then some months, they might, you know,

14     end up paying money -- just on the hedge contracts?

15          A.    Can you clarify what you mean by "cost."

16          Q.    Yeah, out-of-pocket expenses to Davidson

17     Oil.

18          A.    The total loss that Davidson Oil incurred

19     with these hedge fund contracts over that 12-month

20     period was $601,858.99.

21          Q.    Would that have occurred -- that -- that

22     loss, I'm just going to round it off, 601,000 --

23     have occurred regardless of whether or not the

24     contract had been terminated?

25          A.    When you ask about "terminated,"

Davidson Oil Company v. City of Albuquerque                    December 16, 2021
Jayson Boydstun                                             No. 1:20-CV-00838-RCB-JHR

Page 24

1    terminated when?

2        Q.    Well, in March of 2020, as -- in other

3    words, it turned out, correct, that the City of

4    Albuquerque didn't purchase any fuel oil from

5    Davidson Oil during the period of July the 1st of

6    2020 to June 30th of 2021, correct?

7        A.    That is correct.

8        Q.    Did that make any difference in -- I

9    mean, the hedge fund contracts weren't based on

10   whether or not a third-party was going to -- on what

11   the City of Albuquerque was doing, correct?

12       A.    If you're referring, specifically, to the

13   hedge -- no, it does not rely upon what the City

14   ultimately did.  But the City engaged Davidson Oil

15   with a legitimate contract to provide them with a

16   fixed price from July of 2020 through June of '21,

17   and in order to perform that contract, Davidson Oil

18   entered into hedge contracts to provide the City the

19   fixed price that they asked for.

20       Q.    And that resulted in Davidson Oil losing

21   $601,000 chasing a profit of $107,000, is that a

22   fair statement?

23       A.    The two are not correlated, no, sir.  You

24   can't draw a correlation between what the -- what

25   the hedge did and what the profits of Davidson Oil

Davidson Oil Company v. City of Albuquerque                    December 16, 2021
Jayson Boydstun                                               No. 1:20-CV-00838-RCB-JHR

                                                                      Page 37

1          A.    Yes.

2          Q.    And -- and what's -- your understanding

3    is the same as mine, basically what that is, is,

4    it's a measurement that economists use to measure --

5    the measurement of the sensitivity of a consumer to

6    changes in price as to how much that they will buy

7    of a certain commodity, correct?

8          A.    **Correct.**

9          Q.    Did you do any calculations, or was it

10   part of your formula, to try to calculate what the

11   elasticity of the demand of the City of Albuquerque

12   was for fuel oil?

13         **A.    No.  Part of our calculation included**

14   **looking at the market differential for the City of**

15   **Albuquerque, or the Albuquerque racks in particular,**

16   **which would have included some of that elasticity**

17   **depending on if the market was under or**

18   **over-supplied at that point in time.  But**

19   **specifically saying, "Let's look and see if it**

20   **changes here in each month," no, there was no**

21   **elasticity of demand included in our formula.**

22         Q.    And you're familiar just with the basics

23   of -- the supply and demand curve?

24         A.    Yes.

25         Q.    And the elasticity of demand is really

Page 38

1    kind of the measurement of the slope of the demand

2    curve, correct?

3        A.    **Correct.**

4        Q.    At no time did you assume that the -- the

5    demand curve for fuel oil for the City of

6    Albuquerque was -- was completely vertical, did you?

7        A.    **No.**

8        Q.    So -- so you realize that the City of

9    Albuquerque -- the amount of fuel oil the City of

10   Albuquerque would -- would purchase would be

11   dependent upon the -- the price it would have to

12   pay, correct?

13       A.    **Well, I would have to argue that the City**

14   **asked for a firm, fixed price so the City knew the**

15   **price they were going to pay, so why would the**

16   **demand elasticity be involved?**

17       Q.    Good question.  And -- but since I'm

18   asking the questions, I don't get to answer.  But

19   let me ask you this:  It's not just, in a sense,

20   that it measures sensitivity to changes in price,

21   but it could also measure sensitivity to revenue

22   sources, right, how much money I -- I have.  In

23   other words, the price of a commodity could stay the

24   same but if my income goes down, I still might want

25   to purchase less of that -- of that product, even

Davidson Oil Company v. City of Albuquerque                                    December 16, 2021
Jayson Boydstun                                                              No. 1:20-CV-00838-RCB-JHR

Page 39

1      though it's stayed at the same price, correct?

2          A.    That's correct.

3          Q.    What studies did you do on the -- or what

4      the City of Albuquerque's revenue sources were?

5          A.    We -- we did not feel that those were

6      relevant to our analysis of providing the City with

7      a bid price for their fuel oil.  The assumption is

8      that the City was asking for a price in order to

9      formulate their budget for the upcoming year.  And

10     that's typically why people ask for a fixed price,

11     is able to put a budgeted price, and that's what

12     they budget.

13         Q.    Would you take a look again at Exhibit 2

14     of -- of the -- that's been provided to you, which

15     is the -- which you've identified as being the

16     executed contract --

17         A.    Yes, sir.

18         Q.    -- to Davidson Oil and the City of

19     Albuquerque.  Would you look at paragraph 10.

20         A.    Yes, sir.

21         Q.    The terms and conditions on that.

22         A.    Umm-hmm.

23         Q.    What was your understanding of -- of that

24     paragraph, how it operated?

25         A.    It's -- it goes into the budgeting

5057684505       LG Litig. LGLNH06       City of Albuquerque – LG       02:34:09 p.m.       03-11-2022       35 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 34 of 65

Davidson Oil Company v. City of Albuquerque                          December 16, 2021
Jayson Boydstun                                                No. 1:20-CV-00838-RCB-JHR

Page 44

1        that we paid in interest to be able to fund the

2        market requirements of the hedge contract.  And then

3        there were anticipated fuel profits and

4        transportation profits that we're -- you know, we're

5        seeking damages for.

6            Q.    And how much were those?

7            A.    The fuel profits, 107,567, and then we

8        had freight profits, the $62,154.

9            Q.    Again, those freight profits were

10       predicted on the basis that the City of Albuquerque

11       would buy the same, or more, total amount of fuel

12       oil from it?

13           A.    Right.

14           Q.    As it had on the average of the two

15       previous years, correct?

16           A.    That is correct.  Yes.

17           Q.    What other losses, or damages, do you

18       claim?

19           A.    Those are all the claim -- I mean, the

20       claimed damages that we can -- I mean, we have other

21       expenses that -- that are not allowed.

22           Q.    And do you have, handy, a -- I could have

23       done it myself, but do you have, handy, a total?

24           A.    Yes, the total losses that we presented

25       are $785,464.83.

5057684505          LG Litig. LGLNH06          City of Albuquerque – LG          02:34:44 p.m.          03–11–2022          36 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 35 of 65

Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVIDSON OIL COMPANY,**

**Plaintiff,**

**vs.**                                          **Case No. 1:20-CV-00838-RCB-JHR**

**CITY OF ALBUQUERQUE,**

**Defendant.**

## AFFIDAVIT OF SANJAY BHAKTA
## CITY OF ALBUQUERQUE CHIEF FINANCIAL OFFICER

**COMES NOW** Sanjay Bhakta, City of Albuquerque (COA) Chief Financial Officer (CFO), and having been duly sworn, states:

1.      My educational background is a bachelors in advanced accounting and auditing from Sardar Patel University (SPU), India, a master's degree in managerial accounting and international banking from Maharaja Sayajirao University (MSU), India. Also, I am a Certified Public Accountant (CPA), licensed in New Mexico. I became a licensed CPA in 2010. Additionally, I have following certifications: Certified Government Financial Manager (CGFM), Certified Fraud Examiner (CFE) and Charter Global Financial Manager (CGMA). I was employed with the COA in 2017 as the Chief Financial Officer and have continued in that position until the present.

2.      The Procurement Contract between the COA and Davidson Oil was signed on January 21, 2020.

3.      Notice of termination of the Contract for convenience was sent on March 19, 2020, which is 60 days prior to its effective date.

5057684505          LG Litig. LGLNH06          City of Albuquerque – LG          02:35:15 p.m.          03-11-2022          37 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 36 of 65

4.      During the FY/21 Budget process there was concern regarding the cost of fuel during the pandemic.

5.      The Procurement Contract had a provision called the "Termination for Convenience" which states:

> **11. Termination for Convenience:** City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

6.      The Procurement Contract had a provision called the "Termination for Lack of Appropriations" which states:

> **10. Termination for Lack of Appropriations:** Notwithstanding any provision in the Contract to the contrary, payments hereunder are contingent upon the Albuquerque City Council making the necessary appropriations. If sufficient appropriations are not made, the Contract may be terminated at the end of City's' then current fiscal year upon written notice given by City to vendor. Such event shall not constitute an event of default and all payment obligations of City and all of its interest in the Contract will cease upon the date of termination. City's determination regarding appropriation shall be accepted by vendor and shall be final.

7.      The Procurement Contract did not have an exclusivity clause requiring it to only purchase fuel oil from Davidson Oil Company.

8.      The Procurement Contract did not require the COA to purchase any certain amount of fuel from Davidson Oil Company.

5057684505 LG Litig. LGLNH06 City of Albuquerque – LG 02:35:48 p.m. 03-11-2022 38 /66

Case 1:20-cv-00838-RB-JHR Document 52 Filed 03/11/22 Page 37 of 65

9.     The COA terminated the Procurement Contract on March 19, 2020 before the time Davidson Oil Company was to start delivering fuel oil which was July 1, 2020.

10.     I believed at the time of the termination and continue to believe to the present time that it was in the best interest of the COA to terminate the Contract.

11.     Attached is the official state FY/21 Budget process and the memo form NM DFA dated March 18, 2020 that was sent to COA and other local governments.   Nothing like had ever happened before to my knowledge.

12.     The Coronavirus Disease 2019 (COVID-19) public health emergency has not only had a devastating impact on the health of individuals throughout the world and our community but has also had ripple effects on our economy and way of life. As a result of this public health emergency, the City had to reassess the revenue impact from FY/20 forward.

13.     On March 16, 2020 the New Mexico Department of Finance and Administration, Local Government Division, issued memorandum BFB #20-04 to allow municipalities to submit their FY/20 budget as their FY/21 rollover budget until a FY/21 budget could be meaningfully forecasted. This "rollover" budget would allow municipalities and other local governments to operate on a month-to-month basis until revenues could be reasonably estimated and an adjusted budget could be proposed to structurally realign the budget to anticipated resources. Council adopted O-20-7, which provided special procedures for the City's FY/21 budget.

14.     In March of 2020 the Mayor proposed a rollover budget that only incorporated technical adjustments needed to structurally balance the budget to the FY/20's pre-public health emergency revenue estimations (O-20-31). Council approved the rollover budget on April 13, 2020 and the Mayor signed the budget legislation on April 22, 2020.

5057684505   LG Litig. LGLNH06   City of Albuquerque – LG   02:36:26 p.m.   03-11-2022   39 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 38 of 65

15.     On September 3, 2020, the Mayor transmitted legislation to adjust the Fiscal Year 2021 "rollover" budget (O-20-98). Council approved the adjusted Fiscal Year 2021 budget on October 19, 2020 and the Mayor signed the budget legislation on November 6, 2020.

16.     This time table deviated radically from the normal budgetary process in prior years.

17.     To my knowledge the COA has never performed an economic study of on the COA's elasticity of demand for fuel oil.

18.     Davidson Oil Company never sent the hedge contracts for the COA to review, accept, and approve prior to purchasing them, nor at any time prior to the date of termination.

19.     The COA was determined to maintain services within the COA during the pandemic, however, the COA had options to purchase less fuel oil by eliminating some services.

20.     It became clear that the COA's Transit Department, which was a major consumer of fuel, would be using less fuel oil due to the pandemic. If necessary, the bus running times and routes could have been shortened to save on fuel.

21.     Also, the availability of using Zoom during the pandemic assisted in COA employees in using less fuel by not having to attend meetings in person during the pandemic.

Sanjay Bhakta
Chief Financial Officer
City of Albuquerque

SUBSCRIBED AND SWORN the 9th day of March, 2022 by Sanjay Bhakta, City of Albuquerque Chief Financial Officer.

NOTARY PUBLIC



OFFICIAL SEAL
Janice C. Wright
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 1.27.23

740029

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     02:37:03 p.m.     03-11-2022     40 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 39 of 65

**MICHELLE LUJAN GRISHAM**
GOVERNOR



**OLIVIA PADILLA - JACKSON**
CABINET SECRETARY

**DONNIE J. QUINTANA**
DIRECTOR

STATE OF NEW MEXICO
DEPARTMENT OF FINANCE AND ADMINISTRATION
LOCAL GOVERNMENT DIVISION
Bataan Memorial Building ♦ 407 Galisteo St. ♦ Suite 202 ♦ Santa Fe, NM 87501
PHONE (505) 827-4950 ♦ FAX (505) 827-4948

Dear: Local Government Partner                                    18 March 2020

As we plan, prepare and respond for the impact of the COVID-19 public health emergency, we face various uncertainties and unknowns, as they pertain to the economic and financial conditions at the state and local level. Accordingly, Local Government Division ("LGD") recognizes the need to temporarily adjust and amend our budget approval process and guidelines. Specifically, as they relate to: 1) FY-2021 local governments budget submittal and 2) their ability to meet the previous issued guidance (Memorandum BFB #20-02, dtd 2 March 2020) of maintaining the state required reserve as applicable to your respective entity.

Therefore, LGD has published (Attachment #1 Memorandum BFB #20-04, dtd 16 March 2020) providing updated FY-2021 Budget Preparation & Submission Guidelines. For an entity that may not have the data to adequately forecast revenue, we are allowing for the submission of your approved FY-2020 budget as you're FY-2021 budget. In addition, for our partners that may not have the resources to maintain the state required reserve, LGD will temporary modify the Local Government Budget Management System ("LGBMS") to allow for the waiver of this requirement.

If you have any questions, and/or concerns please feel free to contact me at 505-490-5788.

Thank you for your continued support.

Very respectfully,

Donnie Quintana
Director

ATTACHMENT: #1 Memorandum BFB #20-04 dtd 18 March 2020

xc:     Budget & Finance Bureau Analysts
        Brian Colón, State Auditor
        Regina Romero, New Mexico Municipal League Intergovernmental Relations Director
        Steve Kopelman, New Mexico Association of Counties Executive Director

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:37:48 p.m.    03-11-2022    41 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 40 of 65



**MICHELLE LUJAN GRISHAM**
GOVERNOR

**OLIVIA PADILLA-JACKSON**
CABINET SECRETARY

**DONNIE J. QUINTANA**
DIRECTOR

**STATE OF NEW MEXICO**
**DEPARTMENT OF FINANCE AND ADMINISTRATION**
**LOCAL GOVERNMENT DIVISION**
Bataan Memorial Building ♦ 407 Galisteo St. ♦ Suite 202 ♦ Santa Fe, NM 87501
PHONE (505) 827-4950 ♦ FAX (505) 827-4948

## MEMORANDUM BFB #20-04

TO:       New Mexico Counties and Municipalities

FROM:    Donnie J. Quintana, Director
            Local Government Division

DATE:     March 18, 2020

SUBJECT:  Updated Fiscal Year 2020-21 Budget Preparation & Submission Guidelines

In light of current economic uncertainties due to the impact of the COVID-19 public health emergency, we are temporarily adjusting our budget approval guidelines.

In the event that your local entity has inadequate data to make revenue projections and/or is unable to meet the state required reserves, we offer the following recommendations in preparing and submitting an interim budget by the June 1, 2020 statutory deadline:

- You can download your local entity's FY2019-2020 budget from the Local Government Budget Management System (LGBMS) and then upload the exact budget, with any changes you deem necessary, into LGBMS as the FY2020-2021 interim budget using the following steps:
    1. Navigate to the LGBMS Reporting Module and open any of the completed quarters for FY2019-2020 (for example you can go into period "FY2020 Q2" or FY2020 Q3").
    2. Click on the "My Budget" button at the top of the screen.



    3. An Excel file with your entity's FY2019-2020 budget line items will appear on the screen and you can make changes to any of the amounts if you wish.
    4. Using the "Save As" option in Excel, save the file with a new file name denoting it as the FY2020-2021 budget and select "CSV (Comma delimited)" as the file type.

5. Navigate to the LGBMS Budget Module for FY2020-2021 and follow the instructions beginning on page 22 of the *LGMBS Entity User Guide* to upload the CSV file.

- A governing body resolution approving the annual budget is not required until July 31, 2020; therefore, it is based on your local entity's internal policy as to whether the interim budget will be presented to the governing body.

- After the current fiscal year closes on June 30, 2020, reconcile all Funds so that you can complete the FY2020 Q4 report and have beginning balances as of July 1, 2020 to report on the final budget on LGBMS.

- Use the year-to-date actuals on the FY2020 Q4 report to decide what budget line items require revision for the final budget and then contact your assigned LGD Budget Analyst (analyst) to coordinate the revisions.

- We are working with our vendor to temporarily modify LGBMS to allow submittal of budgets not meeting the state required reserves; however, please have a conversation with your analyst if your local entity is unable to meet the state required reserves.

- For questions that come up that are not specifically addressed in this guidance memo, be sure to contact your assigned analyst via email to get direction specific to your local entity's needs.

- Because the impact of the current health emergency is evolving each day, be sure to read all email correspondence coming from your assigned analyst.

You can find the LGBMS User Guide, LGBMS FAQ document, and other information on our website: http://www.nmdfa.state.nm.us/lgbms.aspx

If you have any further questions, please contact your assigned analyst or the main number at (505)827-4975. We appreciate your patience and flexibility as we all navigate through these challenging times together.

xc: Local Government Division, Budget & Finance Bureau Analysts
Brian Colón, State Auditor
Regina Romero, New Mexico Municipal League Intergovernmental Relations Director
Steve Kopelman, New Mexico Counties Executive Director

5057684505       LG Litig. LGLNH06       City of Albuquerque – LG       02–39–14 p.m.       03–11–2022       43 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 42 of 65

Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVIDSON OIL COMPANY,**

**Plaintiff,**

**vs.**                                    **Case No. 1:20-CV-00838-RCB-JHR**

**CITY OF ALBUQUERQUE,**

**Defendant.**

### AFFIDAVIT OF CHRISTOPHER DANIEL
### CITY OF ALBUQUERQUE CHIEF INVESTMENT OFFICER

**COMES NOW** Christopher Daniel, City of Albuquerque (COA) Chief Investment

Officer, and having been duly sworn, states:

1.          My educational background is an undergraduate degree in Broadcasting from the

University North Carolina Chapel Hill, then I earned an MBA degree with a Finance concentration

from Georgia State University in Atlanta. I have been employed with the COA as the Chief

Investment Officer since 2014. I have been employed by the City's Department of Finance &

Administrative Services since February 2006.

2.          I review daily indicators regarding fuel oil prices and other commodities markets

using the Bloomberg Information Service Terminal. This exercise is completely independent of

any procurement agreements the COA may have (see attached Exhibits 1 and 2).

3.          Every work day, I review fixed income investment indicators such as Commercial

Paper rates, U.S. Treasury and Agency rates, Overnight Repurchase Agreements rates, credit

markets, and other.

4.          In late January 2020, I was reviewing the prices of fuel oil and noticed a precipitous

declining trend in fuel oil prices.

5057684505          LG Litig. LGLNH06          City of Albuquerque – LG          02:39:45 p.m.          03-11-2022          44 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 43 of 65

5.     Around that same time, I became concerned about a potential impending fiscal crisis with the COA, and I had to look at what was in my sphere of influence to do something about that.

6.     The purchase of fuel oil was an expense and was something we could control to help reign in our costs to balance the budget.

7.     The COA budget can be volatile because it is based in large part on gross receipts tax revenue, and retail spending had decreased in the first calendar quarter of 2020 due to the pandemic. I discussed with City of Albuquerque Chief Financial Officer Sanjay Bhakta our concerns about a possible revenue shortfall.

8.     For the first 6 months of COA's 2021 fiscal year, which spanned the period from July 1, 2020 through December 31, 2020, the City consumed 1.5 million gallons of diesel fuel at an average price of $1.45 per gallon, for a total cost of $2.1 million, excluding fees and taxes. For the same period, COA also consumed 1.0 million gallons of gasoline at an average price of $1.44 per gallon, for a total cost of $1.5 million, again excluding fees and taxes. For the full fiscal year 2021 COA saved $800,000, net of hedging costs, compared to what it would've paid under the Davidson Oil agreement.

9.     It was decided not to terminate the TAC Energy contract in effect through June 2020 because it was so close to the end of the fiscal year.

10.     Davidson Oil Company was contacted and asked if they could lower their fuel oil prices in the FY21 agreement because of the chaos with the pandemic, and Davidson Oil Company refused.

11.     Fuel oil prices fluctuate daily. One type of hedge which is tied to a fixed rate, called a swap agreement, is a hedge whereby a counterparty and the hedging entity agree on a fixed price (swap price).

12.     With a swap, each month the hedge counterparty will compute the price of the relevant underlying fuel oil futures and if the appropriate NYMEX (New York Mercantile Exchange) futures rate is less than the agreed upon swap price, then the counterparty will be paid by the hedging party an amount that will equal the agreed upon price. If the NYMEX price is above the agreed upon swap price, the counterparty will have to pay the COA. This type of hedge is a great budgeting tool, because for the volumes hedged it provides cost certainty.

13.     Alternativel, the hedging tools that the COA used for FY21 are "caps", whereby the COA has to pay a premium cost upfront, and a "strike price" is agreed upon. The hedging party may choose a strike price higher than the NYMEX rate to keep its premium cost lower (albeit at a lower protection level). There is no monthly settlement until the NYMEX price exceeds the strike price. One advantage of employing hedge caps is that when the NYMEX price goes above the strike price, the COA gets paid an amount above the strike price, thereby "capping" risk to a degree. Another advantage is that when pump prices fall, unlike with swaps, the hedging party benefits from lower supplier prices. Cap hedges are comparable to buying an insurance policy up front to protect the COA.

14.     The COA terminated the Davidson Oil Procurement Contract in March 2020 because the COA needed time purchase the hedges and contract with another procurement vendor and have everything in place by July 1, 2020.

15.     The COA ultimately purchased fuel oil from TAC Energy using the State of New Mexico Statewide Purchasing Agreement.

Christopher Daniel, CFA, CPA, CTP
Chief Investment Officer
City of Albuquerque

SUBSCRIBED AND SWORN the 9th day of March, 2022 by Christopher Daniel, City of Albuquerque Chief Investment Officer.

NOTARY PUBLIC

741983

OFFICIAL SEAL
Janice C. Wright
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 11-21-23

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:41:15 p.m.    03–11–2022    47 /66

Case 1:20-cv-00838-RB-JHR  Document 52  Filed 03/11/22  Page 46 of 65

Exhibit 1

**Bloomberg**

## CL1 Comdty (Generic 1st 'CL' Future)
CL1 Comdty (Generic 1st 'CL' Future)



The BLOOMBERG PROFESSIONAL service, BLOOMBERG Data and BLOOMBERG Order Management Systems (the "Services") are owned and distributed locally by Bloomberg Finance L.P. ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the BLP Countries). BFLP is a wholly-owned subsidiary of Bloomberg L.P. ("BLP"). BLP provides BFLP with all global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. The Services include electronic trading and order-routing services, which are available only to sophisticated institutional investors and only where necessary legal clearances have been obtained. BFLP, BLP and their affiliates do not provide investment advice or guarantee the accuracy of prices or information in the Services. Nothing in the Services shall constitute or be construed as an offering of financial instruments by BFLP, BLP or their affiliates, or as investment advice or recommendations by BFLP, BLP or their affiliates of an investment strategy or whether or not to "buy", "sell" or "hold" an investment. BLOOMBERG, BLOOMBERG PROFESSIONAL, BLOOMBERG MARKETS, BLOOMBERG NEWS, BLOOMBERG ANYWHERE, BLOOMBERG TRADEBOOK, BLOOMBERG TELEVISION, BLOOMBERG RADIO, BLOOMBERG PRESS and BLOOMBERG.COM are trademarks and service marks of BFLP, a Delaware limited partnership, or its subsidiaries.

Bloomberg ®Charts                            1 - 1

5057684505   LG Litig. LGLNH06   City of Albuquerque – LG   02:41:55 p.m.   03–11–2022   48 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 47 of 65

# Commodity Hedging Instruments

## City of Albuquerque, New Mexico

September 6, 2019

## Structured Products Group

Richard Konkel
Managing Director
richard.konkel@hilltopsecurities.com

Collin Vanecek
Analyst
collin.vanecek@hilltopsecurities.com

1201 Elm Street, Suite 3500
Dallas, Texas 75270
214.953.4020 Direct



**Hilltop**Securities
A Hilltop Holdings Company.

Member NYSE/FINRA/SIPC | ©2019 Hilltop Securities Inc.

238

# Futures – Indicative Pricing

*Futures are exchange traded agreements to buy or sell a commodity in the future at a particular price.*

Benefits:

- Budget certainty
- User is protected from prices above the contract price

Considerations:

- Term is limited to 3 years
- User is unable to customize purchase volume; can only purchase whole contracts (e.g., 1 contract = 42,000 gallons gasoline/diesel, or 10,000 MMBTU natural gas)

## NYMEX

| ULSD FY21 Hedging Instruments | | | | RBOB FY21 Hedging Instruments | | |
|---|---|---|---|---|---|---|
| Month | Gallons | Futures | | Month | Gallons | Futures |
| 7/1/2020 | 294,000 | $ 1.819 | | 7/1/2020 | 168,000 | $ 1.673 |
| 8/1/2020 | 294,000 | $ 1.821 | | 8/1/2020 | 168,000 | $ 1.651 |
| 9/1/2020 | 252,000 | $ 1.824 | | 9/1/2020 | 126,000 | $ 1.623 |
| 10/1/2020 | 294,000 | $ 1.839 | | 10/1/2020 | 126,000 | $ 1.503 |
| 11/1/2020 | 252,000 | $ 1.847 | | 11/1/2020 | 126,000 | $ 1.479 |
| 12/1/2020 | 252,000 | $ 1.829 | | 12/1/2020 | 126,000 | $ 1.441 |
| 1/1/2021 | 252,000 | $ 1.845 | | 1/1/2021 | 126,000 | $ 1.455 |
| 2/1/2021 | 210,000 | $ 1.843 | | 2/1/2021 | 126,000 | $ 1.466 |
| 3/1/2021 | 252,000 | $ 1.837 | | 3/1/2021 | 126,000 | $ 1.486 |
| 4/1/2021 | 252,000 | $ 1.826 | | 4/1/2021 | 126,000 | $ 1.685 |
| 5/1/2021 | 294,000 | $ 1.818 | | 5/1/2021 | 126,000 | $ 1.718 |
| 6/1/2021 | 252,000 | $ 1.798 | | 6/1/2021 | 126,000 | $ 1.730 |
| Total/WAVG | 3,150,000 | $ 1.828 | | Total/WAVG | 1,596,000 | $ 1.580 |

*Prices as of August 29, 2019; subject to change due to market conditions. Prices do not include customary transaction costs.*

**Hilltop**Securities
A Hilltop Holdings Company.

**Member NYSE/FINRA/SIPC**
© 2019 Hilltop Securities Inc.

239

# Swaps – Indicative Pricing

*A swap is an over-the-counter ("OTC") derivative that enables an end user to lock in a price for a specific commodity index over a set term and projected usage schedule*

Benefits:

- No upfront premium
- User is protected from prices above the swap price
- User is able customize contract volumes
- Budget certainty

Considerations:

- User will not benefit from prices below the swap price
- Potential negative mark-to-market if prices fall below swap price

## NYMEX

| ULSD FY21 Hedging Instruments | | | | RBOB FY21 Hedging Instruments | | |
|---|---|---|---|---|---|---|
| Month | Gallons | Swap | | Month | Gallons | Swap |
| 7/1/2020 | 299,851 | $ 1.811 | | 7/1/2020 | 175,868 | $ 1.550 |
| 8/1/2020 | 327,720 | $ 1.811 | | 8/1/2020 | 174,652 | $ 1.550 |
| 9/1/2020 | 279,612 | $ 1.811 | | 9/1/2020 | 150,067 | $ 1.550 |
| 10/1/2020 | 304,947 | $ 1.811 | | 10/1/2020 | 159,954 | $ 1.550 |
| 11/1/2020 | 284,454 | $ 1.811 | | 11/1/2020 | 138,871 | $ 1.550 |
| 12/1/2020 | 276,328 | $ 1.811 | | 12/1/2020 | 141,659 | $ 1.550 |
| 1/1/2021 | 256,397 | $ 1.811 | | 1/1/2021 | 131,943 | $ 1.550 |
| 2/1/2021 | 241,036 | $ 1.811 | | 2/1/2021 | 128,281 | $ 1.550 |
| 3/1/2021 | 285,396 | $ 1.811 | | 3/1/2021 | 151,222 | $ 1.550 |
| 4/1/2021 | 293,056 | $ 1.811 | | 4/1/2021 | 155,644 | $ 1.550 |
| 5/1/2021 | 330,106 | $ 1.811 | | 5/1/2021 | 157,389 | $ 1.550 |
| 6/1/2021 | 289,807 | $ 1.811 | | 6/1/2021 | 153,376 | $ 1.550 |
| Total/WAVG | 3,468,710 | $ 1.811 | | Total/WAVG | 1,819,525 | $ 1.550 |

*Prices as of August 29, 2019; subject to change due to market conditions. Prices do not include customary transaction costs.

**Hilltop**Securities
A Hilltop Holdings Company.

Member NYSE/FINRA/SIPC
© 2019 Hilltop Securities Inc.

5057684505   LG Lltlg. LGLNH06   City of Albuquerque – LG   02:43:50 p.m.   03-11-2022   51 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 50 of 65

# Caps – Indicative Pricing

*A cap is an OTC derivative that sets a price threshold above which the price is fixed and below which the price is floating.*

## NYMEX

| Spread | Gallons | ULSD FY21 Cap Strike | Cap Premium | $/Gal |
|---|---|---|---|---|
| | | Hedging Instruments | | |
| ATM | 3,468,710 | $ 1.81 | $ 789,310 | $ 0.228 |
| ATM+25 | 3,468,710 | $ 2.06 | $ 461,880 | $ 0.133 |
| ATM+50 | 3,468,710 | $ 2.31 | $ 263,376 | $ 0.076 |
| ATM+75 | 3,468,710 | $ 2.56 | $ 151,546 | $ 0.044 |
| ATM+100 | 3,468,710 | $ 2.81 | $ 87,787 | $ 0.025 |

| Spread | Gallons | RBOB FY21 Cap Strike | Cap Premium | $/Gal |
|---|---|---|---|---|
| | | Hedging Instruments | | |
| ATM | 1,819,525 | $ 1.55 | $ 439,127 | $ 0.241 |
| ATM+25 | 1,819,525 | $ 1.80 | $ 272,227 | $ 0.150 |
| ATM+50 | 1,819,525 | $ 2.05 | $ 154,873 | $ 0.091 |
| ATM+75 | 1,819,525 | $ 2.30 | $ 100,300 | $ 0.055 |
| ATM+100 | 1,819,525 | $ 2.55 | $ 61,830 | $ 0.034 |

*Prices as of August 29, 2019; subject to change due to market conditions*

## Benefits:

- User is protected from prices above the swap price
- User is able benefit from a decrease in prices
- Mark-to-market always an asset position

## Considerations:

- Upfront premium payment
- Rising prices can still affect the User up to the Cap Strike

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:44:33 p.m.    03-11-2022    52 / 66

Case 1:20-cv-00838-RB-JHR    Document 52    Filed 03/11/22    Page 51 of 65

# Collars – Indicative Pricing

*A collar represents the simultaneous purchase of a cap and sale of a floor at offsetting prices, thereby creating a "band" within which prices float, and outside of which prices are fixed.*

## Benefits:

- User is protected from prices above the swap price
- Can be structured as zero-premium

## Considerations:

- Rising prices can still affect the User up to the Cap Strike
- Lose the benefit of falling prices below the floor option strike price

## NYMEX

| ULSD FY21 | | Hedging Instruments | |
|---|---|---|---|
| Spot | Gallons | Cap Strike | Floor Strike |
| $ 1.81 | 3,468,710 | $ 2.06 | $ 1.60 |
| $ 1.81 | 3,468,710 | $ 2.31 | $ 1.43 |
| $ 1.81 | 3,468,710 | $ 2.56 | $ 1.29 |
| $ 1.81 | 3,468,710 | $ 2.81 | $ 1.17 |

| RBOB FY21 | | Hedging Instruments | |
|---|---|---|---|
| Spot | Gallons | Cap Strike | Floor Strike |
| $ 1.55 | 1,819,525 | $ 1.80 | $ 1.36 |
| $ 1.55 | 1,819,525 | $ 2.05 | $ 1.20 |
| $ 1.55 | 1,819,525 | $ 2.30 | $ 1.07 |
| $ 1.55 | 1,819,525 | $ 2.55 | $ 0.96 |

*Prices as of August 29, 2019; subject to change due to market conditions. Prices do not include customary transaction costs.*

**Hilltop**Securities
A Hilltop Holdings Company.

Member NYSE/FINRA/SIPC
© 2019 Hilltop Securities Inc.

242

5057684505          LG Litig. LGLNH06          City of Albuquerque – LG          02:45:12 p.m.          03-11-2022          53 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 52 of 65

# Disclosure

Derivative instruments are often complex financial arrangements used to manage specific risks. This presentation, and the concepts which are described, use vocabulary which is specific to derivative markets. This presentation assumes the reader is familiar with this vocabulary since they may be parties to derivative instruments.

This material is intended for educational and informational purposes only and does not constitute legal or investment advice, nor is it an offer or a solicitation of an offer to buy or sell any investment or other specific product. Information provided in this paper was obtained from sources that are believed to be reliable; however, it is not guaranteed to be correct, complete, or current, and is not intended to imply or establish standards of care applicable to any attorney or advisor in any particular circumstances. The statements within constitute Hilltop Securities' views as of the date of the report and are subject to change without notice. This paper represents historical information only and is not an indication of future performance.

**Member NYSE/FINRA/SIPC**
© 2019 Hilltop Securities Inc.

**Hilltop**Securities
A Hilltop Holdings Company.

5057684505  LG Litig. LGLNH06  City of Albuquerque – LG  02:45:43 p.m.  03-11-2022  54 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 53 of 65

## ULSD Not Hedged

| Date | Notional | Floating Price |
|---|---|---|
| 7/1/2020 | 299,851 | $ 1.765 |
| 8/1/2020 | 327,720 | $ 1.766 |
| 9/1/2020 | 279,612 | $ 1.769 |
| 10/1/2020 | 304,947 | $ 1.795 |
| 11/1/2020 | 284,454 | $ 1.798 |
| 12/1/2020 | 276,328 | $ 1.775 |
| 1/1/2021 | 256,397 | $ 1.802 |
| 2/1/2021 | 241,036 | $ 1.799 |
| 3/1/2021 | 285,396 | $ 1.796 |
| 4/1/2021 | 293,056 | $ 1.778 |
| 5/1/2021 | 330,106 | $ 1.780 |
| 6/1/2021 | 289,807 | $ 1.751 |
| Total/WAVG | 3,468,710 | $ 1.780 |

## ULSD Hedged with Swap

| Date | Notional | Floating Price | Fixed Price | Portion Hedged |
|---|---|---|---|---|
| 7/1/2020 | 299,851 | $ 1.765 | $ 1.780 | 100% |
| 8/1/2020 | 327,720 | $ 1.766 | $ 1.780 | 100% |
| 9/1/2020 | 279,612 | $ 1.769 | $ 1.780 | 100% |
| 10/1/2020 | 304,947 | $ 1.795 | $ 1.780 | 100% |
| 11/1/2020 | 284,454 | $ 1.798 | $ 1.780 | 100% |
| 12/1/2020 | 276,328 | $ 1.775 | $ 1.780 | 100% |
| 1/1/2021 | 256,397 | $ 1.802 | $ 1.780 | 100% |
| 2/1/2021 | 241,036 | $ 1.799 | $ 1.780 | 100% |
| 3/1/2021 | 285,396 | $ 1.796 | $ 1.780 | 100% |
| 4/1/2021 | 293,056 | $ 1.778 | $ 1.780 | 100% |
| 5/1/2021 | 330,106 | $ 1.780 | $ 1.780 | 100% |
| 6/1/2021 | 289,807 | $ 1.751 | $ 1.780 | 100% |
| Total/WAVG | 3,468,710 | $ 1.780 | $ 1.780 | 100% |

## ULSD Cap

| Date | Notional | Floating Price | ATM Strike (Spot) | Spread | Strike |
|---|---|---|---|---|---|
| 7/1/2020 | 299,851 | $ 1.765 | $ 1.780 | $ 0.250 | $ 2.030 |
| 8/1/2020 | 327,720 | $ 1.766 | $ 1.780 | $ 0.250 | $ 2.030 |
| 9/1/2020 | 279,612 | $ 1.769 | $ 1.780 | $ 0.250 | $ 2.030 |
| 10/1/2020 | 304,947 | $ 1.795 | $ 1.780 | $ 0.250 | $ 2.030 |
| 11/1/2020 | 284,454 | $ 1.798 | $ 1.780 | $ 0.250 | $ 2.030 |
| 12/1/2020 | 276,328 | $ 1.775 | $ 1.780 | $ 0.250 | $ 2.030 |
| 1/1/2021 | 256,397 | $ 1.802 | $ 1.780 | $ 0.250 | $ 2.030 |
| 2/1/2021 | 241,036 | $ 1.799 | $ 1.780 | $ 0.250 | $ 2.030 |
| 3/1/2021 | 285,396 | $ 1.796 | $ 1.780 | $ 0.250 | $ 2.030 |
| 4/1/2021 | 293,056 | $ 1.778 | $ 1.780 | $ 0.250 | $ 2.030 |
| 5/1/2021 | 330,106 | $ 1.780 | $ 1.780 | $ 0.250 | $ 2.030 |
| 6/1/2021 | 289,807 | $ 1.751 | $ 1.780 | $ 0.250 | $ 2.030 |
| Cap Premium | | | | | |
| Total/WAVG | 3,468,710 | $ 1.780 | $ 1.780 | $ 0.250 | $ 2.030 |

| Spread | Premium |
|---|---|
| $ - | 749,300 |
| $ 0.25 | 426,348 |
| $ 0.50 | 234,611 |

## Stress Test (ULSD Not Hedged)

| Date | -1.00 | -0.75 | -0.50 | -0.25 | 0.00 | +0.25 | +0.50 | +0.75 | +1.00 |
|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 229,416 | 304,379 | 379,342 | 454,304 | 529,267 | 604,230 | 679,193 | 754,156 | 829,118 |
| 8/1/2020 | 251,132 | 333,062 | 414,992 | 496,923 | 578,853 | 660,783 | 742,713 | 824,643 | 906,573 |
| 9/1/2020 | 214,938 | 284,841 | 354,743 | 424,646 | 494,543 | 564,452 | 634,355 | 704,258 | 774,161 |
| 10/1/2020 | 242,311 | 318,548 | 394,785 | 471,021 | 547,258 | 623,495 | 699,732 | 775,969 | 852,205 |
| 11/1/2020 | 226,609 | 298,022 | 369,436 | 440,249 | 511,363 | 582,476 | 653,590 | 724,703 | 795,817 |
| 12/1/2020 | 214,044 | 283,126 | 352,208 | 421,289 | 490,371 | 559,453 | 628,535 | 697,617 | 766,699 |
| 1/1/2021 | 205,502 | 269,601 | 333,700 | 397,800 | 461,899 | 525,998 | 590,097 | 654,196 | 718,296 |
| 2/1/2021 | 193,660 | 252,919 | 313,177 | 373,436 | 433,695 | 493,954 | 554,213 | 614,472 | 674,731 |
| 3/1/2021 | 227,261 | 298,610 | 369,959 | 441,308 | 512,657 | 584,006 | 655,355 | 726,704 | 798,052 |
| 4/1/2021 | 227,851 | 301,115 | 374,379 | 447,643 | 520,907 | 594,170 | 667,434 | 740,698 | 813,962 |
| 5/1/2021 | 257,483 | 340,009 | 422,536 | 505,062 | 587,588 | 670,115 | 752,641 | 835,168 | 917,694 |
| 6/1/2021 | 217,558 | 290,010 | 362,462 | 434,914 | 507,365 | 579,818 | 652,269 | 724,721 | 797,173 |
| Total/WAVG | 2,707,064 | 3,574,241 | 4,441,418 | 5,308,596 | 6,175,773 | 7,042,951 | 7,910,128 | 8,777,305 | 9,644,483 |

## Stress Test (ULSD Hedged with Swap)

| Date | -1.00 | -0.75 | -0.50 | -0.25 | 0.00 | +0.25 | +0.50 | +0.75 | +1.00 |
|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 533,735 | 533,735 | 533,735 | 533,735 | 533,735 | 533,735 | 533,735 | 533,735 | 533,735 |
| 8/1/2020 | 583,342 | 583,342 | 583,342 | 583,342 | 583,342 | 583,342 | 583,342 | 583,342 | 583,342 |
| 9/1/2020 | 497,709 | 497,709 | 497,709 | 497,709 | 497,709 | 497,709 | 497,709 | 497,709 | 497,709 |
| 10/1/2020 | 542,806 | 542,806 | 542,806 | 542,806 | 542,806 | 542,806 | 542,806 | 542,806 | 542,806 |
| 11/1/2020 | 506,328 | 506,328 | 506,328 | 506,328 | 506,328 | 506,328 | 506,328 | 506,328 | 506,328 |
| 12/1/2020 | 491,864 | 491,864 | 491,864 | 491,864 | 491,864 | 491,864 | 491,864 | 491,864 | 491,864 |
| 1/1/2021 | 456,386 | 456,386 | 456,386 | 456,386 | 456,386 | 456,386 | 456,386 | 456,386 | 456,386 |
| 2/1/2021 | 429,043 | 429,043 | 429,043 | 429,043 | 429,043 | 429,043 | 429,043 | 429,043 | 429,043 |
| 3/1/2021 | 508,005 | 508,005 | 508,005 | 508,005 | 508,005 | 508,005 | 508,005 | 508,005 | 508,005 |
| 4/1/2021 | 521,639 | 521,639 | 521,639 | 521,639 | 521,639 | 521,639 | 521,639 | 521,639 | 521,639 |
| 5/1/2021 | 587,588 | 587,588 | 587,588 | 587,588 | 587,588 | 587,588 | 587,588 | 587,588 | 587,588 |
| 6/1/2021 | 515,857 | 515,857 | 515,857 | 515,857 | 515,857 | 515,857 | 515,857 | 515,857 | 515,857 |
| Total/WAVG | 6,174,303 | 6,174,303 | 6,174,303 | 6,174,303 | 6,174,303 | 6,174,303 | 6,174,303 | 6,174,303 | 6,174,303 |

## Stress Test (ULSD Cap)

| Date | -1.00 | -0.75 | -0.50 | -0.25 | 0.00 | +0.25 | +0.50 | +0.75 | +1.00 |
|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 229,416 | 304,379 | 379,342 | 454,304 | 529,267 | 604,230 | 608,698 | 608,698 | 608,698 |
| 8/1/2020 | 251,132 | 333,062 | 414,992 | 496,923 | 578,851 | 660,783 | 665,273 | 665,273 | 665,273 |
| 9/1/2020 | 214,938 | 284,841 | 354,743 | 424,646 | 494,549 | 564,452 | 567,612 | 567,612 | 567,612 |
| 10/1/2020 | 242,311 | 318,548 | 394,785 | 471,021 | 547,258 | 619,043 | 619,043 | 619,043 | 619,043 |
| 11/1/2020 | 226,609 | 298,022 | 369,136 | 440,249 | 511,363 | 577,442 | 577,442 | 577,442 | 577,442 |
| 12/1/2020 | 214,044 | 283,126 | 352,208 | 421,289 | 490,371 | 559,453 | 560,946 | 560,946 | 560,946 |
| 1/1/2021 | 205,502 | 269,601 | 313,177 | 397,800 | 461,899 | 520,485 | 520,485 | 520,485 | 520,485 |
| 2/1/2021 | 192,660 | 252,919 | 313,177 | 373,436 | 433,695 | 489,302 | 489,302 | 489,302 | 489,302 |
| 3/1/2021 | 227,261 | 298,610 | 374,379 | 447,643 | 520,907 | 579,354 | 579,354 | 579,354 | 579,354 |
| 4/1/2021 | 227,851 | 301,115 | 374,379 | 447,643 | 520,907 | 594,170 | 594,903 | 594,903 | 594,903 |
| 5/1/2021 | 257,483 | 340,009 | 422,536 | 505,062 | 587,588 | 670,115 | 670,115 | 670,115 | 670,115 |
| 6/1/2021 | 217,558 | 290,010 | 362,462 | 434,914 | 507,366 | 579,818 | 588,309 | 588,309 | 588,309 |
| Total/WAVG | 3,133,412 | 4,000,589 | 4,867,767 | 5,734,944 | 6,602,121 | 7,444,995 | 7,467,829 | 7,467,829 | 7,467,829 |

| | | | |
|---|---|---|---|
| $ | 0.75 | $ | 129,203 |
| $ | 1.00 | $ | 71,749 |

*Annual Premium costs are as of 10/1/19

5057684505    LG Litig. LGLNH06    City of Albuquerque – LG    02:47:29 p.m.    03-11-2022    56 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 55 of 65

## ULSD Not Hedged

| Date | Notional | Floating Price |
|---|---|---|
| 7/1/2020 | 299,851 | $ 1.874 |
| 8/1/2020 | 327,720 | $ 1.873 |
| 9/1/2020 | 279,612 | $ 1.874 |
| 10/1/2020 | 304,947 | $ 1.876 |
| 11/1/2020 | 284,454 | $ 1.877 |
| 12/1/2020 | 276,328 | $ 1.878 |
| 1/1/2021 | 256,397 | $ 1.900 |
| 2/1/2021 | 241,036 | $ 1.894 |
| 3/1/2021 | 285,396 | $ 1.886 |
| 4/1/2021 | 293,056 | $ 1.867 |
| 5/1/2021 | 330,106 | $ 1.858 |
| 6/1/2021 | 289,807 | $ 1.831 |
| Total/WAVG | 3,468,710 | $ 1.873 |

## ULSD Hedged with Swap

| Date | Notional | Floating Price | Fixed Price | Portion Hedged |
|---|---|---|---|---|
| 7/1/2020 | 299,851 | $ 1.874 | $ 1.873 | 100% |
| 8/1/2020 | 327,720 | $ 1.873 | $ 1.873 | 100% |
| 9/1/2020 | 279,612 | $ 1.874 | $ 1.873 | 100% |
| 10/1/2020 | 304,947 | $ 1.876 | $ 1.873 | 100% |
| 11/1/2020 | 284,454 | $ 1.877 | $ 1.873 | 100% |
| 12/1/2020 | 276,328 | $ 1.878 | $ 1.873 | 100% |
| 1/1/2021 | 256,397 | $ 1.900 | $ 1.873 | 100% |
| 2/1/2021 | 241,036 | $ 1.894 | $ 1.873 | 100% |
| 3/1/2021 | 285,396 | $ 1.886 | $ 1.873 | 100% |
| 4/1/2021 | 293,056 | $ 1.867 | $ 1.873 | 100% |
| 5/1/2021 | 330,106 | $ 1.858 | $ 1.873 | 100% |
| 6/1/2021 | 289,807 | $ 1.831 | $ 1.873 | 100% |
| Total/WAVG | 3,468,710 | $ 1.873 | $ 1.873 | 100% |

## ULSD Cap

| Date | Notional | Floating Price | Spot | ATM Strike | Spread | Strike |
|---|---|---|---|---|---|---|
| 7/1/2020 | 299,851 | $ 1.874 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 8/1/2020 | 327,720 | $ 1.873 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 9/1/2020 | 279,612 | $ 1.874 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 10/1/2020 | 304,947 | $ 1.876 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 11/1/2020 | 284,454 | $ 1.877 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 12/1/2020 | 276,328 | $ 1.878 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 1/1/2021 | 256,397 | $ 1.900 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 2/1/2021 | 241,036 | $ 1.894 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 3/1/2021 | 285,396 | $ 1.886 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 4/1/2021 | 293,056 | $ 1.867 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 5/1/2021 | 330,106 | $ 1.858 | | $ 1.873 | $ 0.250 | $ 2.123 |
| 6/1/2021 | 289,807 | $ 1.831 | | $ 1.873 | $ 0.250 | $ 2.123 |
| Total/WAVG | 3,468,710 | $ 1.873 | | $ 1.873 | $ 0.250 | $ 2.123 |

| Spread | | Premium |
|---|---|---|
| $ | - | $ 680,091 |
| $ | 0.25 | $ 364,380 |
| $ | 0.50 | $ 186,905 |

## Stress Test

| Date | -1.00 | -0.75 | -0.50 | -0.25 | 0.00 | +0.25 | +0.50 | +0.75 | +1.00 |
|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 262,040 | 337,003 | 411,965 | 486,928 | 561,891 | 636,854 | 711,817 | 786,779 | 861,742 |
| 8/1/2020 | 286,133 | 368,063 | 449,993 | 531,923 | 613,853 | 695,783 | 777,713 | 859,644 | 941,574 |
| 9/1/2020 | 244,437 | 314,340 | 384,243 | 454,145 | 524,048 | 593,951 | 663,854 | 733,757 | 803,660 |
| 10/1/2020 | 267,073 | 343,310 | 419,546 | 495,783 | 572,020 | 648,257 | 724,493 | 800,730 | 876,967 |
| 11/1/2020 | 249,523 | 320,637 | 391,750 | 462,864 | 533,977 | 605,091 | 676,204 | 747,318 | 818,431 |
| 12/1/2020 | 242,671 | 311,753 | 380,835 | 449,917 | 518,999 | 588,081 | 657,163 | 726,245 | 795,327 |
| 1/1/2021 | 230,808 | 294,908 | 359,007 | 423,106 | 487,205 | 551,304 | 615,404 | 679,503 | 743,602 |
| 2/1/2021 | 215,685 | 275,745 | 336,004 | 396,262 | 456,521 | 516,780 | 577,039 | 637,298 | 697,557 |
| 3/1/2021 | 253,889 | 324,238 | 395,587 | 466,936 | 538,285 | 609,634 | 680,983 | 752,332 | 823,681 |
| 4/1/2021 | 254,050 | 327,314 | 400,578 | 473,842 | 547,106 | 620,370 | 693,634 | 766,897 | 840,161 |
| 5/1/2021 | 283,363 | 365,889 | 448,416 | 530,942 | 613,469 | 695,995 | 778,522 | 861,048 | 943,575 |
| 6/1/2021 | 240,801 | 313,253 | 385,705 | 458,156 | 530,608 | 603,060 | 675,512 | 747,964 | 820,416 |
| Total/WAVG | 3,029,273 | 3,896,451 | 4,763,628 | 5,630,806 | 6,497,983 | 7,365,160 | 8,232,338 | 9,099,515 | 9,966,693 |

## Stress Test

| Date | -1.00 | -0.75 | -0.50 | -0.25 | 0.00 | +0.25 | +0.50 | +0.75 | +1.00 |
|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 561,621 | 561,621 | 561,621 | 561,621 | 561,621 | 561,621 | 561,621 | 561,621 | 561,621 |
| 8/1/2020 | 613,820 | 613,820 | 613,820 | 613,820 | 613,820 | 613,820 | 613,820 | 613,820 | 613,820 |
| 9/1/2020 | 523,713 | 523,713 | 523,713 | 523,713 | 523,713 | 523,713 | 523,713 | 523,713 | 523,713 |
| 10/1/2020 | 571,166 | 571,166 | 571,166 | 571,166 | 571,166 | 571,166 | 571,166 | 571,166 | 571,166 |
| 11/1/2020 | 532,782 | 532,782 | 532,782 | 532,782 | 532,782 | 532,782 | 532,782 | 532,782 | 532,782 |
| 12/1/2020 | 517,562 | 517,562 | 517,562 | 517,562 | 517,562 | 517,562 | 517,562 | 517,562 | 517,562 |
| 1/1/2021 | 480,231 | 480,231 | 480,231 | 480,231 | 480,231 | 480,231 | 480,231 | 480,231 | 480,231 |
| 2/1/2021 | 451,460 | 451,460 | 451,460 | 451,460 | 451,460 | 451,460 | 451,460 | 451,460 | 451,460 |
| 3/1/2021 | 534,546 | 534,546 | 534,546 | 534,546 | 534,546 | 534,546 | 534,546 | 534,546 | 534,546 |
| 4/1/2021 | 548,893 | 548,893 | 548,893 | 548,893 | 548,893 | 548,893 | 548,893 | 548,893 | 548,893 |
| 5/1/2021 | 618,288 | 618,288 | 618,288 | 618,288 | 618,288 | 618,288 | 618,288 | 618,288 | 618,288 |
| 6/1/2021 | 542,809 | 542,809 | 542,809 | 542,809 | 542,809 | 542,809 | 542,809 | 542,809 | 542,809 |
| Total/WAVG | 6,496,893 | 6,496,893 | 6,496,893 | 6,496,893 | 6,496,893 | 6,496,893 | 6,496,893 | 6,496,893 | 6,496,893 |

## Stress Test

| Date | -1.00 | -0.75 | -0.50 | -0.25 | 0.00 | +0.25 | +0.50 | +0.75 | +1.00 |
|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 262,040 | 337,003 | 411,965 | 485,928 | 561,853 | 636,584 | 636,584 | 636,584 | 636,594 |
| 8/1/2020 | 286,133 | 368,063 | 449,993 | 531,923 | 613,853 | 695,751 | 695,751 | 695,751 | 695,751 |
| 9/1/2020 | 244,437 | 314,340 | 384,243 | 454,145 | 524,048 | 593,616 | 593,616 | 593,616 | 593,616 |
| 10/1/2020 | 267,073 | 343,310 | 419,546 | 495,783 | 572,020 | 647,403 | 647,403 | 647,403 | 647,403 |
| 11/1/2020 | 249,523 | 320,637 | 391,750 | 462,864 | 533,977 | 603,896 | 603,896 | 603,896 | 603,896 |
| 12/1/2020 | 242,671 | 311,753 | 380,835 | 449,917 | 518,999 | 586,644 | 586,644 | 586,644 | 586,644 |
| 1/1/2021 | 230,808 | 294,908 | 359,007 | 423,106 | 487,205 | 544,330 | 544,330 | 544,330 | 544,330 |
| 2/1/2021 | 215,486 | 275,745 | 336,004 | 396,262 | 456,521 | 511,718 | 511,718 | 511,718 | 511,718 |
| 3/1/2021 | 253,889 | 324,238 | 395,587 | 466,936 | 538,285 | 605,895 | 605,895 | 605,895 | 605,895 |
| 4/1/2021 | 254,050 | 327,314 | 400,578 | 473,842 | 547,106 | 620,370 | 622,157 | 622,157 | 622,157 |
| 5/1/2021 | 283,363 | 365,889 | 448,416 | 530,942 | 613,469 | 695,995 | 700,815 | 700,815 | 700,815 |
| 6/1/2021 | 240,801 | 313,253 | 385,705 | 458,156 | 530,608 | 603,060 | 615,261 | 615,261 | 615,261 |
| Total/WAVG | 3,393,653 | 4,260,830 | 5,128,008 | 5,995,185 | 6,662,363 | 7,709,642 | 7,728,450 | 7,728,450 | 7,728,450 |

Case 1:20-cv-00838-RB-JHR Document 52 Filed 03/11/22 Page 56 of 65

| | | | |
|---|---|---|---|
| $ | 0.75 | $ | 94,747 |
| $ | 1.00 | $ | 47,764 |

*Annual Premium costs are as of 11/5/19

**City of Albuquerque – Fuel Hedging & Fuel Purchases Data – Fleet, Transit, & Solid Waste (FY18 & FY19)**

**DIESEL**

| Mo | FY | Fleet Purchases Gallons | Fleet actual cost per gallon | Total cost of Fleet fuel | Transit Purchases Gallons | Transit actual cost per gallon | Total cost of Transit Fleet fuel | Solid Waste Gallons Used | Solid Waste actual cost per gallon | Total cost of Solid Waste fuel | Total Gallons Purchased |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CITY COST | | | | | |
| Jul-11 | FY12 | 84,045 | $ 3.440 | 289,115 | 149,467 | $ 3.13 | 467,660 | | | | |
| Aug-11 | FY12 | 66,033 | 3.417 | 225,635 | 141,131 | 3.13 | 442,219 | | | | |
| Sep-11 | FY12 | 80,485 | 3.391 | 272,923 | 134,495 | 3.02 | 406,689 | | | | |
| Oct-11 | FY12 | 66,121 | 2.875 | 190,098 | 127,225 | 2.84 | 360,719 | | | | |
| Nov-11 | FY12 | 69,704 | 3.276 | 228,348 | 120,352 | 3.26 | 392,604 | | | | |
| Dec-11 | FY12 | 67,798 | 3.242 | 219,769 | 130,404 | 3.14 | 409,975 | | | | |
| Jan-12 | FY12 | 74,912 | 3.274 | 245,249 | 113,550 | 3.07 | 349,157 | | | | |
| Feb-12 | FY12 | 59,177 | 3.240 | 191,761 | 119,998 | 3.13 | 375,535 | | | | |
| Mar-12 | FY12 | 92,604 | 3.329 | 308,238 | 135,364 | 3.42 | 462,829 | | | | |
| Apr-12 | FY12 | 65,634 | 3.436 | 225,496 | 142,406 | 3.31 | 471,000 | | | | |
| May-12 | FY12 | 73,468 | 3.334 | 244,920 | 143,109 | 3.03 | 433,987 | | | | |
| Jun-12 | FY12 | 71,090 | 3.112 | 221,228 | 128,303 | 2.90 | 372,657 | | | | |
| | | 871,069 | | 2,862,779 | 1,585,794 | | 4,945,011 | | | | |
| Jul-12 | FY13 | 75,875 | $ 2.982 | 226,275 | 141,317 | $ 2.890 | 408,406 | | | | |
| Aug-12 | FY13 | 93,878 | 3.719 | 349,117 | 143,145 | 3.278 | 469,230 | | | | |
| Sep-12 | FY13 | 66,758 | 2.854 | 190,496 | 128,373 | 3.382 | 434,157 | | | | |
| Oct-12 | FY13 | 79,718 | 3.219 | 256,586 | 135,665 | 3.493 | 473,824 | | | | |
| Nov-12 | FY13 | 68,528 | 3.476 | 238,217 | 116,178 | 3.190 | 370,607 | | | | |
| Dec-12 | FY13 | 64,685 | 3.273 | 211,738 | 110,046 | 3.150 | 346,644 | | | | |
| Jan-13 | FY13 | 55,074 | 3.193 | 175,877 | 115,506 | 3.080 | 355,758 | | | | |
| Feb-13 | FY13 | 66,743 | 3.274 | 218,543 | 110,103 | 3.390 | 373,251 | | | | |
| Mar-13 | FY13 | 69,390 | 3.380 | 234,526 | 125,405 | 3.270 | 410,075 | | | | |
| Apr-13 | FY13 | 66,059 | 3.347 | 221,110 | 127,628 | 2.980 | 380,332 | | | | |
| May-13 | FY13 | 79,286 | 3.127 | 247,895 | 132,129 | 2.950 | 389,780 | | | | |
| Jun-13 | FY13 | 68,763 | 3.067 | 210,897 | 134,841 | 2.940 | 396,431 | | | | |
| | | 854,756 | $ 3.254 | 2,781,277 | 1,520,335 | $ 3.166 | 4,808,494 | | | | |
| | | | | | 2,375,092 | | | | | | |
| Jul-13 | FY14 | 58,051 | $ 3.103 | 180,133 | 142,221 | 3.050 | 433,773 | | | | |
| Aug-13 | FY14 | 54,553 | 3.149 | 171,801 | 143,594 | 3.100 | 445,140 | | | | |
| Sep-13 | FY14 | 54,783 | 3.239 | 177,455 | 125,906 | 3.130 | 394,085 | | | | |
| Oct-13 | FY14 | 52,102 | 3.170 | 165,162 | 127,667 | 3.060 | 390,661 | | | | |
| Nov-13 | FY14 | 42,415 | 3.149 | 133,576 | 106,125 | 3.010 | 319,437 | | | | |
| Dec-13 | FY14 | 46,187 | 3.150 | 145,472 | 106,030 | 3.050 | 323,393 | | | | |
| Jan-14 | FY14 | 45,559 | 3.111 | 141,712 | 108,803 | 2.970 | 323,145 | | | | |
| Feb-14 | FY14 | 44,983 | 3.074 | 138,293 | 105,499 | 3.080 | 324,937 | | | | |
| Mar-14 | FY14 | 48,489 | 3.167 | 153,584 | 117,407 | 3.139 | 368,482 | | | | |
| Apr-14 | FY14 | 51,541 | 3.167 | 163,225 | 123,639 | 3.141 | 388,379 | | | | |
| May-14 | FY14 | 56,167 | 3.145 | 176,644 | 123,379 | 3.044 | 375,566 | | | | |
| Jun-14 | FY14 | 57,108 | 3.093 | 176,644 | 126,609 | 2.997 | 379,477 | | | | |
| | | 611,938 | $ 3.144 | 1,923,701 | 1,456,879 | $ 3.064 | 4,466,474 | | | | |
| Jul-14 | FY15 | 58,310 | $ 3.149 | 183,627 | 133,972 | 3.005 | 402,644 | | | | |
| Aug-14 | FY15 | 57,726 | $ 3.174 | 183,208 | 130,621 | 3.040 | 397,112 | | | | |

X:\LGSHARE\LG-Real Estate & Land Use\Daniel, Christopher\Item No. 2\FY12 to FY19 fuel usage

City of Albuquerque - Fuel Hedging & Fuel Purchases Data - Fleet, Transit, & Solid Waste (FY18 & FY19)

DIESEL

| Mo | FY | Fleet Purchases Gallons | Fleet actual cost per gallon | Total cost of Fleet fuel | Transit Purchases Gallons | Transit actual cost per gallon | Total cost of Transit Fleet fuel | Solid Waste Gallons Used | Solid Waste actual cost per gallon | Total cost of Solid Waste fuel | Total Gallons Purchased |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | CITY COST | | | | |
| Sep-14 | FY15 | 54,253 | $ 3.144 | 170,593 | 126,210 | $ 2.908 | 367,005 | | | | |
| Oct-14 | FY15 | 55,761 | $ 3.034 | 169,156 | 127,365 | $ 2.780 | 354,075 | | | | |
| Nov-14 | FY15 | 43,636 | $ 3.001 | 130,956 | 102,686 | $ 2.850 | 292,655 | | | | |
| Dec-14 | FY15 | 50,012 | $ 2.900 | 145,035 | 106,886 | $ 2.160 | 230,873 | | | | |
| Jan-15 | FY15 | 49,735 | $ 2.329 | 115,833 | 104,862 | $ 1.610 | 168,828 | | | | |
| Feb-15 | FY15 | 45,442 | $ 2.089 | 94,928 | 106,164 | $ 1.960 | 208,082 | | | | |
| Mar-15 | FY15 | 53,542 | $ 2.144 | 114,773 | 119,142 | $ 1.820 | 216,779 | | | | |
| Apr-15 | FY15 | 54,428 | $ 2.026 | 110,271 | 124,235 | $ 1.883 | 233,934 | | | | |
| May-15 | FY15 | 53,563 | $ 2.149 | 115,096 | 112,241 | $ 2.047 | 229,723 | | | | |
| Jun-15 | FY15 | 58,617 | $ 2.150 | 126,038 | 123,464 | $ 1.817 | 224,334 | | | | |
| | | 635,026 | $ 2.613 | 1,659,513 | 1,417,848 | $ 2.323 | 3,326,043 | | | | |

X:\LGISHARE\LG-Real Estate & Land Use\Daniel, Christopher\Item No. 2\FY12 to FY19 fuel usage

257

5057684505   LG Litig. LGLNH06   City of Albuquerque – LG   02:50:56 p.m.   03-11-2022   60 /66
LG Litig. LGLNH06   City of Albuquerque – LG

## City of Albuquerque - Fuel Hedging & Fuel Purchases Data - Fleet, Transit, & Solid Waste (FY18 & FY19)

DIESEL

| Mo / FY | Fleet Purchases Gallons | Fleet actual cost per gallon | Total cost of Fleet fuel | Transit Purchases Gallons | Transit actual cost per gallon | Total cost of Transit Fleet fuel | Solid Waste Gallons Used | Solid Waste actual cost per gallon | Total cost of Solid Waste fuel | Total Gallons Purchased |
|---|---|---|---|---|---|---|---|---|---|---|
| Jul-15 FY16 | 57,710 | 2.071 | 119,491 | 128,302 | 1.78 | 229,006 | | | | |
| Aug-15 FY16 | 60,762 | 1.988 | 120,767 | 126,237 | 1.60 | 202,105 | | | | |
| Sep-15 FY16 | 58,110 | 1.800 | 104,618 | 120,901 | 1.570 | 189,814 | | | | |
| Oct-15 FY16 | 56,137 | 1.683 | 94,479 | 118,902 | 1.566 | 186,201 | | | | |
| Nov-15 FY16 | 49,441 | 1.716 | 84,841 | 98,727 | 1.570 | 155,001 | | | | |
| Dec-15 FY16 | 54,237 | 1.677 | 90,934 | 97,317 | 1.250 | 121,647 | | | | |
| Jan-16 FY16 | 46,268 | 1.513 | 70,003 | 93,526 | 1.029 | 96,238 | | | | |
| Feb-16 FY16 | 45,211 | 1.264 | 57,160 | 99,825 | 1.100 | 109,807 | | | | |
| Mar-16 FY16 | 54,952 | 1.327 | 72,921 | 112,637 | 1.270 | 143,049 | | | | |
| Apr-16 FY16 | 50,409 | 1.372 | 69,161 | 107,597 | 1.287 | 156,849 | | | | |
| May-16 FY16 | 57,808 | 1.386 | 80,122 | 109,462 | 1.449 | 158,611 | | | | |
| Jun-16 FY16 | 58,536 | 1.495 | 87,511 | 116,501 | 1.550 | 180,611 | | | | |
| | 649,581 | 1.620 | 1,052,007 | 1,329,934 | 1.419 | 1,928,939 | | | | |
| Jul-16 FY17 | 55,916 | 1.557 | 87,069 | 117,825 | 1.464 | 172,460 | | | | |
| Aug-16 FY17 | 60,372 | 1.486 | 89,682 | 123,094 | 1.444 | 177,747 | | | | |
| Sep-16 FY17 | 57,171 | 1.558 | 89,076 | 112,711 | 1.513 | 170,531 | | | | |
| Oct-16 FY17 | 51,452 | 1.586 | 81,611 | 110,778 | 1.656 | 183,426 | | | | |
| Nov-16 FY17 | 46,502 | 1.649 | 76,666 | 97,471 | 1.569 | 152,932 | | | | |
| Dec-16 FY17 | 52,522 | 1.718 | 90,215 | 98,161 | 1.710 | 167,855 | | | | |
| Jan-17 FY17 | 49,993 | 1.807 | 90,330 | 95,079 | 1.761 | 167,435 | | | | |
| Feb-17 FY17 | 44,302 | 1.802 | 79,822 | 93,038 | 1.693 | 157,514 | | | | |
| Mar-17 FY17 | 54,665 | 1.900 | 103,858 | 108,826 | 1.864 | 202,797 | | | | |
| Apr-17 FY17 | 48,417 | 2.005 | 97,059 | 103,840 | 1.805 | 187,379 | | | | |
| May-17 FY17 | 58,013 | 1.956 | 113,449 | 108,720 | 1.662 | 180,725 | | | | |
| Jun-17 FY17 | 58,929 | 1.804 | 106,292 | 116,970 | 1.450 | 169,572 | | | | |
| | 638,253 | 1.731 | 1,105,129 | 1,286,512 | 1.632 | 2,090,373 | | | | |
| Jul-17 FY18 | 54,985 | 1.70 | 93,374 | 115,346 | 1.584 | 182,650 | 128,249 | 1.731 | 221,958.59 | 298,579 |
| Aug-17 FY18 | 57,916 | 1.75 | 101,556 | 121,103 | 1.763 | 213,553 | 135,777 | 1.734 | 235,397.39 | 314,796 |
| Sep-17 FY18 | 51,703 | 1.92 | 99,063 | 110,995 | 2.005 | 222,577 | 130,962 | 1.737 | 227,397.31 | 293,600 |
| Oct-17 FY18 | 54,861 | 2.08 | 114,244 | 110,397 | 2.071 | 228,644 | 135,881 | 1.765 | 239,816.37 | 301,139 |
| Nov-17 FY18 | 40,266 | 2.14 | 86,192 | 99,648 | 2.215 | 220,730 | 131,367 | 1.765 | 231,849.65 | 271,280 |
| Dec-17 FY18 | 46,718 | 2.30 | 107,409 | 93,744 | 2.320 | 217,468 | 130,954 | 1.765 | 231,120.74 | 271,416 |
| Jan-18 FY18 | 46,918 | 2.37 | 111,149 | 97,741 | 2.159 | 211,063 | 143,951 | 1.764 | 253,997.63 | 288,610 |
| Feb-18 FY18 | 43,301 | 2.28 | 98,876 | 94,101 | 2.008 | 188,946 | 122,615 | 1.763 | 216,145.73 | 260,017 |
| Mar-18 FY18 | 48,683 | 2.23 | 108,412 | 106,531 | 2.173 | 231,534 | 138,078 | 1.765 | 243,693.79 | 293,292 |
| Apr-18 FY18 | 50,383 | 2.33 | 117,508 | 107,537 | 2.447 | 263,186 | 134,233 | 2.063 | 276,918.75 | 292,153 |
| May-18 FY18 | 53,503 | 2.53 | 135,114 | 114,248 | 2.524 | 288,317 | 136,479 | 2.142 | 292,324.36 | 304,231 |
| Jun-18 FY18 | 53,107 | 2.56 | 136,101 | 116,730 | 2.367 | 276,347 | 131,227 | 2.142 | 281,075.11 | 301,064 |
| | 602,344 | 2.17 | 1,308,997 | 1,288,121 | 2.131 | 2,745,014 | 1,599,713 | 1.845 | 2,951,695.42 | 3,490,178 |
| Jul-18 FY19 | 53,277.8 | 2.48 | 132,050 | 117,289 | 2.399 | 281,377 | 129,284 | 2.142 | 276,913.40 | 298,851 |
| Aug-18 FY19 | 58,526.0 | 2.39 | 139,855 | 121,748 | 2.399 | 292,075 | 147,446 | 2.142 | 315,814.53 | 327,720 |

CITY COST

5057684505 LG Litig. LGLNH06 City of Albuquerque – LG 02:52:00 p.m. 03–11–2022 61/66

Case 1:20-cv-00838-RB-JHR Document 52 Filed 03/11/22 Page 60 of 65

City of Albuquerque - Fuel Hedging & Fuel Purchases Data - Fleet, Transit, & Solid Waste (FY18 & FY19)

DIESEL

| Mo FY | Fleet Purchases Gallons | Fleet actual cost per gallon | Total cost of Fleet fuel | Transit Purchases Gallons | Transit actual cost per gallon | Total cost of Transit Fleet fuel | Solid Waste Gallons Used | Solid Waste actual cost per gallon | Total cost of Solid Waste fuel | Total Gallons Purchased |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | CITY COST | | | | | |
| Sep-18 FY19 | 47,315.1 | $ 2.40 | 113,405 | 109,689 | 2.399 | 263,143 | 122,608 | 2.142 | 262,614.07 | 279,612 |
| Oct-18 FY19 | 56,029.9 | $ 2.40 | 134,197 | 112,964 | 2.399 | 271,001 | 135,953 | 2.394 | 325,456.68 | 304,947 |
| Nov-18 FY19 | 46,803.5 | $ 2.39 | 112,043 | 97,675 | 2.399 | 234,321 | 139,976 | 2.394 | 335,088.56 | 284,454 |
| Dec-18 FY19 | 54,281.9 | $ 2.39 | 129,943 | 92,516 | 2.399 | 221,946 | 129,530 | 2.394 | 310,081.86 | 276,328 |
| Jan-19 FY19 | 51,149.8 | $ 2.39 | 122,493 | 75,717 | 2.399 | 181,645 | 129,530 | 2.394 | 310,081.86 | 256,397 |
| Feb-19 FY19 | 42,852.5 | $ 2.39 | 102,528 | 83,133 | 2.399 | 199,436 | 115,050 | 2.392 | 275,176.57 | 241,036 |
| Mar-19 FY19 | 52,937.9 | $ 2.39 | 126,609 | 98,124 | 2.399 | 235,399 | 134,334 | 2.392 | 321,297.66 | 285,396 |
| Apr-19 FY19 | 98,208.7 | $ 2.39 | 234,873 | 112,595 | $ 2.399 | 270,115 | 82,252 | 2.392 | 196,730.00 | 293,056 |
| May-19 FY19 | 59,368.9 | $ 2.38 | 141,279 | 113,329 | $ 2.371 | 268,667 | 157,408 | 2.392 | 376,488.00 | 330,106 |
| Jun-19 FY19 | 57,476.4 | $ 2.39 | 137,468 | 104,528 | $ 2.393 | 250,138 | 127,803 | 2.392 | 305,678.00 | 289,807 |
| | 678,228.3 | $ 2.40 | 1,626,742.9 | 1,239,307 | $ 2.396 | 2,969,264 | 1,551,174 | 2.328 | 3,611,421 | 3,468,710 |

'19-Transit Gallons pulled from FF Jan-Jun

X:\LG\SHARE\LG-Real Estate & Land Use\Daniel, Christopher\Item No. 2\FY12 to FY19 fuel usage

5057684505 LG Litig. LGLNH06 City of Albuquerque – LG 02:52:33 p.m. 03-11-2022 62 /66

Case 1:20-cv-00838-RB-JHR Document 52 Filed 03/11/22 Page 61 of 65

5057684505     LG Litig. LGLNH06     City of Albuquerque – LG     02:53:47 p.m.     03-11-2022     63 /66

Case 1:20-cv-00838-RB-JHR   Document 52   Filed 03/11/22   Page 62 of 65

Exhibit 2



Bloomberg

**CL1 Comdty (Generic 1st 'CL' Future)**
CL1 Comdty (Generic 1st 'CL' Future)



The BLOOMBERG PROFESSIONAL service, BLOOMBERG Data and BLOOMBERG Order Management Systems (the "Services") are owned and distributed locally by Bloomberg Finance L.P. ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg L.P. ("BLP"). BLP provides BFLP with all global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. The Services include electronic trading and order-routing services, which are available only to sophisticated institutional investors and only where necessary legal clearances have been obtained. BFLP, BLP and their affiliates do not provide investment advice or guarantee the accuracy of prices or information in the Services. Nothing on the Services shall constitute an offering of financial instruments by BFLP, BLP or their affiliates. BLOOMBERG, BLOOMBERG PROFESSIONAL, BLOOMBERG MARKETS, BLOOMBERG NEWS, BLOOMBERG ANYWHERE, BLOOMBERG TRADEBOOK, BLOOMBERG TELEVISION, BLOOMBERG RADIO, BLOOMBERG PRESS and BLOOMBERG.COM are trademarks and service marks of BFLP, a Delaware limited partnership, or its subsidiaries.

Bloomberg ®Charts

266

Exhibit E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVIDSON OIL COMPANY,**

**Plaintiff,**

**vs.**                                    **Case No. 1:20-CV-00838-RCB-JHR**

**CITY OF ALBUQUERQUE,**

**Defendant.**

## AFFIDAVIT OF JENNIFER BRADLEY
## CITY OF ALBUQUERQUE CHIEF PROCUREMENT OFFICER

**COMES NOW** Jennifer Bradley, City of Albuquerque (COA) Chief Procurement Officer, and having been duly sworn, states:

1. My educational background is I have a undergraduate degree from St. Cloud State University, and a juris doctorate from University of Iowa Law School. I also have the Chief Procurement Officer certification through New Mexico State procurement agency. In 2014, I was employed with the COA to represent purchasing and in 2019 I became the Chief Procurement Officer.

2. The Procurement process is the COA enters a Procurement Contract, and we pay for goods and services then, if the Procurement Contract is not renewed, we end the Procurement Contract at the end of the term.

3. The COA is not a seeking to make a profit even if the COA is a municipal corporation.

4. Davidson Oil Company was contacted and informed that they won the Procurement Contract. Davidson Oil Company then negotiated for and was granted a change in "Termination for Convenience Clause" that increased the notice requirement from 30 days to 60 days. For almost

all COA procurement contracts, the "Termination for Convenience Clause" has the provision for giving notice to terminate a contract as 30 days.

5.       The RFB requested bids for a firm fixed fuel price plus the delivery cost. Compared with other bidders, Davidson Oil won the Procurement contract as low bid.  Payment of costs or any other tangential fees was not contemplated by the COA at the time of the signing of the Contract and would have required additional negotiations or maybe even a whole new procurement process.

6.       Under the "Termination for Convenience Clause", the COA agreed to pay for any goods or services that the COA had ordered or approved prior to the termination.  After the termination, Davidson Oil Company never sent an invoice or claimed any such money owed pursuant to this clause to which it had agreed.

7.       When Davidson Oil's Procurement Contract was terminated, the COA contracted with TAC using a State Procurement Office Statewide Price Agreement, which is an authorized procurement method under the City Purchasing Ordinance because it was a State competitive solicitation for the entire State to buy fuel oil.

_____
Jennifer Bradley
Chief Procurement Officer
City of Albuquerque

SUBSCRIBED AND SWORN the 9th day of March, 2022 by Jennifer Bradley, City of Albuquerque Chief Procurement Officer.

_____
NOTARY PUBLIC



OFFICIAL SEAL
Janice C. Wright
NOTARY PUBLIC
STATE OF NEW MEXICO
743531
My Commission Expires: 11.21.23