**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**DAVIDSON OIL COMPANY,**

     **Plaintiff,**

**vs.**                         **Case No. 1:20-CV-00838-RB-JHR**

**CITY OF ALBUQUERQUE,**

     **Defendant.**

---

# PLAINTIFF DAVIDSON OIL COMPANY'S MOTION FOR SUMMARY JUDGMENT

---

Ross L. Crown
Lewis Roca Rothgerber Christie LLP
201 Third Street NW, Suite 500
Albuquerque, New Mexico 87103-1027
(505) 764-5402

Attorneys for Plaintiff Davidson Oil Company

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................................1

ARGUMENT ....................................................................................................11

I.       Standard for Granting Summary Judgment ..........................................................11

II.      City Breached Contract by Seeking Cheaper Pricing Elsewhere ..........................12

         A.       New Mexico law limits City's exercise of Termination for
                  Convenience clause...........................................................................12

         B.       City breached Contract under bad faith standard.......................................14

         C.       City breached Contract under changed circumstances standard................19

III.     City Breached Implied Promise of Good Faith and Fair Dealing
         in Contract.................................................................................................22

IV.      Davidson Oil Entitled to Recover Damages Against City....................................23

V.       Alternatively, even if City Lawfully Invoked the TFC Clause, it Breached
         the Clause by Not Compensating Davidson Oil for Preparation Costs....................26

REQUEST FOR RELIEF .........................................................................................27

# TABLE OF AUTHORITIES

## New Mexico Cases

*Camino Real Mobile Home Park v. Wolfe*,
    1995-NMSC-013, 891 P.2d 1190, *overruled in part on other grounds*,
    *Sunnyland Farms v. Cent. N.M. Coop., Inc.,* 2013-NMSC-017, 301 P.3d 387 ................24, 25

*Mb Oil v. City of Albuquerque*,
    2016-NMCA-090, 382 P.3d 975 ................................................................12, 13, 14, 19

*McMillan v. Allstate Indem. Co.*,
    2004-NMSC-002, 84 P.3d 65 ................................................................................12, 13

*Ranchers Exploration and Development Corp. v. Miles*,
    1985-NMSC-019, 696 P.2d 475 ................................................................................25

*Sanders v. FedEx Ground Package System, Inc.*,
    2008-NMSC-040, 188 P.3d 1200 ............................................................................22, 23

## Non-New Mexico Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................................12

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*,
    939 F.2d 887 (10th Cir. 1991) ................................................................................11

*Garrison v. Gambro, Inc.*,
    428 F.3d 933 (10th Cir. 2005) ................................................................................11

*Johnson v. City of Roswell*,
    752 F. App'x 646 (10th Cir. 2018) ..........................................................................12

*Keeter Trading Co., Inc. v. United States*,
    79 Fed. Cl. 243, 263 (2007) ................................................................................14, 23

*Krygoski Constr. Co. v. United States*,
    94 F.3d 1537 (Fed. Cir. 1996) ........................................................................13, 15, 19

*NCLN20, Inc. v. United States*,
    99 Fed. Cl. 734 (2011) ......................................................................................15, 18

*Northrop Grumman Corp. v. United States*,
    46 Fed. Cl. 622 (2000) ..........................................................................................18

*Ram Eng'g & Constr., Inc. v. Univ. of Louisville*,
    127 S.W.3d 579 (Ky. 2003) ....................................................................................20

*Ry-Tan Constr., Inc. v. Wash. Elementary Sch. Dist. No. 6*,
   93 P.3d 1095 (Ariz. Ct. App. 2004), *vacated on other grounds by* 111 P.3d
   1019 (Ariz. 2005).................................................................................................20

*Sigal Construction Corp. v. General Servs. Admin.*,
   10-1 BCA ¶ 34442 (2010) ...................................................................................15

*TigerSwan, Inc. v. United States*,
   110 Fed. Cl. 336 (2013) .............................................................15, 16, 17, 18

*Torncello v. United States*,
   681 F.2d. 756 (Ct. Cl. 1982) ...................................................................... *passim*

## Rules

Fed. R. Civ. P. 56(a) ...................................................................................................11

## Other Authorities

Joseph J. Petrillo & William E. Conner, *From Torncello to Krygoski: 25 Years of
   the Government's Termination for Convenience Power* ..........................................19

7 Williston on Contracts § 7:7 (4th ed.)......................................................................20

24 Williston on Contracts § 64:4 (4th ed.)..................................................................24

Davidson Oil Company entered into a fixed price contract to supply all of the fuel requirements of the City of Albuquerque. As the City expected, to guarantee its ability to deliver fuel at the fixed prices called for by the contract, Davidson Oil hedged its position by purchasing hedge contracts at prices pegged just below the contract prices. Following a decline in world oil prices and before Davidson Oil could even commence deliveries of fuel, the City terminated the contract for convenience solely to seek better pricing from another vendor. As a result of this termination, Davidson Oil lost money on its hedge along with the opportunity to earn expected profits on the contract.

The City's termination destroyed the mutuality of consideration that is the very essence of any contractual relationship. This action was a bad faith exercise of contracting discretion and not justified by a change in circumstances. Alternatively, the City breached the contract by not compensating Davidson Oil for costs incurred in preparing to perform.

Based on the undisputed material facts and applicable law, the City committed a breach of contract and a breach of the contract's implied promise of good faith and fair dealing. Davidson Oil is entitled to summary judgment on these claims and awarding damages caused by the City's unlawful termination.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On or about December 16, 2019, the City of Albuquerque ("City") issued Request for Bids No. RFB0091C ("RFB") for the purchase and delivery of diesel fuel and unleaded gasoline. Among other things, the RFB indicated that the City "plans to award one firm fixed price agreement under this RFB."  Estimated usage of fuel was listed by fuel type in Appendix A to the RFB. The City cautioned bidders that it "does not intend these estimates to be bulk orders [it] shall order only in quantities and types needed." *See* Affidavit of Chan Davidson (hereinafter "Davidson Aff. "), attached hereto as **Exhibit 1, ¶** 3 and the RFB attached hereto as **Exhibit 1-A** at 1 & 6.

2.      On or about January 7, 2020, the City issued Addendum #1 to the RFB. The addendum recites that its purpose "is to respond to questions that were timely submitted by potential offerors...". Davidson Aff. ¶ 4 and Addendum #1 attached hereto as **Exhibit 1-B** at 121.

3.      Addendum #1 included the following questions and answers concerning the fixed price nature of the fuel supply contract and price hedging by bidders:

(1)  Is OPIS based pricing allowed, or must it be a fixed firm price?

**Answer:** The City is only interested in a firm fixed price.

(4)   Will the City consider a differential to be added to NYMEX at the time of award to allow for market fluctuation?

**Answer:**  No. *It is the City's belief that the bidder should have its supplies already hedged in such a way, or the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date.* [Emphasis added].

(12)   Will the City allow for NYMEX adjustments after award?

**Answer:** No. This is for a firm fixed price agreement.

(27)   Is the bid for one fixed-price per-gallon for each product for the entire year? Are you looking for one price that will not change with the market price of fuel?

**Answer:** Yes, the City is requesting a firm fixed price per gallon delivered to various City sites.

(28)   When quoting our price per gallon on the quote form, where do we notate the rak [sic] or base price per gallon that changes every day?

**Answer:** The City will not take into consideration pricing that will fluctuate daily. The intent of this bid [*sic*] is for a firm fixed price for the term of the agreement as stated in the RFB.

Davidson Aff. ¶ 4 and Addendum #1 at 121-123.

4.      Addendum #1 included the following questions and answers concerning the exclusive nature of the fuel supply contract:

(7)  Will the City purchase from any vendor, other than the awarded vendor during the life of the contract?

> **Answer:** The City's intent is to award one vendor that can meet the needs of the City's fuel usage.
>
> (13)   Will the City award Gas and ULSD to the same vendor or will the City split awards between Gas and ULSD?
>
> **Answer:**  The City will award one vendor that is able to supply all the fuel required.
>
> (25)   Why did the City move from a Vendor Pool purchasing fuel from multiple vendors, to a contract with one fuel vendor?
>
> **Answer:** The City believes it's in its best interest to purchase fuel for various needs from one supplier. The City has an obligation to seek all ways in which cost effectiveness is of the utmost priority to obtain, and be sustained throughout the duration of any contracts being executed.

Davidson Aff. ¶ 4 and Addendum # 1 at 121-123.

5.      Addendum #1 included the following questions and answers concerning the quantities to be ordered under the fuel supply contract:

> (8)   Will the City purchase all gallons from the awarded vendor during the contract period? …
>
> **Answer:** The quantities listed are an estimated amount based on prior usage. Estimated usage should not be considered as a firm amount that will be purchased from the successful Bidder. The City does not intend these estimates to be bulk orders and shall order only in quantities and types needed.
>
> (18)   If the City does not purchase all gallons, can the awarded vendor charge the City for liquidation damages?
>
> **Answer:** No. Please refer to the "Estimated Usage" section in the RFB.

Davidson Aff. ¶ 4 and Addendum #1 at 121-122.

6.      Four vendors, including Davidson Oil, submitted bids in response to the RFB. The City then requested best and final prices. On January 16, 2020, Davidson Oil reduced its original bid for fuel and submitted to the City its best and final prices.  Davidson Aff. ¶ 5.

7.      Following submission of Davidson Oil's best and final prices to the City, the City notified Davidson Oil that it intended to award the fuel supply contract to it. After reviewing the

terms and conditions that were to be incorporated into the contract, Davidson Oil requested that the termination for convenience clause be omitted, or alternatively, that the notice period under the clause be extended up to 180 days. In response, the City declined to delete the termination for convenience clause but agreed to extend the notice period from 30 days to 60 days.  Davidson Oil agreed to this modification.  Davidson Aff. ¶ 6.

8.      On or about January 21, 2020, the City and Davidson Oil entered into Contract No. SHR000022076 (hereinafter the "Contract").  Davidson Aff. ¶ 7 and Contract attached hereto as **Exhibit 1-C.**

9.      The Contract provides for Davidson Oil to supply fuel to the City for two years from July 1, 2020 to June 30, 2022.  The Contract also includes two (2) one (1) year options to renew. Renewal was at the discretion of the City by mutual written agreement of both parties. Davidson Aff. ¶ 7 and Contract at 1.

10.     Pricing under the Contract was to remain firm through the first year. Pricing for the second year was to be provided to the City by Davidson Oil by December 31, 2020. Davidson Aff. ¶ 7 and Contract at 2.

11.     The Contract includes a Termination for Convenience clause. This clause states as follows:

> City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor [sic] shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

Davidson Aff. ¶ 7 and Contract at 7.

12.     The Contract provides that it "is governed by the laws of the State of New Mexico and the City of Albuquerque."  Davidson Aff. ¶ 7 and Contract at 7.

13.     Having committed to fixed prices for fuel for a one year period, Davidson Oil needed to ensure it would have the ability to sell fuel to the City at the agreed prices regardless of market fluctuations. To do so, on January 31, 2020, Davidson Oil purchased hedge contracts. By entering

into hedge contracts Davidson Oil ensured that no matter the market price, it would have the money to buy diesel fuel and unleaded gasoline at prices less than the fixed prices called for during the first year of the Contract.   Davidson Aff. ¶ 8.

14.     The hedge contracts purchased by Davidson Oil were a type of derivative instruments known as "swap contracts". The company agreed with the party on the other side of the hedge to swap a floating market price for diesel fuel and unleaded gasoline in exchange for fixed prices. As derivative instruments, the hedge contracts did not involve the actual purchase of fuel.  Instead, the parties traded financial positions.  Davidson Aff. ¶ 9.

15.     The prices of the hedge contracts were locked-in as of the date of purchase, January 31, 2020. These prices were pegged just slightly below the fixed prices called for by the Contract with the City, allowing Davidson Oil a profit margin of $0.02 per gallon. The hedge contracts were in equal quantity lots of 12 one-month agreements. These instruments corresponded to each month of the first year of the Contract, beginning in July 2020 and concluding in June 2021. Davidson Aff. ¶ 10.

16.     The way the hedge contracts were designed, at the end of each one-month contract, Davidson Oil would be required to "settle" the financial obligations with the other party to the hedge. If market prices for fuel rose above the prices of the hedge contract, the other party would be obligated to pay Davidson Oil the difference between the hedge prices and the higher market prices. Thus, if market prices increased, Davidson Oil would still have the money to buy the fuel required by the City. On the other hand, if market prices for fuel fell below the hedge prices, then Davidson Oil would be obligated to pay the other party the difference between the hedge prices and the lower market prices. In this latter circumstance however, Davidson Oil would be protected from loss because it was entitled to sell fuel to the City at the fixed prices called for by the Contract, which were slightly higher than the hedge prices. Thus, revenues from sales to the City would cover

any monthly losses on the hedge contracts and further allow Davidson Oil to realize a modest profit on these sales. Davidson Aff. ¶ 11.

17.     On February 7, 2020, a little more than two weeks after Davidson Oil and the City entered into the Contract and a week after Davidson Oil purchased its hedge contracts, the company received an e-mail from the City. This e-mail requested that, in light of price decreases in oil markets since January 14, 2020, Davidson Oil reduce the fixed prices incorporated into the Contract. The e-mail stated in pertinent part as follows:

> … there has been a recent decrease in oil pricing. Since the January 14, 2020  RFB close, prices of RBOB futures with a July 2020 expiration have declined by 8.8 % and 1-year swaps have declined by 7.5%. Similar ULSD futures and swaps have declined by 12.2% and 9.3%, respectively. *In view of the current pricing, the City is requesting Davidson Oil consider a reduction of pricing per gallon for diesel and unleaded fuel for the recently awarded contract.* [Emphasis added.]

Davidson Aff. ¶ 12 and e-mail dated February 7, 2020 attached hereto as **Exhibit 1-D.**

18.     Davidson Oil declined the City's request for a price reduction. Such a reduction would have been inconsistent with the Contract. By entering into the Contract, the City and Davidson Oil agreed to fixed prices for one year. As noted above, to ensure Davidson Oil could fulfill its contractual commitment to the City, it had already purchased hedge contracts obligating the company to pay money to the other party if market prices fell below the hedge prices. A reduction in the fixed prices called for by the Contract below the hedge prices would cause Davidson Oil to lose money. Davidson Aff. ¶ 13.

19.     By e-mail dated March 19, 2020, the City provided notice to Davidson Oil of its intent to terminate the Contract effective May 19, 2020 pursuant to the Termination for Convenience clause. The City's stated reason for this termination was the decline in oil prices combined with the uncertainty created by the COVID-19 pandemic. Davidson Aff.  ¶ 14 and e-mail dated

March 19, 2020 attached hereto as **Exhibit 1-E**; City's Answer to Interrogatory No. 8 attached hereto as **Exhibit 2.**

      20.    The City's Chief Financial Officer, Sanjay Bhakta, testified in his deposition in this action as follows about the City's intention to pay the fixed prices called for by the Contract at the time of award:

> Q. So is it fair to say at the time the contract was awarded, the City did not intend to pay a fixed price for fuel oil if the market price for fuel oil declined substantially?
>
> A**.** I just don't know.  I don't know what the future would be.

Excerpts of Bhakta deposition ("Bhakta depo.") attached hereto as **Exhibit 3** at 7, lns. 12-24 & 30, lns. 9-14.

      21.    The City's Chief Financial Officer testified as follows as to how the City would have responded to a price *increase* in the oil market after the Contract was awarded:

> Q. If oil prices during that same period had spiked upward substantially, would the City have entertained a request from Davidson Oil to adjust the fixed price upwards?
>
> A. No.
>
> Q. And why not?
>
> A. That's why -- I mean it is in the City's best interest -- my fiduciary responsibility is to pay as much less as possible for anything we buy, and not to pay more than what we are required to pay.

Bhakta depo. at 36, lns. 11-20.

      22.    The City's Chief Financial Officer testified as follows about the anticipated effect of the Contract on the City if its demand for fuel was reduced by the COVID-19 pandemic:

> Q. So if the pandemic were to, for example, reduce the City's demand for fuel oil, that would not be a problem under the Davidson Oil contract, because you weren't required to purchase any particular quantity?

A. That's right.

Bhakta depo. at 44, lns. 15-20.

23.     Davidson Oil attempted to persuade the City to keep the Contract in place. The company informed the City that that the termination would leave Davidson Oil obligated on its hedge contracts with no ability to offset its monthly settlement payments with revenue from sales to the City under the Contract. Unfortunately, the City refused to rescind the termination. Davidson Aff. ¶ 15 and e-mail correspondence dated April 3, 2020 attached hereto as **Exhibit 1-F.**

24.     In an effort to mitigate the company's damages resulting from the termination of the Contract, Davidson Oil made four proposals to reduce its pricing of fuel if the City would reinstate the Contract. The City rejected each proposal and chose to contract for fuel with another vendor under the New Mexico State Price Agreement at cheaper market prices.  Davidson Aff. ¶ 16 and letter dated June 25, 2020 attached hereto as **Exhibit 1-G;** Bhakta depo. at 60-61, lns. 18-5.

25.     As a result of the termination of the Contract, Davidson Oil incurred damages. These damages consisted of losses sustained on its hedge contracts, additional interest paid on its line of credit, lost profits on sales of fuel and lost profits on transport of fuel. Davidson Aff. ¶ 17.

26.     Following termination of the Contract, Davidson Oil remained obligated on its hedge contracts but the company was left with no place to sell fuel at the fixed prices it had agreed to with the City in the Contract. Consequently, Davidson Oil could not offset the losses it sustained at the end of each month in which the market prices of diesel fuel and unleaded gasoline were less than the hedge prices for these fuels.  Davidson Aff. ¶ 18.

27.     As oil prices continued to decline, Davidson Oil realized a loss on its hedge contracts at the end of each month from July 2020 through January 2021. These losses totaled $1,226,356.65. When oil prices began to turn around, Davidson Oil realized a gain on its hedge contracts at the end of each month from February 2021 through the end of its last hedge contract in June 2021. These

gains totaled $624,497.66. Davidson Aff. ¶ 19.

28.     As a result of the monthly settlements under the hedge contracts, Davidson Oil ended-up realizing a net loss on these hedge contracts in the amount of $601,858.99 ($1,226,356.65 minus $624,497.66). These monthly losses and gains on the hedge contracts and this net loss are shown in the calculation of Davidson Oil's damages**.** Davidson Aff. ¶ 20 and Calculation of Damages attached hereto as **Exhibit 1-H.**

29.     The $1,226,356.65 in losses incurred by Davidson Oil on its hedge contracts each month from July 2020 through January 2021 had to be settled with cash. These payments created a substantial drain on the company's cash flow. To satisfy the company's cash requirements during the latter half of 2020, it requested its lender, Amarillo National Bank, to increase Davidson Oil's line of credit by $1 million. The bank did so. This increase in the company's borrowings caused Davidson Oil to incur additional interest payments in the amount of $13,883.89. These additional interest expenses are shown in the calculation of Davidson Oil's damages. Davidson Aff. ¶ 21 and Calculation of Damages.

30.     The fixed prices for fuel that Davidson Oil proposed in its best and final offer and accepted by the City included a profit margin of $0.02 per gallon. In the RFB, the City provided prospective bidders with figures showing its historical usage of diesel fuel and unleaded gasoline. Based on these historical figures, Davidson Oil projected it would deliver to the City during the first year of the Contract 293,079 gallons of diesel fuel and 155,117 gallons of unleaded gasoline. If the City had permitted Davidson Oil to perform the first year of the Contract, the company expected to realize a profit of $107,567.04 on fuel sales. A calculation of these lost profits is shown in the calculation of Davidson Oil's damages. Davidson Aff. ¶ 22 and Calculation of Damages.

31.     The Contract called for Davidson Oil to deliver the fuel it sold to the City. Based on the figures for historical fuel usage the City provided to prospective bidders in the RFB, Davidson

Oil estimated that it would deliver 469 loads of diesel fuel (consisting of 7,500 gallons per load) and 233 loads of unleaded gasoline (consisting of 8,500 gallons per load). Davidson Oil priced the Contract with a profit per load of fuel of $88.59. If the City had permitted Davidson Oil to perform the first year of the Contract, the company expected to realize freight profits of $62,154.91. Davidson Aff. ¶ 23.

32.     After the Contract was terminated, the vendor who provided fuel to the City in place of Davidson Oil was Truman Arnold Company (TAC). TAC, in turn, requested Davidson Oil to transport to the City a portion of this fuel. As a result, Davidson Oil earned a profit of $8,593.23 on fuel deliveries to the City made at the request of TAC. Deducting the profits realized by Davidson Oil on deliveries for TAC, the company lost a net of $53,561.68 in freight profits it expected to earn during the first year of the Contract. A description of these lost profits is shown in the calculation of Davidson Oil's damages. Davidson Aff. ¶ 24 and Calculation of Damages.

33.     In summary, the damages sustained by Davidson Oil resulting from the City's termination of the Contract consist of the following:

    (a)   Direct losses on hedge contracts: $601,858.99

    (b)   Additional interest paid on line of credit: $13,883.89.

    (c)   Loss of anticipated profits on fuel sales: $107,567.04

    (d)   Loss of anticipated fuel delivery profits: $53,561.68

**TOTAL: $776,871.60**

Davidson Aff. ¶ 25 and Calculation of Damages.

34.     The City has refused to compensate Davidson Oil for the damages it has sustained as a result of the termination of the Contract. Davidson Aff. ¶ 26.

35.     Prices in the world oil market are volatile. The events leading to the filing of Davidson Oil's lawsuit against the City began with a dramatic decline in world oil prices in

January 2020. This decline bottomed out in April 2020 and thereafter oil prices generally rallied until mid-November 2020 when prices began a steady increase that continued throughout 2021 and into early 2022. In late February 2022, following Russia's invasion of Ukraine, oil prices accelerated upwards.  Davidson Aff. ¶ 27.

## ARGUMENT

The City of Albuquerque unlawfully invoked the termination for convenience clause in its fuel supply contract with Davidson Oil. This termination resulted in damages to Davidson Oil. Consequently, Davidson Oil is entitled to summary judgment against the City on its claims for breach of contract and breach of the implied promise of good faith and fair dealing and awarding relief that places the company in as good a position as it would have been had the contract been performed. Alternatively, the City breached the TFC clause by not compensating Davidson Oil for the expenses it incurred at the City's direction in preparing to perform the contract and the company is entitled to recover damages for these expenses.

## I.        Standard for Granting Summary Judgment

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (reiterating the standard).  The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party passes this initial hurdle, "the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine triable issue." *Johnson v. City of Roswell*, 752 F. App'x 646, 649 (10th Cir. 2018) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

11

The purpose of summary judgment is to "determin[e] whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

## II.   City Breached Contract by Seeking Cheaper Pricing Elsewhere

The City breached the fuel supply contract by using the termination for convenience (TFC) clause to seek from another vendor cheaper pricing than it agreed to pay Davidson Oil.  In doing so, the City broke its commitment to purchase from Davidson Oil all of its fuel requirements for at least one year at the fixed prices called for in the Contract.

### A.   New Mexico law limits City's exercise of Termination for Convenience clause

Although the TFC clause appears to confer a broad right upon the City to terminate a contract at will, this right is not unlimited. The Contract is governed by New Mexico law. Fact 12. Under New Mexico law, all contracts are subject to public policy, and contractual provisions contrary to law cannot be enforced.  *See, e.g., McMillan v. Allstate Indem. Co.*, 2004-NMSC-002, ¶ 10, 84 P.3d 65, 69.

The leading New Mexico case addressing terminations for convenience by government agencies is *Mb Oil v. City of Albuquerque*, 2016-NMCA-090, 382 P.3d 975. *Mb Oil* also involves the termination for convenience of a contract to supply the City with its fuel requirements and essentially the same TFC clause as in the present case. The contractor brought suit alleging, *inter alia*, the City's termination for convenience was a breach of contract.

The Court of Appeals examined the TFC clause and explained that regardless of the broad discretion afforded the City by this clause, there are "some limitations on the government's ability to terminate contracts at will." *Id.*, ¶ 21. According to the court, "[t]hese limitations are designed to ensure that government contracts with nonmutual termination for convenience clauses are not illusory." *Id.* (*citing Torncello v. United States*, 681 F.2d. 756, 769 (Ct. Cl. 1982)). *See also*,

Memorandum Opinion and Order of June 23, 2021 (Doc. 15) (denying in part and granting in part the City's motion to dismiss the complaint in this action) at 7, *citing id.*

An illusory contract is not a contract at all. Courts refuse to construe a contract clause in such a way that the contract is destroyed if there is an alternative reading that upholds the contract. *Torncello*, 681 F.2d at 771.  "[T]he government's ability to invoke a TFC clause must be predicated on 'an obligation sufficient to uphold a contract…'". Mem. Op. and Order (Doc. 15) at 13, *citing id.*

Here, the City reads the Contract to confer upon it an unlimited right to terminate, but that interpretation would nullify any mutual consideration and void the agreement. To prevent such an outcome, the TFC clause must be construed as having limits, as this Court previously ruled. The City breached the Contract by violating those limits.

In *Mb Oil*, the Court of Appeals observed that two competing standards have developed to determine whether the exercise of a termination for convenience clause renders a contract illusory. *See also*, Mem. Op. and Order (Doc. 15) at 7. The first standard provides the government cannot "abuse its discretion or act in bad faith." *Id.*, ¶ 22 (*citing Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1543-1545 (Fed. Cir. 1996)). *See also*, Mem. Op. and Order (Doc. 15) at 12, *citing id*.

The second standard requires a sufficient change in the "circumstances of the bargain or the expectations of the parties". *Id.*, ¶ 23 (*citing Torncello*, 681 F.2d at 771). *See also*, Mem. Op. and Order (Doc. 15) at 7-8, *citing id.*

*Mb Oil* did not decide whether to adopt the bad faith standard or changed circumstances standard. Rather, it determined that under the particular facts of that case, "[t]he City was entitled, under any standard, to terminate the [c]ontract" because the contractor was unable to meet the City's requirements for fuel oil. *Id.*, ¶ 24.

**B.     City breached Contract under bad faith standard**

The bad faith or abuse of discretion standard is satisfied if a contractor can show that the government did not terminate the contract in good faith. *See Mb Oil*, 2016-NMCA-090, ¶ 22, 382 P.3d 979. "This standard while somewhat daunting, 'is not intended to be impenetrable,' and it 'does not insulate government action from *any* review by courts.'" *Keeter Trading Co., Inc. v. United States.,* 79 Fed. Cl. 243, 263 (2007) [citations omitted] (emphasis in original).

According to *MB Oil*, bad faith may be found where the government terminates a contract only to secure "a better bargain from a competing supplier in a requirements contract." *Id.* (*citing Torncello*, 681 F.2d at 771). In *Torncello*, the Navy contracted with Soledad Enterprises for general grounds maintenance, including pest control. The Navy never ordered any pest control from Soledad, but instead obtained these services from a lower-priced competitor.

On appeal of a breach of contract claim, the Court of Claims observed that "[t]he government contracts as does a private person, under the broad dictates of the common law." *Torncello*, 681 F.2d at 762. The court began its analysis by noting "one of the most elementary propositions of contract law [is] that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void . . ." *Id*. at 760. In a requirements contract, although a buyer is not obligated to order any specific quantity of goods or services, consideration is furnished "by the buyer's promise to turn to the seller for all such requirements as do develop." *Id*. at 761.

Applying these principles, the court concluded the Navy was not permitted to terminate the contract for convenience simply to obtain better pricing:

> The Navy had known from the competitor's bid, before it made its contract with Soledad, that Soledad's price was high and that it could get pest control more cheaply elsewhere. The Navy contracted with Soledad anyway. The ASBCA erred in allowing constructive termination for convenience to excuse the Navy's diversion of

> business. Termination for convenience was not available to the Navy,
> and so the Navy's breach of Soledad's contract is unexcused.

*Torncello*, 681 F.2d at 772.

Relying on *Torncello,* the Federal Circuit has held that "[a] contracting officer may not terminate for convenience in bad faith, for example, simply to acquire a better bargain from another source." *Krygoski*, 94 F.3d at 1541. "When tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach." *Id. See also, TigerSwan, Inc. v. United States,* 110 Fed. Cl. 336, 347  (2013) (abuse of discretion standard satisfied "when government has terminated a contract for convenience in order to get a better price for itself."); *NCLN20, Inc. v. United States,* 99 Fed. Cl. 734, 759 (2011) (terminating a contract to find a better bargain is "grounds for invalidating a termination for convenience"); *Sigal Construction Corporation v. General Services Administration*, 10-1 BCA ¶  34442 (2010) at 6 ("[o]ne of the few limitations on the Government's right to terminate for convenience is that the Government may not terminate simply to get a better price for performing needed work." )

When the government terminates a contract to secure more favorable pricing, agency animus towards the contractor is not necessarily required to establish an abuse of discretion. *TigerSwan,* 110 Fed. Cl. At 346-47. Nor does bad faith require a harmful purpose. As noted in *TigerSwan*:

> …"bad faith" does not necessarily involve an intent to harm the contractor. Rather, the government may be liable for breach in situations where it took action at the expense of the plaintiff without necessarily acting with animus toward the plaintiff. The court reads the [cited] precedents to include liability for a breach of contract based on an improper termination for convenience where the government has engaged in some form of improper self-dealing for its own benefit ….

*Id.*

Here, Davidson Oil alleges a valid claim for breach of contract under the bad faith standard. In December 2109, the City issued an RFB requesting bids for a fixed price, fuel supply requirements contract. Fact 1. The RFB incorporated an addendum setting forth questions and answers concerning the procurement. Fact 2. In response to questions from prospective bidders, the City repeatedly emphasized that it would accept only fixed prices, and not entertain quotes subject to adjustment based on market changes. Fact 3. The City further recited that to permit bidders to offer fixed prices, they should have their supplies already hedged or have the ability to hedge. *Id*. These questions and answers also made it clear that the fuel supply contract would be exclusive and that the winning bidder would be have to supply all of the City's fuel requirements with no commitment by the City to any specific quantity. Facts 4 & 5.

Following two rounds of competitive bidding, Davidson Oil was awarded the Contract. Facts 6 & 7. The City and Davidson Oil entered into the Contract on January 21, 2020. Fact 8. The Contract provided for Davidson Oil to supply the City's requirements for diesel fuel and unleaded gasoline at the fixed prices it bid for at least one year. Facts 1, 9 & 10. As the City expected, promptly after contract award and to ensure that it would have the ability to deliver fuel to the City regardless of market fluctuations, on January 31, 2020 Davidson Oil entered into hedge contracts. Fact 13. The hedge contracts guaranteed that Davidson Oil would have the money available to pay for fuel if market prices rose. Facts 13-16. Should market prices fall, Davidson Oil would owe money on the hedge contracts but it would be able to recoup that money from sales to the City pursuant to the Contract. *Id.*

On February 7, 2020, a little more than two weeks after the parties entered the Contract and one week after Davidson Oil purchased its hedge contracts, citing recent price decreases in the oil market, the City asked Davison Oil to reduce its prices. Fact 17. Davidson Oil declined to reduce

its prices, noting that the Contract provides for fixed prices and that it would lose money if it reduced its prices below the prices of its hedge contracts. Fact 18.  The City responded on March 19, 2020 by exercising the TFC clause. Fact 19. The City's reason for this termination was the decline in oil prices combined with the uncertainty created by the COVID-19 pandemic. *Id.* After refusing to rescind the termination or allow Davidson Oil to provide reduced prices to mitigate its damages, the City contracted for fuel with another vendor at cheaper market prices under the New Mexico State Price Agreement. Facts 23 & 24.

These facts support a claim for breach of contract. The City's termination of the Contract solely to obtain better pricing reeks of bad faith and abuse of discretion. If permitted to stand, this action would render the City's contractual commitment illusory. As this Court noted in ruling upon the motion to dismiss, the City "has not adequately established consideration under these circumstances." Mem. Op. and Order (Doc. 15) at 13.

For commodities subject to volatile market pricing, fixed-price contracts serve to share risk. By entering into the Contract with Davidson Oil, the City protected itself from increases in the market price of oil. The risk of price increases is borne by Davidson Oil. In exchange for this protection, the City accepted the risk that the price of oil might decline, and it would end-up paying Davidson Oil more than market rates.

By terminating the Contract, the City sought to dispense with the parties' agreed allocation of risk and instead place the entire risk on Davidson Oil. That is, if the market price of fuel rises, the City is shielded from this increase by the fixed prices it contracted for. If, on the other hand, prices fall, the City claims the right to terminate its fixed-price contract and look for better rates elsewhere. In effect declaring "heads I win, tails you lose," the City attempts to impose any and all losses on Davidson Oil. Should market prices increase, Davidson Oil must honor the lower prices

17

it agreed to with the City. Should prices fall, the City terminates and Davidson Oil is stuck paying for the hedge contracts it purchased to ensure it would be able to supply the City. This one-way shifting of risk is the very opposite of mutually bargained-for consideration.

The lack of mutual consideration in the way the City interprets the Contract is highlighted by the deposition testimony of Sanjay Bhakta, the City's Chief Financial Officer. The City requested Davidson Oil to cut its fixed prices following a fall in world oil prices and then terminated the Contract when Davidson Oil declined to do so. Facts 17 – 19. Notwithstanding these facts, Mr. Bhakta made it clear that the City did not deem price modifications reciprocal. That is, if oil prices had spiked substantially higher during the same time period, Mr. Bhakta testified the City would not have entertained a request from Davidson Oil to adjust the fixed prices upwards. Fact 21.

A termination for convenience is also unlawful under the bad faith standard when the government enters into a contract with no intention of fulfilling its promises. *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 627 (2000_. *See also*, *TigerSwan,* 110 Fed. Cl. at 336 ("… a breach may arise when the government enters a contract without intending to allow the awardee to perform..."); *NCLN20*, 99 Fed. Cl. at 759 ("… entering a contract with no intention of honoring it … are grounds for invalidating a termination for convenience.").

Here, the City clearly did not intend to be bound to the Contract when it was awarded. A mere 15 days after executing the Contract, the City was already asking Davidson Oil for reductions to the fixed prices it had agreed to pay. Fact 17. According to its Chief Financial Officer, at the time it awarded the Contract, the City was not necessarily committed to pay the fixed prices it had just accepted from Davidson Oil. When asked if it was fair to say that at the time of award, "the City did not intend to pay a fixed price for fuel oil if the market price for fuel oil declined substantially", Mr. Bhakta responded, "I just don't know." Fact 20.

The City's exercise of the TFC clause was in bad faith and an abuse of contracting discretion. Accordingly, under this standard the City is in breach of contract.

### C.   City breached Contract under changed circumstances standard

The second standard for determining if a termination for convenience is a breach of contract under New Mexico law is the changed circumstances test. *Mb Oil*, 2016-NMCA-090, ¶ 23, 382 P.3d 980. This standard allows a termination for convenience to be enforced "where the circumstances of the bargain or the expectations of the parties have changed sufficiently so that the clause serves only to allocate risk." *Id.* (citing *Torncello*, 681 F.2d at 771).

Based on its reading of *Krygoski*, 94 F.3d at 1545, the *Mb Oil* court concluded that the changed circumstances test announced in *Torncello* has been abandoned by the federal courts. *Mb Oil*, ¶ 23.[1] Nonetheless, the Court of Appeals further noted that this standard has been adopted by state courts. *Id.*, citing *Ry-Tan Constr., Inc. v. Wash. Elementary Sch. Dist. No. 6,* 93 P.3d 1095, 1112 (Ariz. Ct. App. 2004), *vacated on other grounds by* 111 P.3d 1019, 1024 (Ariz. 2005) (en banc); *Ram Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 587 (Ky. 2003).

In *Ry-Tan Construction,* the Arizona Court of Appeals ruled that a termination for convenience could not be properly invoked as a defense to a breach of contract claim where circumstances had not changed:

> The jurisprudence makes clear that termination for convenience, whether actual or constructive, is not of unlimited availability to the government, that it is not an open license to dishonor contractual obligations." [Citation omitted]. In this case, no unexpected event or "changed circumstances" occurred that might justify retroactive application of the contract termination provision, and we will not reduce the contract between the parties to an illusory contract that

---

[1] Although the application of the changed circumstances test under federal law does not affect contract claims brought under New Mexico law, it is not entirely clear that the changed circumstances test is no longer available to assess terminations for convenience by the federal government. *See* Joseph J. Petrillo & William E. Conner, *From Torncello to Krygoski: 25 Years of the Government's Termination for Convenience Power,* 7 Fed. Circuit B.J. 337, 362 & 369.

vitiates the terms contained in the contract documents, especially
where the School District's own actions caused the contract to be
terminated.

*Ry-Tan Constr.*, 93 P.3d at 1112.

Similarly, in *Ram Engineering,* the Supreme Court of Kentucky noted that "the law is clear
that a contracting officer cannot terminate for convenience in bad faith simply to acquire a better
bargain elsewhere." *Id.* at 583. The court went on to say that "interpreting termination for
convenience as allowing the government to terminate without a substantial change of circumstances
would not advance the fairness policies" of the Kentucky version of the Model Procurement Code.
*Id.* at 586. Thus, "[w]hile contractors ought to expect the government to terminate a contract when
it is in its best interest to do so, it is also reasonable for them to expect that the government's interest
will only change if the circumstances surrounding the contract substantially change." *Id.*

The court further observed that "if there is no good faith limitation set by a change of
circumstances, then the government's contracted-for promise becomes illusory[.]" *Id.* "Where an
illusory promise is made, that is, a promise merely in form, but in actuality not promising anything,
it cannot serve as consideration." *Id.*, *citing* 7 Williston on Contracts § 7:7 (4th ed.).

In the present case, Davidson Oil also alleges a valid claim for breach of contract under the
changed circumstances standard. There are simply no facts establishing a change in circumstances
sufficient to support exercise of the TFC clause. The City attempts to justify termination as a result
of a decline in oil prices combined with the uncertainty created by the COVID-19 pandemic. Fact
19.  Neither circumstance is a material change. The Contract itself anticipated market fluctuations
in calling for fixed prices. Facts 1 & 8. When asked by prospective bidders if they could propose
prices tied to market prices, the City repeatedly stated it would not consider such bids. Fact 3.
Moreover, the Contract is a requirements contract that did not obligate the City to purchase any
particular amount of fuel. Fact 1.

The absence of changed circumstances is first of all demonstrated by the plain truth that the oil market is volatile. Fact 35.  The City insists however, on characterizing the drop in oil prices in early 2020 as some kind of wholly unexpected "Black Swan" event. Although this price decline was indeed severe, it had already bottomed-out by April 2020, before Davidson Oil was even scheduled to begin fuel deliveries under the Contract. Facts 9 & 35. Thereafter, fuel prices rose. Fact 35. By February 2021, market prices for fuel exceeded the prices in Davidson Oil's hedge contracts. Fact 27. A year later, the increase in oil prices accelerated upwards following Russia's invasion of Ukraine. Fact 35.

Unforeseen price changes in a commodity market are precisely the type of unanticipated risks that cause parties to enter into fixed-price supply contracts. The Contract was designed to grant predictability to both the City and Davidson Oil in an uncertain oil market. This agreement was not intended to be cast aside as soon as prices shifted in favor of the City.  As this Court noted in ruling on the motion to dismiss, "the City has not persuaded the Court that a price decline in the context of a fixed-price contract is a change in circumstances as contemplated by *Torncello*." Mem. Op. and Order (Doc. 15) at 10. Consequently, "the City has not adequately shown that it possessed an obligation sufficient to supply consideration where Davidson Oil had already expended resources to prepare for the contract." *Id*. at 12.

Changed circumstances also cannot be established by the pandemic. The virus had no material impact on the Contract because it is a requirements contract. This means the City could purchase as much or as little fuel as it needed. Facts 1 & 5. The Contract did not bind the City to buy any particular amount of fuel oil. Instead, it merely obligated the City to purchase whatever fuel it did require from Davidson Oil. Thus, if—as a result of the pandemic—the City's demand for fuel was reduced, it was free to limit its purchases under the Contract accordingly. For this reason,

its Chief Financial Officer admits that a reduction in the City's demand for fuel would not have caused a problem under the Contract. Fact 22.

The City's exercise of the TFC clause was not justified by a change in circumstances. This termination was therefore a breach of contract under that standard as well.

### III.    City Breached Implied Promise of Good Faith and Fair Dealing in Contract

The City's termination of its fixed-price requirements contract with Davidson Oil solely to seek better pricing not only was a breach of contract, this act further constitutes a separate breach of the implied promise of good faith and fair dealing incorporated into the Contract. Even if the City can show it did not breach an express provision of the Contract in terminating the agreement, the termination completely undermined the design and purpose of the Contract and denied to Davidson Oil the benefit of the bargain it had reached with the City.

Under New Mexico law, every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract. *Sanders v. FedEx Ground Package System, Inc.,* 2008-NMSC-040, ¶ 7, 188 P.3d 1200, 1203. The implied covenant "requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Id*., *citing Bourgeous v. Horizon Healthcare Corp*., 117 N.M. 434, 438, 872 P.2d 852, 856 (1994). "It is one function of the good-faith performance doctrine to enforce the spirit of deals, including their unspecified inner logic." *Id.,* ¶ 9, *citing* Symposium: Restatement (Second) of Contracts, 67 Cornell L. Rev. 810, 827 (1982). "[T]he implied covenant of good faith and fair dealing helps insure that both parties receive the benefit of their respective bargains." *Id.*, ¶ 10.

The covenant of good faith and fair dealing is also implied in contracts with the government and may "be breached 'if, in ways unenvisioned by the contract, a party proceeds in a fashion calculated to frustrate or hinder performance by its contracting partner.'" *Keeter Trading Co., Inc.,* 79 Fed. Cl. at 264, *citing North Star Alaska Housing v. United States*, 76 Fed. Cl. 158, 188 (2007).

"This type of violation may occur even in the absence of a separate breach of express contractual terms." *Id.*

As demonstrated by the undisputed facts of this case, the City's exercise of the TFC clause deprived Davidson Oil of the benefit of the bargain it secured through a competitive procurement process. In a manner not envisioned by the Contract, the City frustrated the performance of its contracting partner. Both parties were aware the purpose of the Contract was to protect the City from price changes in the oil market. Davidson Oil made arrangements to provide that protection. By terminating the Contract to seek better pricing in an oil market suddenly more favorable to buyers, the City sabotaged the spirit of the deal.

The City solicited bids for a fixed price fuel oil requirements contract. Fact 1. During the bidding process, the City repeatedly insisted that it would accept only fixed prices for fuel and informed bidders they must be prepared to hedge their positions to provide such prices. Fact 3. After two rounds of bidding, Davidson Oil managed to submit prices low enough to win the contract while still allowing for a modest profit. Facts 7, 8 & 16. In accordance with the City's expectation, Davidson Oil made sure it could fulfill its commitment to the fixed prices it quoted by purchasing hedge contracts. Facts 3 & 13.

As it was intended to do, the Contract shielded the City from volatility in the oil market. Rather than honoring the agreement it had reached with Davidson Oil however, the City chose to abandon this commitment to take advantage of more favorable prices. Davidson Oil suffered damages instead of realizing the expected benefits of the Contract. Facts 25 -- 33.

### IV. <u>Davidson Oil Entitled to Recover Damages Against City</u>

The City's exercise of the TFC clause constituted a breach of contract, and based on that breach, Davidson Oil is entitled to recover expectation damages for the profit it expected to earn during the first year of the Contract. This profit would have been realized had the Contract not been

23

breached.  In addition, Davidson Oil may recover as reliance damages the costs it incurred in preparing to perform the Contract along with its expectation damages.

As a matter of hornbook law, a party injured by a breach of contract is entitled to seek both expectation damages resulting from the alleged breach and reliance damages. *See, e.g.*, 24 Williston on Contracts § 64:4 (4th ed.) ("… courts will allow the recovery of both expectation and reliance damages, because the compensation principle that underlies the recovery of damages by the victim of a breach requires both an assessment of the gains prevented as well as the losses proximately caused by the breach.")

These measures of contract damages are recognized in New Mexico.  In an action for breach of contract, the party who fails to perform the agreement is justly responsible for all damages flowing naturally from the breach. *Camino Real Mobile Home Park v. Wolfe*, 1995-NMSC-013, ¶ 20, 891 P.2d 1190, 1197, *overruled in part on other grounds, Sunnyland Farms v. Cent. N.M. Coop., Inc.,* 2013-NMSC-017, 301 P.3d 387. "[D]amages awarded for breach of contract must be the amount of money that will place [claimant] in the position [it] would have been in if the contract had been performed." NM UJI-Civ. § 13-843. Where profit is the inducement to making a contract, damages for lost profits are allowed if proven. *Ranchers Exploration and Development Corp. v. Miles,* 1985-NMSC-019, ¶ 5, 696 P.2d 475, 477. *See also*, *Camino Real Mobile Home Park,* ¶ 32. Contract damages may also include reliance damages, which are defined as  "[t]he reasonable cost to [claimant] of having relied on the contract, less any loss which [claimant] would have sustained had the contract been fully performed." *Id.* § 13-852.

Davidson Oil seeks to be put in the same place it would have been in but for the City's breach, which is exactly what the law contemplates. To do so, Davidson Oil must recover (1) the

profits it failed to realize due to the City's breach and (2) the losses it incurred in obtaining the hedge contracts necessary to perform.

If the City had not breached the Contract, Davidson Oil could reasonably expected to realize a profit on its fuel sales. The company's bid included a profit margin $0.02 per gallon. Multiplying this rate of profit by the quantities of fuel the City estimated it would require during the first year of the Contract results in lost profits of $107,567.04. Fact 30.

If the contract had not been breached, Davidson Oil also reasonably expected to earn profits for transporting the fuel purchased by the City. Fact 31. Davidson Oil priced the Contract to include a profit per load of fuel of $88.59. *Id*. Based on the fuel requirement estimates of fuel requirements provided by the City, these profits would have totaled $62,154.91. Fact 31. Davidson Oil was able to offset a fraction of these lost profits by providing fuel transport services to the replacement fuel supply vendor. Fact 32. Subtracting the profits on these deliveries from the gross figure results in lost net profits of $53,561.68. *Id*.

Davidson Oil's reliance damages arise from its purchase of hedge contracts based on the City's agreement to pay the fixed prices for fuel oil set forth in the Contract. When oil prices fell and the City terminated the Contract, Davidson Oil remained obligated on its hedge contracts. Fact 26. Consequently, it could not offset with sales to the City the losses it sustained at the end of each month in which the market prices for fuel were less than the hedge prices. Facts 16 & 26. Although market prices rose above the hedge prices in early 2021, Davidson Oil still sustained a net loss of $601,858.99 on its hedge contracts. Facts 27 & 28.

Davidson Oil also incurred additional interest expenses due to the City's breach of contract. The company incurred losses of $1,226,356.65 on its hedge contracts each month from July 2020 through January 2021 had to be settled with cash. Fact 29. These payments created a substantial

drain on the company's cash flow. *Id.* To satisfy the company's cash requirements during this period, at Davidson Oil's request, its bank increased the company's line of credit by $1 million. *Id.* This increase in the company's borrowings caused Davidson Oil to incur additional interest payments in the amount of $13,883.89. *Id.*

In summary, Davidson Oil's damages consist of (a) direct losses on its hedge contracts of $601,858.99, (b) additional interest paid on line of credit of $13,883.89, (c) loss of anticipated profits on fuel sales of $107,567.04, and (d) loss of anticipated fuel transport profits of $53,561.68. Fact 34. These damages total $776,871.60. *Id.* The City has refused to compensate Davidson Oil for its damages. Fact 34.

## V.  **Alternatively, even if City Lawfully Invoked the TFC Clause, it Breached the Clause by Not Compensating Davidson Oil for Preparation Costs**

Alternatively, even if the Court finds that the City's termination of the Contract was permitted by the TFC clause, the City still breached this provision by failing to compensate Davidson Oil for the cost of hedging its position in the oil market. The TFC clause provides that in the event of a termination for convenience, the City shall pay the vendor "for all … services provided to and accepted by City, if ordered… by City prior to the effective date of termination." Fact 11.  The RFB provides that bidders should be have their "supplies already hedged in such a way, or the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date." Fact 3.

In accordance with the Contract and to ensure it could sell fuel to the City at fixed prices, Davidson Oil hedged its position in the oil market. Facts 3 & 13-16. This hedge would have imposed no loss on Davidson Oil had the City performed the Contract. Instead, the City terminated the Contract before Davidson Oil could deliver any fuel. As a result of the termination, Davidson Oil sustained a net loss on its hedge contracts of $601,858.99, plus interest expenses of $13,883.89 incurred in having cash

available to pay obligations due to the other party under the first seven monthly hedge contracts for July 2020 through January 2021. Facts 26 - 29.

If the Court does not grant summary judgment to Davidson Oil for breach of contract and/or breach of the implied promise of good faith and fair dealing, Davidson Oil is alternatively entitled to summary judgment for the City's breach of the TFC clause by not compensating Davidson Oil for the expenses it incurred at the direction of the City prior to termination of the Contract.

## REQUEST FOR RELIEF

For the reasons set forth above, Plaintiff Davidson Oil Company respectfully requests the Court to enter summary judgment in its favor and against Defendant City of Albuquerque on its claims for breach of contract and breach of the implied promise and good faith and fair dealing and awarding to Davidson Oil the damages it sustained as a result of these breaches. Alternatively, Davidson Oil requests summary judgment on its claim for compensation due under the Termination for Convenience clause. Davidson Oil further requests an award of its costs and such other relief as the Court may deem just and proper.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By   /s/ Ross L. Crown
    Ross L. Crown
    *Attorneys for Plaintiff Davidson Oil Company*
    201 Third Street NW, Suite 500
    Albuquerque, NM  87102
    505-764-5402
    rcrown@lrrc.com

**CERTIFICATE OF SERVICE**

I certify that on March 11, 2022, I served a copy of the foregoing motion for summary judgment on the attorneys listed below through the Court's case management and electronic filing system:

John E. DuBois
Assistant City Attorney
Devon P. King
Managing Assistant City Attorney
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500 / F: (505) 768-4525
jdubois@cabq.gov


*/s/ Ross L. Crown*
Ross L. Crown