## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DAVIDSON OIL COMPANY,

      Plaintiff,

v.                                       No. CIV 20-0838 RB/JHR

CITY OF ALBUQUERQUE,

      Defendant.

### MEMORANDUM OPINION AND ORDER

In December 2019, the City of Albuquerque (the City) published a request for bids (RFB), seeking a fuel distributor to meet the City's fuel needs beginning July 1, 2020. The RFB provided that the City would only consider bids for a firm, fixed-price per gallon to cover the first year of the agreement and that the winning bidder should have the ability to hedge its position at the close date. Davidson Oil submitted the winning bid, and the parties signed a Contract on January 21, 2020, which specified the agreed-upon unit prices for unleaded regular gasoline and No. 2 diesel (collectively, fuel). On January 31, 2020, Davidson Oil purchased hedge contracts to ensure it had the ability to sell fuel to the City at the Contract unit prices regardless of market fluctuations. On February 7, 2020, the City emailed Davidson Oil and asked it to consider reducing the Contract unit prices based on a recent decrease in oil pricing. Davidson Oil declined to reduce the prices. In March 2020, the City notified Davidson Oil that it was terminating the agreement pursuant to the Contract's Termination for Convenience (TFC) clause. The City asserts that it made this decision not only because of drastically reduced market oil prices, but also because it was dealing with decreasing revenues and unprecedented uncertainties in the City's budget due to the COVID-19 pandemic.

Davidson Oil brings claims against the City for breach of contract and breach of the implied covenant of good faith and fair dealing. Both parties move for summary judgment. For the reasons discussed in this Opinion, the Court will grant in part the City's motion and dismiss with prejudice the claim for breach of contract, grant in part Davidson Oil's motion on the claim for breach of the implied covenant of good faith and fair dealing, and order further briefing on the issue of damages.

I.     **Factual Background**

A.     **The Contract**

On December 16, 2019, the City issued an RFB, seeking bids for the purchase and delivery of fuel in accordance with detailed specifications. (Docs. 53-1 ¶ 3; 53-1-A at 1.) The RFB specified that "[t]he City plans to award one firm fixed price agreement under this RFB." (Doc. 53-1-A at 1.) The contract would have a two-year term with two one-year options to renew at the City's discretion and by mutual agreement of the parties. (*Id.* at 5; *see also* Doc. 53-1-C at 1.) "Pricing submitted . . . [was to] remain firm throughout the first year term" and would cover "City-wide fuel usage, to include that of the Solid Waste Department, Transit Department, Department of Finance and Administrative Services, Fleet Division, and other City departments as needed . . . ." (Docs. 53-1-A at 5; 53-1-C at 2.) The City listed its estimated usage by fuel type in an appendix to the RFB but noted that it "does not intend these estimates to be bulk orders and shall order only in quantities and types needed." (*See* Doc. 53-1-A at 6.)

The City issued Addendum #1 to the RFB on January 7, 2020, "to respond to questions that were timely submitted by potential offerors . . . ." (*See* Doc. 53-1-B at 1–2.)

Addendum #1 included the following questions and answers concerning the fixed price nature of the fuel supply contract and price hedging by bidders:

1.     Is OPIS based pricing allowed, or must it be a fixed firm price?
Answer: The City is only interested in a firm fixed price. . . .

4.      Will the City consider a differential to be added to NYMEX at the time of award to allow for market fluctuation? . . .
Answer: No. It is the City's belief that the bidder should have its supplies already hedged[1] in such a way, or the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date. . . .

12.     Will the City allow for NYMEX adjustments after award?
Answer: No. This is for a firm fixed price agreement. . . .

27.     Is the bid for one fixed-price per-gallon for each product for the entire year? Are you looking for one price that will not change with the market price of fuel?
Answer: Yes the City is requesting a firm fixed price per gallon delivered to various City sites.

28.     When quoting our price per gallon on the quote form, where do we notate the [rack] or base price per gallon that changes every day?
Answer: The City will not take into consideration pricing that will fluctuate daily. The intent of this bid is for a firm fixed price for the term of the agreement as stated in the RFB. . . .

36.     How long after the bid opening are we required to hold our firm pricing before the recommendation?
Answer: It is the intent of the City to enter into an agreement with the awarded vendor within 7 days.

(Docs. 53 at 6; 53-1-B at 2–5.)

Addendum #1 included the following questions and answers concerning the exclusive nature of the fuel supply contract:

7.      Will the City purchase from any vendor, other than the awarded vendor, during the life of the contract?
Answer: The City's intent is to award one vendor that can meet the needs of the City's fuel usage. . . .

13.     Will the City award [diesel fuel and unleaded gasoline] to the same vendor or will the City split awards . . . ?
Answer: The City will award one vendor that is able to supply all the fuel

---

[1] "A hedge is an investment that is made with the intention of reducing the risk of adverse price movements in an asset." *Hedge Definition*, Investopedia, https://www.investopedia.com/terms/h/hedge.asp (updated Aug. 15, 2022); *see also In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 254 (E.D.N.Y. 2002) (to hedge is "to insure [oneself] against loss by unfavorable changes in price at the time of actual delivery") (quoting *United States v. N.Y. Coffee & Sugar Exch.*, 263 U.S. 611, 619 (1924)).

3

required. . . .

25.   Why did the City move from a Vendor Pool purchasing fuel from multiple
vendors, to a contract with one fuel vendor?
Answer: The City believes it's in its best interest to purchase fuel for various
needs from one supplier. . . .

(Docs. 53 at 6; 53-1-B at 2–5.)

Addendum #1 included the following questions and answers concerning the
quantities to be ordered under the fuel supply contract:

8.    Will the City purchase all gallons from the awarded vendor during the
contract period? . . .
Answer: The quantities listed are an estimated amount based on prior usage.
Estimated usage should not be considered as a firm amount that will be
purchased from the successful Bidder. The City does not intend these
estimates to be bulk orders and shall order only in quantities and types
needed. . . .

18.   If the City does not purchase all gallons, can the awarded vendor charge the
City for liquidation damages?
Answer: No. Please refer to the "Estimated Usage" section in the RFB.

(Docs. 53 at 6; 53-1-B at 2–3.) The Addendum indicated that bidders should "incorporate the

change in this Addendum into the original RFB document." (*Id.* at 5.)

Davidson Oil, a Texas corporation and fuel oil distributor, submitted a bid in response to

the RFB. (Docs. 1 (Compl.) ¶¶ 1, 8; 53-1 ¶ 5.) After two rounds of bidding, the City notified

Davidson Oil that it was the lowest bidder, and Davidson Oil reviewed the proposed contract. (*See

id.* ¶¶ 5–6.) The contract contained a TFC clause that provided:

Termination for Convenience: City may terminate the Contract at any time by
giving at least [30] days' written notice to the Vendor. In such event, vendor shall
be paid under the terms of the Contract for all goods and/or services provided to
and accepted by City, if ordered or accepted by City prior to the effective date of
termination.

(Doc. 53-1-C at 7.) "Davidson Oil requested that the [TFC] clause be omitted, or alternatively, that

the notice period under the clause be extended up to 180 days." (Doc. 53-1-A ¶ 6.) "[T]he City

declined to delete the [TFC] clause but agreed to extend the notice period from 30 days to 60 days."[2] (*Id.*) "Davidson Oil agreed to this modification." (*Id.*) The parties entered into the contract on January 21, 2020, with the term of the contract to begin on July 1, 2020. (*See* Doc. 53-1-C at 1.) The contract is governed by New Mexico state law. (*Id.* at 7.)

Because the City indicated its "intent [that] the bidder should have its supplies already hedged in such a way, or the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date" (Doc. 53-1-B at 2), Davidson Oil understood that it "needed to ensure it would have the ability to sell fuel to the City at the agreed prices regardless of market fluctuations (Doc. 53-1 ¶ 8). To offer the fixed price as agreed to in the contract, Davidson Oil purchased 12 one-month "hedge contracts" (corresponding with "each month of the first year of the Contract") with prices "locked-in as of the date of purchase" on January 31, 2020.[3] (*Id.* ¶¶ 8, 10.)

On February 7, 2020, the City emailed Davidson Oil and stated: "Since the January 14, 2020 RFB close, prices [of fuel[4]] have declined by" 7.5% to 12.2%. (Doc. 53-1-D.) "In view of the [decreases], the City [asked] Davidson Oil to consider a reduction of pricing per gallon for [fuel] for the recently awarded contract." (*Id.*) Davidson Oil declined to reduce the prices that the parties agreed to, because "[a] reduction in the fixed prices called for by the Contract below the hedge prices would cause Davidson Oil to lose money." (*See* Doc. 53-1 ¶ 13.)

On March 19, 2020, the City gave Davidson Oil notice of the City's intent to terminate the

---

[2] Jennifer Bradley, the City's Chief Procurement Officer, stated that a 30-day TFC clause is standard in "almost all [City] procurement contracts . . . ." (Doc. 49-E ¶¶ 1, 4.)

[3] Davidson Oil's CEO, Chan Davidson, explains that the prices of the hedge contracts "were pegged just slightly below the fixed prices called for by the Contract with the City, allowing Davidson Oil a profit margin of $0.02 per gallon." (Doc. 53-1 ¶¶ 1, 10.) Davidson asserts that the hedge contracts were designed to protect Davidson Oil from loss even if fuel market prices fluctuated. (*See id.* ¶ 11.)

[4] Specifically, the email referred to "RBOB futures with a July 2020 expiration," "1-year swaps," and "ULSD futures." (Doc. 53-1-D.)

parties' Contract pursuant to the TFC clause effective May 19, 2020. (Doc. 53-1-E.) "Davidson Oil attempted to persuade the City to keep the Contract in place[,]" but the City affirmed its intent to cancel on April 3, 2020. (*See* Docs. 53-1 ¶ 15; 53-1-F.)

### B.   The City's Reasons for Terminating the Contract

Sanjay Bhakta, the City's Chief Financial Officer, testified that it was his decision to invoke the TFC clause on the parties' Contract. (Docs. 57-B ¶ 1; 57-D at 71:14–17.) When asked if he understood "that Davidson Oil had invested in hedge contracts to guarantee its ability to provide a fixed price to the City[,]" Bhakta, testified that although he did not know "what kind of contract or contracts" Davidson Oil would have needed to secure the fixed price, he "would not be surprised" that Davidson Oil had invested in hedge contracts prior to February 7, 2020.[5] (Doc. 53-3 at 32:24–33:22.)

Prior to February 7, 2020, Christopher Daniel, the City's Chief Investment Officer, initiated a discussion about asking Davidson Oil to reduce the fixed prices. (*See id.* at 33:25–34:17; *see also* Doc. 57-F at 2.) Daniel regularly "monitor[s] various financial and nonfinancial markets for [their] impact on [the City's] investment decisions." (*See* Doc. 57-A at 33:3–6; *see also* Doc. 53-3 at 34:18–36:10.) Daniel explained that he noticed the prices of "crude oil were plummeting as a result of the pandemic" in late January 2020. (*See* Doc. 57-A at 32:19–33:12; *see also* Doc. 49-D ¶ 4.) He believed that the City "needed to take preemptive action, even though the virus had not yet hit the [United States] with full force . . . , [because] all indications were that it was on its way and [the City] needed to . . . shore up [its] expenses for the upcoming fiscal year." (Doc. 57-A at 33:8–17.) Bhakta testified that in the two weeks between when the parties signed the Contract and when the City asked Davidson Oil to reduce the agreed-upon prices, "COVID-19 kind of

---

[5] The City did not review or approve the hedge contracts prior to Davidson Oil purchasing them. (Doc. 57-B ¶ 18.)

became a worldwide thing" and "changed everything financially" for the City. (Doc. 53-3 at 32:6–14.) "[T]he oil price declined in a very sharp manner, and that was the reason for reaching out to Davidson [Oil], because the price just fell much sharper than a normal fluctuation—above and beyond the normal fluctuation." (*Id.* at 32:14–18.)

Bhakta stated that the pandemic financially affected the City due to the City's dependence on the "gross receipts tax[,] which is directly connected with the economy." (Doc. 57-D at 82:1–7; *see also* Doc. 57-B ¶ 12.) He testified that the "immediate impact was very intense because" city retailers and entertainment venues closed, consumer spending decreased and the gross receipts tax revenue dropped, creating concerns about a revenue shortfall. (Doc. 57-D at 82:11–22; *see also* Doc. 49-D ¶ 7.) The statewide Public Health Emergency Orders, which went into effect shortly before the City invoked the TFC clause,[6] added to the economic decline. (Doc. 57-D at 83:1–11.) The pandemic forced the City "to reassess the revenue impact from [Fiscal Year (FY) 2020] forward." (Doc. 57-B ¶ 12.) For example, the City's 2020 budgetary process "deviated radically" from previous years. (*Id.* ¶ 16.) Rather than submitting its FY2020–2021 budget using normal procedures, the City chose to exercise an option to utilize a "rollover budget" that the New Mexico Department of Finance and Administration (NMDFA) announced on March 18, 2020.[7] (*See id.* ¶¶ 13–14; *see also* Doc. 57-B at 5–7.)

---

[6] *See, e.g.*, *Public Health Orders and Executive Orders*, N.M. Dep't of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited Aug. 25, 2022) (listing March 13, 2020 Public Health Emergency Order to Temporarily Limit Nursing Home Visitation Due to COVID-19 and March 16, 2020 Public Health Emergency Order to Limit Mass gatherings Due to COVID-19).

[7] The NMDFA's March 18 Memorandum stated that "[i]n light of current economic uncertainties due to the impact of the COVID-19 public health emergency, [it was] temporarily adjusting [its] budget approval guidelines." (Doc. 57-B at 6.) Rather than requiring municipalities to submit their FY2020–2021 budget by the June 1, 2020 statutory deadline, the NMDFA allowed each local entity to submit its FY2019–2020 budget as a "rollover budget." (*See id.*; *see also* Doc. 57-B ¶ 13.) "This 'rollover' budget would allow municipalities . . . to operate on a month-to-month basis until revenues could be reasonably estimated and an adjusted budget could be proposed to structurally realign the budget to anticipated resources." (Doc. 57-B ¶ 13.)

In a response to an interrogatory, the City stated that it exercised the TFC clause due to the pandemic and its resulting uncertainty, uncertainty in the City's budget for fiscal year 2021, and "uncertainty in the City's total use or need for oil as everything shut down." (*See* Doc. 53-2 at 2.) Daniel testified that "[t]he City's reason for eventually terminating the agreement . . . was simply to try to reduce [its] expenses so that [it] could continue to offer essential City services." (Doc. 57-A at 30:21–25.) He stated that the City "terminated the . . . Contract in March 2020 because the [City] needed time [to] purchase hedges and contract with another procurement vendor and have everything in place by July 1, 2020." (Doc. 49-D ¶ 14.) "The [City] ultimately purchased fuel oil from TAC Energy using the State of New Mexico Statewide Purchasing Agreement."[8] (*Id.* ¶ 15.) The new contract enabled the City "to buy at the market price" using "the OPIS index." (*See* Doc. 57-D at 60:20–61:5.) Bhakta testified that Davidson Oil sent three proposals to the City after the termination, all of which were higher than what the City was able to procure from the statewide agreement. (Doc. 57-D at 73:2–23.)

Bhakta testified that the City would not "have entertained a request from Davidson Oil to adjust the fixed price upwards" if oil prices "had spike upward substantially . . . ." (Doc. 53-3 at 36:11–15.) He stated that "it is in the City's best interest" and it is his "fiduciary duty . . . to pay as much less as possible for anything [the City] buy[s], and not to pay more than what [it is] required to pay." (*Id.* at 36:16–20.) When asked if, "at the time the contract was awarded, the City did not intend to pay a fixed price for fuel oil if the market price for oil declined substantially[,]" Bhakta responded, "I just don't know. I don't know what the future would be." (*Id.* at 30:9–14.) He continued, "I think a fair statement would be the City did not anticipate the price of a decline

---

[8] The New Mexico Statewide Purchasing Agreement "was a State competitive solicitation for the entire State to buy fuel oil." (Doc. 49-E ¶ 7.)

or rise substantially." (*Id.* at 30:20–22.)

Bhakta asserted that the City used less fuel during the pandemic. (*See, e.g.*, Doc. 50-C ¶¶ 19–21.) He acknowledged, however, that the City was not required to purchase any particular quantity of fuel from Davidson Oil under the Contract, so a pandemic-related reduction in the City's demand "would not be a problem . . . ." (Doc. 53-3 at 44:15–20.)

## II.    Legal Standards and Evidentiary Rulings

### A.    Summary Judgment Standard of Review

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). In examining cross-motions for summary judgment, the Court analyzes each motion on its own merits and "according to the well-worn standard for individual Rule 56 motions." *See AT&T Mobility Servs., LLC v. Vill. of Corrales*, 127 F. Supp. 3d 1169, 1172 (D.N.M. 2015). "[W]hen the parties file cross motions for summary judgment, '[the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties . . . .'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)) (subsequent citation omitted).

"The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that

there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* at 1107 (quotation and citations omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in its favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044 (quotation omitted), is insufficient.

## B.     Evidentiary Objections and Rulings

In response to Davidson Oil's recitation of material facts, the City denies a variety of facts on the basis that it "lacks sufficient knowledge or information to form a belief as to the truth of the allegations . . . and therefore denies those allegations." (*See* Doc. 57 at 7–10.) To the extent Davidson Oil's factual assertions are supported by record evidence and do not contain legal conclusions, the City's denials for lack of knowledge fail to create genuine factual disputes. *See* Fed. R. Civ. P. 56(c)(1), 56(e)(2); *Miller v. Contreras-Sweet*, No. 13-CV-01285-RM-KLM, 2014 WL 5092257, at *2 (D. Colo. Oct. 10, 2014) (noting that "[f]acts denied on the basis of "no personal knowledge" are insufficient to create a disputed material fact because it is the obligation of the non-moving party to designate evidence which contradicts the purportedly contested fact") (citing Fed. R. Civ. P. 56(e)(2), 56(e)(3); *1-800-Contacts, Inc. v. Lens. com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013)).

## III.   Count I: Breach of Contract

"A [TFC] clause is generally understood to be a risk-allocating tool, intended to permit a government to 'terminate a contract, even in the absence of fault or breach by the other party, without incurring the usual financial consequences of breach.'" *Mb Oil Ltd., Co. v. City of*

10

*Albuquerque*, 382 P.3d 975, 976 (N.M. Ct. App. 2016) (quoting *Mark Dunning Indus. v. Cheney*, 934 F.2d 266, 267 n.1 (11th Cir. 1991) (per curiam)). "The Government's right to terminate a contract for convenience is broad."[9] *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) (citation omitted). The New Mexico Court of Appeals opined that "[a] clause that allows a party to terminate a contract for convenience, as opposed to default, is typically treated as a provision allowing termination 'without cause[,]' *Harris Corp. v. Giesting & Assocs.*, 297 F.3d 1270, 1273 (11th Cir. 2002), which is the functional equivalent of an agreement for an indefinite period, terminable at will." *Mb Oil*, 382 P.3d at 978 (citing *Lopez v. Kline*, 124 N.M. 539, 953 P.2d 304 (N.M. Ct. App. 1998)); *see also Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 650 P.2d 825, 829–30 (N.M. 1982) (allowing a "terminable at will" clause to stand in a contract governed by the Uniform Commercial Code).

Because TFC clauses are standard "in almost all federal procurement contracts[,]" much of the related law "has developed primarily in the Federal Circuit Court of Appeals and its predecessor the Court of Claims." *A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, No. 1677CV01366, 2017 WL 1312005, at *4 (Mass. Super. Mar. 3, 2017), *remanded by* 95 N.E.3d 547 (Mass. 2018) (citations omitted). States and municipalities also typically include TFC clauses in their own contracts, and state courts—including the New Mexico Court of Appeals—look to federal decisions for guidance in analyzing whether TFC clauses are properly invoked. *Id.* (gathering cases).

Courts have imposed limits on the government's right to terminate federal contracts for convenience "to ensure that government contracts with nonmutual [TFC] clauses are not illusory."

---

[9] The Court discussed the history of TFC clauses in its Opinion granting in part the City's Motion to Dismiss. *See Davidson Oil Co. v. City of Albuquerque*, 545 F. Supp. 3d 1039, 1045–46 (D.N.M. June 23, 2021).

*Mb Oil*, 382 P.3d at 979 (citing *Torncello v. United States*, 681 F.2d 756, 769 (Ct. Cl. 1982)).

Courts recognize two competing standards when analyzing whether termination under a TFC

clause constitutes a breach. *See id.* The *Torncello* court, in a plurality opinion, announced the first

standard, which considers whether the parties experienced changed circumstances, either in the

bargain or in their own expectations. 681 F.2d at 766. The second standard, primarily attributed to

*Krygoski Construction Co. v. United States*, 94 F.3d 1537 (Fed. Cir. 1996), requires "that the

government does not abuse its discretion or act in bad faith." *Mb Oil*, 382 P.3d at 979 (discussing

*Krygoski*, 94 F.3d at 1543). The parties agree that these standards govern the outcome of this case.

(*See* Docs. 50 at 10; 53 at 17–26.)

> **A.**     **The City properly invoked the TFC clause under the changed circumstances standard.**

The United States Court of Claims originated the "changed circumstances" test in

*Torncello*, which was "the first court decision to hold that a termination for convenience was

improper and therefore constituted a breach of contract." Joseph J. Petrillo & William E. Conner,

*From Torncello to Krygoski: 25 Years of the Government's Termination for Convenience Power*,

7 Fed. Circuit B.J. 337, 337 (1997). In that case, the Navy solicited bids for a grounds-maintenance

requirements contract that covered 12 types of work, including pest control services. 681 F.2d at

758. The Navy awarded the contract to Soledad Enterprises, even though Soledad's bid itemization

specified a charge for pest control services that far exceeded that of other bidders. *See id.* When

the Navy needed pest control work, it did not honor its contract with Soledad, but instead called

another vendor who charged a lower price. *See id.* A plurality of the court concluded that based on

"the historical limits on the use of the [TFC] clause[,]" the government may properly invoke the

clause only when there is "some kind of change from the circumstances of the bargain or in the

expectations of the parties." *Id.* at 772. Because the Navy invoked the TFC clause "to take advantage of a price [it] had known about at the award date and where" there were no changed circumstances fundamental to the contract, the Navy's conduct rendered its original promise illusory. *Id.* at 760.

Courts have since largely confined *Torncello*'s test to the specific factual circumstances at play in that case: that is, termination for convenience to take advantage of a better price that the government knew about in advance constitutes a breach. *See, e.g.*, *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990) (*Torncello* "stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause."). The New Mexico Court of Appeals recognized that federal courts have "abandoned" the changed circumstances test. *See* 382 P.3d at 980. It noted, however, that two state courts have adopted it. *See id.* (citing *Ry-Tan Constr., Inc. v. Wash. Elementary Sch. Dist. No. 6*, 93 P.3d 1095, 1112 (Ariz. Ct. App. 2004), *vacated on other grounds by* 111 P.3d 1019, 1024 (Ariz. 2005) (en banc); *Ram Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 587 (Ky. 2003)).

Neither *Ry-Tan* nor *RAM* are on point. In *Ry-Tan*, a school district awarded a construction project bid to Ry-Tan but after a dispute arose, the district cancelled the contract and awarded it to another contractor. 93 P.3d at 1097. The Arizona Court of Appeals declined to find that the district properly invoked the TFC clause where the district neither adhered to the 30-day notice requirement nor showed that an "unexpected event or 'changed circumstances'" retroactively justified using the TFC clause. *Id.* at 1112. The court also noted that "public policy does not support terminating a contract with the lowest bidder for a project, and then awarding a contract for the same project to a contractor who submitted a higher bid." *Id. Ry-Tan* is distinguishable, as the

13

parties here signed the Contract only weeks before a new pandemic upended normal life. Further, the City did not award the contract to another supplier that bid with Davidson Oil. Instead, it procured a completely different type of contract (one based on the OPIS index) using a statewide pricing agreement.

In *RAM*, a university solicited bids for a construction project and declared RAM the lowest bidder. 127 S.W. 3d at 581. Later, as part of a lawsuit with a separate vendor, the university agreed to declare the first contract void. *Id.* When RAM bid and won the contract again, it filed suit and argued that the university had improperly terminated the first contract. *See id.* The state supreme court found that the university did not properly terminate the contract under the TFC clause. *Id.* at 587. "While contractors ought to expect the government to terminate a contract when it is in its best interest to do so, it is also reasonable for them to expect that the government's interest will only change if the circumstances surrounding the contract substantially change." *Id.* at 586. "Relying on circumstances the [u]niversity itself created simply is not grounds for termination under the changed circumstances standard." *Id.* at 587. Here, the City did not terminate the parties' Contract due to circumstances that it created but was responding to decreasing revenues and predicted shortfalls caused by an unprecedented pandemic, together with falling oil prices. These factors changed "'the circumstances of the bargain' . . . significantly enough to justify termination of the" Contract. *See id.* (quoting *Torncello*, 681 F.2d at 771).

The *Mb Oil* court also found a change of circumstances sufficient to justify invocation of a TFC clause in a contract much like the one here. *See Mb Oil*, 382 P.3d at 980. There, the City of Albuquerque contracted with a wholesale fuel distributor (Mb Oil) to supply the City's fuel needs, and the contract contained a TFC clause almost identical to the one in this Contract. *See id.* at 976. By the time Mb Oil began performing under the contract, the City had elected a new mayor. *See*

14

*id.* at 979. During the first year of the contract, the City's new administration "directed the City's fleet management to convert its fleet" to use unleaded fuel, rather than the E85 fuel it previously used, due to price and efficiency concerns. *See id.* Faced with providing an increased amount of unleaded fuel, Mb Oil failed to timely deliver fuel to the City on a number of occasions, and the City provided written notice that its "fuel requirements were not being met." *Id.* at 977, 979. Eventually, the City "terminated the contract for default and/or convenience[,]" and Mb Oil sued. *Id.* at 977. The appellate court opined that the vendor's inability to meet the City's new fuel needs was "a 'changed circumstance' and an inconvenience to the City, which contracted and paid to be a preferred customer entitled to the reliable delivery of fuel within twelve hours of its request." *Id.* at 980. Although the parties here did not experience a change in administrations, the Court finds the *Mb Oil* decision persuasive.

Davidson Oil asserts that the "contract was designed to grant predictability to [the parties] in an uncertain oil market." (Doc. 53 at 21.) If the City had only terminated the Contract because of falling oil prices, the Court would be inclined to agree that there was a breach. But the City's decision to terminate the Contract rested on more than market fluctuations. The circumstances in March 2020 were substantially different from those when the parties signed the Contract. The State was in the midst of a public health emergency and issued its first pandemic-related Public Health Orders days before the City invoked the TFC clause. On March 18, 2020, the day before the City gave notice of its intent to terminate, the City declared a Local State of Emergency and ordered, in part, the closure of "all places of mass assembly" and the cancellation of "all nonessential City-sponsored events and gatherings." *City of Albuquerque Declaration of Local State of Emergency Due to Novel Coronavirus COVID-19*, https://www.cabq.gov/mayor/documents/emergecy-declaration.pdf (Mar. 18, 2020). The evidence demonstrates that as a result of the pandemic, the

City was experiencing decreasing revenues. City staff were tasked with finding ways to reorganize the budget to deal with the altered economic reality. Moreover, the testimony shows that the City invoked the TFC clause, in part, in an effort to provide essential services to City residents. Under the dicta in *Mb Oil* approving the use of TFC clauses for "the best interests of the citizenry[,]" the Court finds that the City has shown changed circumstances sufficient to terminate the Contract under the TFC clause. *See id.* at 979.

Davidson Oil contends that the pandemic "had no material impact on the Contract because it is a requirements contract." (Doc. 53 at 21.) "Thus, if—as a result of the pandemic—the City's demand for fuel was reduced, it was free to limit its purchases under the Contract accordingly." (*Id.*) This argument is more persuasive, but it still falls short. The City had to make fast decisions in a novel, changing landscape. It saw that the circumstances under which it had entered the Contract with Davidson Oil, in which fixed prices represented the wisest fiscal decision, had changed. The *Mb Oil* court opined that although "a clause that provides only one party the right to terminate for convenience might seem unfair[] or . . . illusory[,] . . . there are good reasons to allow the government to include a nonmutual [TFC] clause in its supply contracts." 382 P.3d at 978 (internal citation omitted). First, the New Mexico Legislature has expressly authorized public bodies to include TFC clauses in contracts. *Id.* (citing N.M. Stat. Ann. § 13-1-170(A) (1997)). Second, as the City "contract[s] for the benefit of its citizens[, t]he flexibility provided by a TFC clause allows it to limit expenditures without binding successor governments to contractual obligations that are not in the best interests of the citizenry." *Id.* at 979 (citation omitted). This is the scenario at play here. The City made a budgetary-related decision in the best interest of its citizenry.

Unlike the Navy in *Torncello*, the City did not terminate the Contract only to make an

identical deal with another vendor who offered lower prices. Instead, the City opted for an entirely different contractual route, choosing an OPIS index-based contract under a statewide pricing agreement. This fact falls heavily in favor of finding that there was a change in the circumstances of the parties' bargain and in the expectations of the parties. *See id.*; *see also Northrop Grumman*, 46 Fed. Cl. at 627 (finding that under *Torncello*, the government's invocation of the TFC clause was proper because a planned space station project encountered numerous setbacks, resulting in "circumstances [that] changed dramatically from the time of contracting to the time of termination"). The Court finds that the City's termination of the Contract stands under the *Torncello* test.

### B.   Davidson Oil fails to show that the City used bad faith or abused its discretion in invoking the TFC clause.

Under the second standard, a plaintiff may show that the invocation of a TFC clause was a breach of contract if it can establish that the government abused its discretion or acted in bad faith. *Mb Oil*, 382 P.3d at 979 (citing *Krygoski*, 94 F.3d at 1543). "The Federal Circuit has stated that a contractor's burden to prove that the Government acted in bad faith is 'weighty.'" *Northrop Grumman*, 46 Fed. Cl. at 626 (citing *Krygoski*, 94 F.3d at 1541). "Government officials are presumed to act in good faith." *Id.* at 626–27 (citing *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298 (Ct. Cl. 1976)). "A termination for convenience causes a contract breach only when a plaintiff can show 'well-nigh irrefragable proof' that the government did not terminate the contract in good faith." *Mb Oil*, 382 P.3d at 979 (quoting *Kalvar*, 543 F.2d at 1301–02).

> This narrow standard would presumably be met if a plaintiff showed that the contracting officer was (1) motivated by malice, *Gadsden v. United States*, 78 F. Supp. 126, 128 (Ct. Cl. 1948); (2) involved in a conspiracy to get rid of the plaintiff, *Knotts v. United States*, 121 F. Supp. 630, 636 (Ct. Cl. 1954); (3) sought only to secure a better bargain from a competing supplier in a requirements contract, *Torncello*, 681 F.2d at 772; or (4) never intended to keep its promise when the

promise was made, *Krygoski*, 94 F.3d at 1545.

*Id.* at 979–80. Davidson Oil contends that the City abused its discretion by seeking "a better bargain from a competing supplier in a requirements contract." (Doc. 53 at 14 (quoting *Mb Oil*, 382 P.3d at 979).) Discussing *Torncello*, the *Krygoski* court found that "bad faith . . . is a prerequisite for a *Torncello* claim." 94 F.3d at 1544 (quoting *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1582 (Fed. Cir. 1995)). Specifically, the court noted that in *Torncello*, "the Navy knew of the better price it later terminated the contract to obtain." *Id.* at 1541. The *Krygoski* court found that this conduct—entering into a contract with no intention of adhering to its terms—is sufficient to show bad faith. *See id.* at 1543–44 (discussing *Salsbury*, 905 F.2d at 1521).

Davidson Oil argues that it has shown evidence of such an intent, because Bhakta's deposition shows that "the City's commitment to the Contract was always conditional on market prices." (Doc. 63 at 3.) It refers to Bhakta's "repeated refusal to state without qualification that the City intended to honor the fixed prices it had negotiated . . . ." (*Id.*) The relevant testimony includes:

> Q. So, if there was – so we'll – you defined substantially as a major change, as opposed to more of a normal market fluctuation, is how I'm understanding your testimony?
> A. That's right.
> Q. So is it fair to say at the time the contract was awarded, the City did not intend to pay a fixed price for fuel oil if the market price for fuel oil declined substantially?
> A. I just don't know. I don't know what the future would be.
> Q. Well, as I'm understanding your testimony, you're saying that if the market price fell substantially, using your words, the City may not be willing to pay a fixed-price throughout the term of the contact; is that a fair statement?
> A. I think a fair statement would be the City did not anticipate the price of a decline or rise substantially.
> Q. My question is a little different. My question is: Did the City consider that if the price did fall substantially, it would not honor the fixed price it had negotiated?
> A. That's very hypothetical, because I didn't even think the price would rise or

> decline substantially.
> Q. Well, as Chief Financial Officer of the City of Albuquerque, I would think that
> you, basically, need to anticipate all kinds of things, even if they are unusual; isn't
> that fair to say?
> A. Unfortunately, I did not anticipate COVID-19 and [the] pandemic. I did not
> anticipate that at all . . . .

(Doc. 53-3 at 30:4–31:11.) Given that government officials are presumed to act in good faith, this testimony is insufficient to show "well-nigh irrefragable proof" evidence that the City never intended to honor the Contract. *See Mb Oil*, 382 P.3d at 979 (quoting *Kalvar*, 543 F.2d at 1301–02). Rather, the City did not anticipate a world in which it needed to extricate itself from a Contract in order to rework its budget and manage essential services.

Nor does the City's February 7 request that Davidson Oil lower the agreed-upon prices provide the requisite proof that it terminated the Contract in bad faith only to get a better bargain from a competing supplier. As Bhakta testified, the letter was merely "a request to a vendor that they would consider." (Doc. 53-3 at 32:22–23.) The Court finds guidance in *Northrop Grumman*. There, "Northrop Grumman [("Grumman")] was one of four contractors chosen by [NASA] to construct a Space Station . . . ." 46 Fed. Cl. at 623. It later became clear that the chosen plan was inefficient and, rather than lose the entire project, NASA redesigned the plan and made one of the four contractors a "prime" role with "overall responsibility for the project." *Id.* at 623–24. Grumman expressed dissatisfaction with its decreased role. *Id.* at 624. NASA ultimately found that it was in its best interest to remove Grumman from the project and invoked the TFC clause. *Id.* The United States Court of Federal Claims examined Grumman's breach of contract claim under both the "changed circumstances" and "bad faith" standards and found that NASA properly invoked the TFC clause under either. *Id.* at 627. Examining the contractor's allegations of bad faith, the court found that "[t]he Government did not terminate this contract for convenience

'simply' to acquire a better bargain from another source, even if that may have been the result." *Id.* In deciding whether NASA's invocation of the TFC clause was in bad faith, the court reviewed NASA's "actions for a determination of motive and intent . . . ." *Id.* NASA's goal was "to save the Space Station[,]" which "was in serious jeopardy politically." *Id.* Thus, the court found that "NASA's motivation was to save [and scale down] the program, not specifically to replace Grumman with" the new prime contractor. *Id.*

Similarly, the City was interested in cutting costs—that much is true. But its goal was not merely to replace Davidson Oil with another fuel distributor. Instead, the City was faced with revamping its budget, which could not be approved as anticipated. Davidson Oil makes much of the City's February 7 request to consider reducing the fixed price, but the City's *request* to lower the price does not constitute a breach of the Contract. The City did not invoke the TFC clause until March 19, 2020, after it became clear that the pandemic was having a larger effect on the City's revenues than the City ever anticipated when it put out the RFB. Moreover, the City invoked the TFC clause after it received word that it had state-sanctioned options to submit an alternative budget. In short, Davidson Oil fails to meet its burden to show the requisite proof of the City's bad faith or abuse of discretion, and the breach of contract claim must fail.

Davidson Oil emphasizes language from the Court's Opinion denying the City's motion to dismiss under the changed circumstances standard, where the undersigned found that "the City ha[d] not adequately shown that it possessed an obligation sufficient to supply consideration where Davidson Oil had already expended resources to prepare for the contract." (Doc. 53 at 21 (quoting *Davidson Oil*, 545 F. Supp. 3d at 1049).) But the Court decided that motion under the Rule 12(b)(6) standard and declined to consider the City's arguments regarding pandemic-related budgetary concerns, as they were not suitable for judicial notice. *See Davidson Oil*, 545 F. Supp. 3d at 1047–

48 & n.5. On the summary judgment record, the City has established that the pandemic-induced revenue decreases and related budgetary concerns significantly changed the circumstances of the bargain.

Further, the evidence shows that Davidson Oil requested a 180-day notice and then knowingly agreed to a 60-day notice in the TFC clause, rather than the 30-day notice that was offered. In *Mb Oil*, the court commented on "the unremarkable obligation of courts to enforce the bargained-for terms of a contract as written." *Mb Oil*, 382 P.3d at 978 (citing *Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1110 (N.M. 1988)). "Parties are free to negotiate for provisions that are beneficial to them, and '[a] dissatisfied party to a valid contract should not be allowed to rewrite the provisions to which he initially assented.'" *Id.* (quoting *Melnick*, 749 P.2d at 1111). The limitations placed on the government's ability to invoke TFC clauses "are designed to ensure that government contracts with nonmutual [TFC] clauses are not illusory." *Id.* at 979 (citing *Torncello*, 681 F.2d at 769 ("It is hornbook law . . . that a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract.")). The City's Contract required a 60-day notice and payment under certain conditions, and there is no evidence that the City entered the Contract fully intending not to honor it. Thus, there is evidence that the City supplied adequate consideration. *See, e.g.*, *Torncello*, 681 F.2d at 769 (government cannot reserve "a route of complete escape" without showing a sufficient change in circumstances); *Salsbury*, 905 F.2d at 1521 (if the government "could agree to buy services with no intention of doing so, the contract would fail for want of consideration"). The Court finds that the City's invocation of the TFC clause under either standard was appropriate; it did not breach the parties' Contract. The Court will grant the City's motion and deny Davidson Oil's motion on this issue.

**IV.     Count II: Breach of Implied Promise of Good Faith and Fair Dealing**

Davidson Oil contends that the City's termination of the Contract "constitutes a separate breach of the implied promise of good faith and fair dealing" because it "completely undermined the design and purpose of the Contract and denied to Davidson Oil the benefit of the bargain it had reached with the City." (Doc. 53 at 22.) The City argues that "the implied covenant cannot override an express termination clause" and that "the facts do not support that the City acted in bad faith when it exercised the TFC" clause. (Doc. 57 at 14.) The Court agrees that the implied covenant may not override an express termination clause, but that does not end the inquiry.

"[E]very contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Watson Truck & Supply Co. v. Males*, 801 P.2d 639, 642 (N.M. 1990) (citing *Spencer v. J.P. White Bldg.*, 585 P.2d 1092, 1095 (N.M. 1978); Restatement (Second) of Contracts § 205 (1979)). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Id.* (quoting *Romero v. Mervyn's*, 784 P.2d 992, 1000 (N.M. 1989)). "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Sanders v. FedEx Ground Package Sys.*, 188 P.3d 1200, 1203 (N.M. 2008) (quoting *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 82 (N.M. 1993)). In *Mb Oil*, the New Mexico Court of Appeals held that the City's termination pursuant to the TFC clause "was neither a breach of the Contract nor a breach of the covenant of good faith and fair dealing." 382 P.3d at 980 (citing *Melnick*, 749 P.2d at 1110) ("We align . . . with those courts that have refused to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract."); *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347, 359 (N.M. Ct. App. 2005) ("The implied duty of good faith does not confer on

a district court a roving commission to do whatever it[ ] wishes in the name of fairness.")).

The state supreme court in *Melnick* found that "[w]here a contract provides for a manner by which termination can be effected, those provisions must ordinarily be enforced as written." 749 P.2d at 1110 (quotation omitted). Davidson Oil does not argue that the breach of the implied covenant relates to the TFC clause, but that the City's termination "violated the spirit of the deal . . . and denied to Davidson Oil the benefit of its bargain." (Doc. 63 at 7; *see also* Doc. 53 at 11.) It cites *Sanders* in support of its position.

In *Sanders*, FedEx recruited Sanders as an independent contractor and told him that "he would have the ability to grow his business by buying routes from other contractors as they became available." *Id.* at 1202. The contract did not expressly provide for such a right. *See id.* When Sanders tried to purchase other routes, FedEx refused to authorize the purchases. *Id.* He claimed that FedEx breached the implied covenant of good faith and fair dealing. *Id.* The state supreme court noted that "the implied covenant of good faith and fair dealing cannot be used to overcome or negate an express term contained within a contract." *Id.* at 1203 (citations omitted). FedEx argued that because the contract did not give Sanders the right to buy routes, "the covenant of good faith and fair dealing cannot be used to imply one." *Id.* at 1204. Sanders argued that the covenant could be implied by examining the meaning of the term "independent contractor," which the parties "understood to mean that he had a right to grow his business by buying other routes as they became available, as long as he was qualified to operate them." *Id.* The supreme court agreed with Sanders and found that it was appropriate to introduce testimony surrounding the parties' understanding of the term. *Id.* at 1204–05. The court held that Sanders did not use the covenant "to override express terms of the contract" but to "establish the parties' intent as well as their expectations regarding the benefits that would flow from the agreement, and more specifically

from the term "independent contractor." *Id.* at 1207. The Court emphasized:

> [W]hen it is clear . . . from the relevant parts of the contract taken together and considered with the facts and circumstances surrounding the execution of the agreement, that the obligation in question was within the contemplation of the parties or was necessary to effect their intention, then such obligation may be implied and enforced.

*Id.* (quoting *Cont'l Potash*, 858 P.2d at 80).

Davidson Oil argues that an implied covenant regarding the hedge contracts would not "override" the TFC clause. (Doc. 63 at 7.) Neither the TFC clause nor the parties' Contract provides for damages for expenses made in preparation to perform, but the City clearly expected the winning bidder to take steps to lock in the fixed price as the RFB demanded that the winning bidder be able to hedge its position. Bhakta testified that he would not be surprised that Davidson Oil had invested in hedge contracts in anticipation of performance.

The City fails to discuss *Sanders* or to effectively rebut Davidson Oil's claim that the implied covenant does not override an express contractual provision. (*See* Doc. 57 at 14–15.) Rather, it simply asserts that this question "raises the same issue concerning whether the City exercised the TFC in bad faith . . . ." (*Id.* at 15.) The Court disagrees, as the issue of the City's conduct regarding Davidson Oil's procurement of hedge contracts is distinct from whether the City exercised bad faith in terminating the Contract in March. The facts show that with knowledge that it had induced Davidson Oil into changing its position after signing the Contract, and without any intention of compensating it for the measures it took in reliance thereon, the City intentionally invoked the TFC clause to Davidson Oil's detriment. *See Sanders*, 188 P.3d at 1203.

The Court finds further guidance in *Planning & Design Solutions v. City of Santa Fe*, 885 P.2d 628 (1994 N.M.), a case that the *Mb Oil* cited positively. *See* 382 P.3d at 979. There, the City of Santa Fe requested bids for a new development, awarded the bid to a contractor, then rejected

the bid after introducing new criteria to the project. 885 P.2d at 630. The court found that "by requesting proposals, the City entered into an implied or informal contract that it would fairly consider each bid in accordance with all applicable statutes." *Id.* at 635 (quotation marks and citations omitted). "As with any contract, this implied contract 'imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *Id.* (quoting Restatement (Second) of Contracts § 205 (1979)) (citing *Watson Truck & Supply Co.*, 801 P.2d at 642). The court opined that the City "could not have been unaware that preparation of a bid on a multi-million dollar project would involve numerous foreseeable expenditures on the part of the bidder" and that the bidder relied on the City's original project requirements and "changed its position by 'incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts.'" *Id.* at 635–36 (quoting Restatement (Second) of Contracts § 344 cmt. a (1979)). Moreover, had the City included the new requirements in the original request, the contractor might have had different expenditures or "might have chosen not to bid at all." *Id.* at 636.

Similarly, the City demanded in the RFB that the winning bidder have "the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date." (Doc. 53-1-B at 2–5.) Davidson Oil relied on the City's explicit requirement by purchasing hedge contracts. Regardless whether the TFC clause allowed the City to terminate the Contract before the parties started performing, the Contract did not have any express provisions regarding reliance damages based on the winning bidder's procurement of hedge contracts or other means to guarantee the agreed-upon fixed price.

The Court finds that the holding in *Mb Oil* does not preclude this result. The state appellate court declined to find breach of the covenant of good faith and fair dealing under circumstances where the parties were already performing under the contract and the contract expressly provided

for damages the City owed by invoking the clause. *See Mb Oil*, 382 P.3d at 980. The court was not faced with a situation where the parties had not yet begun performance, but the City demanded the distributor to change its position before any services were rendered.[10] The Court will deny the City's motion on this claim and grant Davison Oil's motion.

## V.   Damages

The City's arguments on summary judgment regarding damages related to a breach of the implied covenant of good faith and fair dealing are slim. (Docs. 49 at 16; 57 at 16–19.) The Court will deny both motions on this issue and require the parties to submit new briefs on the issue of damages only.

**THEREFORE**,

**IT IS ORDERED** that the City of Albuquerque's Motion for Partial Summary Judgment as to Damages and Supporting Memorandum (Doc. 49) is **DENIED** without prejudice.

**IT IS FURTHER ORDERED** that the City of Albuquerque's Motion for Summary Judgment and Supporting Memorandum (Doc. 50) is **GRANTED in part** as to the claim for breach of contract and is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Davidson Oil Company's Motion for Summary Judgment (Doc. 53) is **GRANTED in part** as to the claim for breach of the implied covenant of good faith and fair dealing. Davidson Oil's argument regarding damages is **DENIED without**

---

[10] Nor did the *Mb Oil* court discuss the fact that under federal contracts, when the government terminates a contract pursuant to a TFC clause, standard recovery includes "costs incurred, profit on work done[,] and the costs of preparing the termination settlement proposal." *See A.L. Prime Energy Consultant, Inc.*, 95 N.E. 3d at 553 (quoting *Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988); *see also Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 178 (2014) (noting that the federal statutory scheme "provides for a form of reliance damages to contractors when the government exercises its right to terminate for convenience") (citing *Krygoski*, 94 F.3d at 1545 ("Termination for convenience damages include "costs of performance prior to termination, profits on that performance and termination costs. No anticipatory profits are to be awarded.")) (subsequent citation omitted). To the Court's understanding, there is no similar state statute.

**prejudice**, and its argument regarding breach of contract is **DENIED** and that claim is **dismissed with prejudice**.

   **IT IS FURTHER ORDERED** that Davidson Oil shall submit a new brief on the issue of damages alone no later than **October 17, 2022**. The City shall file a response brief no later than **November 7, 2022**, and Davidson Oil may file a reply brief no later than **November 28, 2022**.

   **IT IS FURTHER ORDERED** that the pretrial conferences set for September 23 and October 21, 2022, and the bench trial set for November 21–23, 2022, are hereby **VACATED** and will be **RESET** at a later date.



   _____
   ROBERT C. BRACK
   SENIOR U.S. DISTRICT JUDGE