IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DAVIDSON OIL COMPANY,

      Plaintiff,

v.                                                        No. CIV 20-0838 RB/JHR

CITY OF ALBUQUERQUE,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

On August 30, 2022, the Court entered a Memorandum Opinion and Order granting in part Plaintiff Davidson Oil Company's motion for summary judgment and finding that Defendant City of Albuquerque breached the implied covenant of good faith and fair dealing when it terminated the parties' fixed-price fuel supply contract. Davidson Oil now moves for summary judgment on the issue of damages. Having considered the parties' arguments and the relevant law, the Court grants the motion in part and enters judgment for Davidson Oil in the amount of $744,574.55.

**I.      Factual Background**

      **A.     The Parties' Contract and the City's Breach**

On December 16, 2019, the City issued a Request for Bids (RFB), seeking bids for the purchase and delivery of fuel in accordance with detailed specifications. (Docs. 78-1 ¶ 3; 78-1-A at 10.[1]) The RFB specified that "[t]he City plans to award one firm fixed price agreement under this RFB." (Doc. 78-1-A at 10.) Both the RFB and a later Addendum made it exceedingly clear that the City would only consider a firm fixed price. (*See id.*; *see also* Doc. 78-1-B at 20–21.) The

---

[1] The Court cites to the CM/ECF numbering on Davidson Oil's exhibits.

Addendum also indicated "the City's belief that the bidder should have its supplies already hedged[2] in such a way, or the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date. . . ." (Doc. 78-1-B at 21.)

Davidson Oil, a Texas corporation and fuel oil distributor, was the lowest bidder. (*See* Doc. 78-1 ¶¶ 1, 5–6.) Davidson Oil and the City entered into a contract on January 21, 2020, with the term of the contract to begin on July 1, 2020. (*See* Doc. 78-1-C at 25.) The contract contained a Termination for Convenience (TFC) clause that provided:

> Termination for Convenience: City may terminate the Contract at any time by giving at least 60 days' written notice to the Vendor. In such event, vendor shall be paid under the terms of the Contract for all goods and/or services provided to and accepted by City, if ordered or accepted by City prior to the effective date of termination.

(*Id.* at 31.)

Because the City indicated its "intent [that] the bidder should have its supplies already hedged in such a way, or the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date" (Doc. 78-1-B at 21), Davidson Oil understood that it "needed to ensure it would have the ability to sell fuel to the City at the agreed prices regardless of market fluctuations (Doc. 78-1 ¶ 8). To offer the agreed-upon fixed price, Davidson Oil purchased 12 one-month "hedge contracts" (corresponding with "each month of the first year of the Contract") with prices "locked-in as of the date of purchase" on January 31, 2020. (*Id.* ¶¶ 8, 10.) Davidson Oil's CEO, Chan Davidson, explains:

> The hedge contracts . . . were a type of derivative instruments known as "swap contracts[."] The company agreed with the party on the other side of the hedge to

---

[2] "A hedge is an investment that is made with the intention of reducing the risk of adverse price movements in an asset." *Hedge Definition*, Investopedia, https://www.investopedia.com/terms/h/hedge.asp (updated Apr. 24, 2023); *see also In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 254 (E.D.N.Y. 2002) (to hedge is "to insure [oneself] against loss by unfavorable changes in price at the time of actual delivery") (quoting *United States v. N.Y. Coffee & Sugar Exch.*, 263 U.S. 611, 619 (1924)).

>swap a floating market price for diesel fuel and unleaded gasoline in exchange for fixed prices. As derivative instruments, [the] hedge contracts did not involve the actual purchase of fuel. Instead, the parties traded financial positions. . . . [The] prices [of each one-month contract] were pegged just slightly below the fixed prices called for by the Contract with the City, allowing Davidson Oil a profit margin of $0.02 per gallon. . . .
>
>The way [the] hedge contracts were designed, at the end of each one[-]month contract, [Davidson Oil was] required to "settle" the financial obligations with the other party to the hedge. If market prices for fuel rose above the prices of the hedge contract, the other party would be obligated to pay Davidson Oil the difference between the hedge prices and the higher market prices. Thus, if market prices increased, Davidson Oil would still have the money to buy the fuel required by the City. On the other hand, if market prices for fuel fell below the hedge prices, then Davidson Oil would be obligated to pay the other party the difference between the hedge prices and the lower market prices. In this latter circumstance however, Davidson Oil would be protected from loss because it was entitled to sell fuel to the City at the fixed prices called for by the Contract, which were slightly higher than the hedge prices. Thus, revenues from sales to the City would cover any monthly losses on [the] hedge contracts and further allow [Davidson Oil] to realize a modest profit on these sales.

(*Id.* ¶¶ 9–11.)

On March 19, 2020, the City gave Davidson Oil notice of the City's intent to terminate the parties' Contract pursuant to the TFC clause effective May 19, 2020. (Doc. 78-1-E.) "The [City] ultimately purchased fuel oil from TAC Energy [at market price] using [a] State of New Mexico Statewide Purchasing Agreement." (Doc. 49-D ¶ 15; *see also* Doc. 57-D at 60:20–61:5.) The Court found in a previous Opinion that the City, "with knowledge that it had induced Davidson Oil into changing its position after signing the Contract, and without any intention of compensating it for measures it took in reliance thereon, . . . intentionally invoked the TFC clause to Davidson Oil's detriment[,]" breaching the implied covenant of good faith and fair dealing. (Doc. 68 at 24 (citation omitted).)

### B.   Davidson Oil's Claimed Losses

Davidson Oil claims losses from the City's breach in four categories.

1. **Hedge Losses**

"Davidson Oil realized a loss on its hedge contracts at the end of each month from July 2020 through January 2021" totaling $1,226,356.65. (Doc. 78-1 ¶ 19.) "When oil prices began to turn around, Davidson Oil realized a gain on its hedge contracts at the end of each month from February 2021 through the end of its last hedge contract in June 2021" totally $624,497.66. (*Id.*) Davidson Oil "realiz[ed] a net loss on [the] hedge contracts in the amount of $601,858.99 ($1,226,356.65 minus $624,497.66)." (*Id.* ¶ 20; Doc. 78-1-H.)

2. **Interest on Line of Credit**

Davison Oil also contends that it had to settle its losses on the hedge contracts from July 2020 through January 2021 with cash, which "created a substantial drain on the company's cash flow." (Docs. 78-1 ¶ 21; 78-1-H.) It asserts that it had to increase its line of credit, which "caused Davidson Oil to incur additional interest payments in the amount of $13,883.89." (Docs. 78-1 ¶ 21; 78-1-H.)

3. **Lost Profits on Fuel and Deliveries**

Davidson Oil projected that, based on the City's historical usage of fuel, it would "realize a profit of $107,567.04 on fuel sales." (Docs. 78-1 ¶ 22; 78-1-H.) Because the parties' contract called for Davidson Oil to deliver fuel to the City, it estimated it would realize freight profits of $62,154.91. (Docs. 78-1 ¶ 23; 78-1-H.) Davidson Oil did deliver a portion of the City's fuel to the City as an agent of TAC Energy, earning a profit of $8,593.23. (Docs. 78-1 ¶ 24; 78-1-H.) Thus, Davidson Oil "lost a net of $53,561.68 in freight profits it expected to earn during the first year of the Contract." (Docs. 53-1 ¶ 24; 78-1-H.)

The City asserts, and Davidson Oil does not disagree that, based on the quantities of fuel the City actually purchased over the term of the Contract, Davidson Oil would have realized profits

on fuel sales of $96,648.76 and on fuel transport of $46,066.80.[3] (*See* Docs. 78 at 20–21; 81 at 12.)

## II.   Legal Standard and Evidentiary Rulings

### A.   Summary Judgment Standard of Review

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cnty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* at 1107 (quotation and citations omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in its favor. *Id.* (citations omitted).

### B.   Evidentiary Rulings

Of the 35 facts Davidson Oil recited in its original motion for summary judgment, it asserts that 14 of them support its motion for damages. (*See* Doc. 78 at 2.) It thus repeats those 14 facts

---

[3] Although the City did not provide evidence in support of these amounts, Davidson Oil does not dispute them. Davidson Oil asserts that counsel for the City shared the amounts in a letter sent in advance of the parties' settlement conference. (*See* Doc. 78 at 20 n.2.)

and retains their original numbering. (*See id.* at 2–9 (discussing Undisputed Material Facts (UMF) Nos. 3, 13–16, 25–33).) It adds one new fact in support of its current motion. (*Id.* at 9 (UMF No. 36).)

The City admitted the allegations in UMF No. 3. (*See* Doc. 57 at 3.) With respect to UMF Nos. 13–16 and 26–32, the City largely responded that it "lack[ed] sufficient knowledge or information" about the factual assertions "and therefore denie[d] those allegations." (*See id.* at 3–5.) The Court ruled in its August 2022 Opinion that "[t]o the extent Davidson Oil's factual assertions are supported by record evidence and do not contain legal conclusions, the City's denials for lack of knowledge fail to create genuine factual disputes." (Doc. 68 at 10 (citations omitted).) The City does not dispute that this ruling applies to UMF Nos. 13–16 and 26–32 for purposes of the motion currently before the Court. (*See* Doc. 81 at 1–2.)

The City disputes that the ruling applies to the facts asserted in UMF Nos. 25 and 33. In UMF No. 25, Davidson Oil asserts that "[a]s a result of the termination of the Contract, [it] incurred damages" that "consisted of losses sustained on its hedge contracts, additional interest paid on its line of credit, lost profits on sales of fuel[,] and lost profits on transport of fuel." (*See* Doc. 78 at 5 (citing Doc. 78-1 ¶ 17).) UMF No. "33 is the quantification of [UMF No.] 25; it states the total amount of damages Davidson Oil is claiming." (Doc. 81 at 2 (citation omitted).) The City contends that "[w]hether losses are recoverable as damages is a question of law, not fact." (Doc. 81 at 2 (citations omitted).) Thus, the City argues, "Davidson Oil's allegation that it incurred damages is a legal conclusion, and accordingly the Court's ruling[] does not" apply. (*Id.*) Davidson Oil replies that the City's objection is insufficient to establish a genuine factual dispute on the amount of its claimed losses. (*See* Doc. 85 at 1–2.)

The Court agrees that the City fails to establish a factual dispute on the amount of the claimed losses; however, whether those losses are recoverable is a question of law. Thus, UMF Nos. 25 and 33 are not deemed admitted as undisputed to the extent that they are claimed as "damages."

**III.    The Court declines to reconsider its denial of Davidson Oil's first motion for damages.**

Davidson Oil first asks the Court to reconsider the denial of its first motion for summary judgment on damages. (Doc. 78 at 10.) In its previous Opinion, the Court noted that "[t]he City's arguments on summary judgment regarding damages related to a breach of the implied covenant of good faith and fair dealing are slim." (Doc. 68 at 26 (citations omitted).) The Court directed the parties to submit new briefs on the issue of damages alone. (*See id.*) Davidson Oil submits that because "the City failed to raise a genuine issue of material fact concerning damages[,]" summary judgment in its favor is warranted. (*See id.*) As the Court held above, however, the undersigned is "not bound to accept as true [the proffered] legal conclusion[s]" concerning damages that Davidson Oil "couched as . . . factual allegation[s] . . . ." *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation and citations omitted).

Moreover, Davidson Oil based its first motion for damages on its position that in exercising the TFC clause, the City breached the parties' contract. (*See* Doc. 53 at 23–24.) The Court disagreed and found that the City properly invoked the TFC clause but breached the implied covenant of good faith and fair dealing. (*See* Doc. 68 at 12–26.) As the parties did not focus their briefing on this outcome, the Court found it proper to have them revisit the issue of damages with the Court's ruling in mind. Davidson Oil fails to dissuade the Court from its earlier decision.

**IV.    Analysis of Damages**

As mentioned above, the Court previously found that the City "intentionally invoked the

TFC clause to Davidson Oil's detriment[,]" thereby breaching the implied covenant of good faith and fair dealing. (Doc. 68 at 24 (citing *Sanders v. FedEx Ground Package Sys.*, 188 P.3d 1200, 1203 (N.M. 2008)).) The City asserts, and Davidson Oil does not disagree, that the implied covenant of good faith and fear dealing "becomes part of the contract[,] and the remedy for its breach is on the contract itself." (Doc. 81 at 4 (quoting *Young v. Hartford Cas. Ins. Co.*, 503 F. Supp. 3d 1125, 1183 (D.N.M. 2020)) (subsequent citations omitted)); *see also* Doc. 78 at 12–13 (discussing damages recoverable for breach of contract).)

The parties agree that the contract was for the sale of goods and is governed by the New Mexico Uniform Commercial Code (UCC), N.M. Stat. Ann. §§ 55-1-101–55-12-111. (*See* Docs. 81 at 5; 85 at 3.) "The UCC allows a seller damages caused by repudiation." *Elephant Butte Resort Marina, Inc. v. Wooldridge*, 694 P.2d 1351, 1357 (N.M. 1985) (citing N.M. Stat. Ann. § 55-2-708).[4] Where a buyer repudiates, § 55-2-708(1) provides that a seller may recover "the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages . . . but less expenses saved in consequence of the buyer's breach." If the seller demonstrates that the measure of damages in § 55-2-708(1) is inadequate, then § 55-2-708(2) allows the seller to recover "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages . . . less due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

Davidson Oil seeks four types of damages: (1) "losses on its hedge contracts"; (2) "interest

---

[4] At the hearing on this motion, the parties agreed that N.M. Stat. Ann. § 55-2-708 applies. (Tr. of April 25, 2023 Hrg. (Tr.) at 13–17, 29–33.) The parties further agreed that N.M. Stat. Ann. § 55-2-706 is inapplicable due to the nature of Davidson Oil's swap contracts. (*Id.* at 12, 26–27.) Section 55-2-706 involves the *reselling* of goods that are repudiated by the buyer. Because Davison Oil was not actually purchasing fuel and holding it in storage to send to the City, there was no fuel for Davidson Oil to *resell* to another buyer.

paid on its line of credit"; (3) "lost profits on anticipated sales of fuel"; and (4) "lost profits on anticipated transport of fuel." (Doc. 78 at 8–9.) At issue here is whether to award Davidson Oil damages under § 55-2-708(1), § 55-2-708(2), the common law, or some combination of the three. "When the court has sufficient evidence before it, it can make findings on damages." *Elephant Butte Resort Marina, Inc.*, 694 P.2d at 1357 (citations omitted). The Court finds that it has evidence sufficient to award Davidson Oil damages as discussed below.

      A.      **The Court will not award damages under § 55-2-708(1).**

Section 55-2-708(1) allows a seller to recover the difference between the market price at the time and place for tender and the contract price. The parties spent little time discussing this subsection. Davidson Oil did not address § 708(1) in its motion and only summarily argued in its reply brief that "this standard is the same measure of damages that defines the hedge losses." (Doc. 85 at 3.)

For its part, the City failed to submit evidence to dispute Davidson Oil's allegations regarding its claimed hedge losses or to dispute that its claimed losses were based on the market price of fuel. (*See* Doc. 81.) The City affirmed at the hearing that the basic facts at issue are not in dispute. (Tr. at 25.) Counsel for the City later briefly argued that because this was a "destination contract," the market price for purposes of § 55-2-708(1) must be the market price *in Albuquerque*, a fact that Davidson Oil did not explicitly address. (*Id.* at 26.)

It is unnecessary to address this issue further, as the Court finds below that the hedge losses are recoverable as incidental damages under § 55-2-708(2). Therefore, the Court need not award damages under § 55-2-708(1).

      B.      **The Court will award Davidson Oil damages under § 55-2-708(2).**

The parties focus primarily on § 55-2-708(2), which is a measure of recovery based on a

seller's lost profits.[5] *See Bill's Coal Co. v. Bd. of Pub. Utils. of Springfield, Mo.*, 887 F.2d 242, 245 (10th Cir. 1989), *holding modified on other grounds by Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351 (10th Cir. 1997). Section 55-2-708(2) provides that if damages under § 55-2-708(1) are "inadequate to put the seller in as good a position as performance would have done[,] then the measure of damages is the profit . . . which the seller would have made from full performance by the buyer, together with any incidental damages" as allowed by § 55-2-710. Davidson Oil argues that the measure of damages under § 55-2-708(1) is inadequate because recovery for the hedge losses alone would not compensate it for lost profits, which it "would have made from full performance by the" City. *See id.* The Court agrees with this premise. Had the City performed, Davidson Oil would have realized profits on the sale and transportation of fuel and would not have incurred net losses on the hedge contracts. Accordingly, the Court will examine Davidson Oil's four categories of damages using § 55-2-708(2) as a framework.

### 1. Lost Profits on Fuel and Transportation

The parties agree that under § 55-2-708(2), Davidson Oil is entitled to its lost profits on the sale of fuel and to lost freight profits. (*See* Docs. 81 at 5, 12; 85 at 9–10.) The City argues that Davidson Oil's lost profits damages should be tied to the amount of fuel the City actually purchased during the contract term, rather than on Davidson Oil's estimate based on the RFB. (*See* Doc. 81 at 12.)

---

[5] "Courts have routinely recognized that the contract/market remedy [in § 55-2-708(1)] is inadequate, and that the lost profits formula [in § 55-2-708(2)] is applicable, in three situations[:]" (1) where the goods are specially manufactured; (2) "where the seller is a 'lost volume seller'"; and (3) where the seller is deemed a "jobber." *Purina Mills, L.L.C. v. Less*, 295 F. Supp. 2d 1017, 1035–36 (N.D. Iowa 2003); *see also Bill's Coal Co.*, 887 F.2d at 245.
At the motion hearing, Davidson Oil argued it was akin to a seller who sells specially-manufactured goods, while the City argued that Davidson Oil is like a jobber. (Tr. at 24, 30.) The Court need not reach this issue, as the parties agree that § 55-2-708(2) applies under these circumstances. *See, e.g.*, *Purina Mills*, 295 F. Supp. 2d at 1036 (noting that these three categories are not necessarily "the only types of sellers entitled to the lost profits remedy[,]" but they are the "most widely recognized as inadequately compensated" under § 2-708(1), thereby "making lost profits damages the appropriate remedy") (citation omitted).

Davidson Oil replies that "[w]hile [its] lost profits could reasonably be based on either estimated quantity or actual quantity, the more accurate measure is estimated quantity[,]" which "reflects Davidson Oil's expected profits upon entering the Contract." (Doc. 85 at 9.) Davidson Oil relies on a case in which the "New Mexico Court of Appeals affirmed [a] jury verdict for expected profit arising from a breach of contract." (*Id.* at 10 (citing *H&B Props., Inc. v. Miller*, No. A-1-CA-37445, 2021 WL 119142, at *6 (N.M. Ct. App. Jan. 12, 2021), *cert. denied* (Mar. 19, 2021)).) In *H&B Properties*, the plaintiff (H&B) owned and operated a ranch. 2021 WL 119142, at *1. H&B made an oral agreement with the defendant (Miller), in which Miller would perform certain duties at the ranch, to include guiding hunts and maintaining the animal population. *See id.* H&B later sold part of the land, reducing the acreage available for guided hunts, and the parties brought claims against each other. *See id.* Miller sued for breach of contract and claimed damages based on his estimate of what he would have earned over a ten-year period. *Id.* at *1, 6. A jury found in Miller's favor. *Id.* at *1. *H&B Properties* is distinguishable from the circumstances here because in that case, H&B did not breach the contract with Miller only to have another individual take Miller's place. *See id.* Thus, the fact that the state appellate court upheld the jury's verdict of Miller's *estimated* damages over time has no bearing on the appropriate award here.

The Court sides with the City on this point. Davidson Oil submitted evidence to show that it *expected* to earn profits on fuel sales of $107,567.04 and on fuel transport of $53,561.68. (*See* Doc. 78-1 ¶¶ 22–24.) But Davidson Oil would not have realized these expected profits, because the City did not purchase as much fuel as the parties anticipated. The applicable standard is that damages should "put the seller in as good a position as performance would have done" had the buyer fully performed. *See* N.M. Stat. Ann. § 55-2-708(2). Based on the quantities of fuel the City actually purchased over the term of the Contract, Davidson Oil acknowledges that it would have

11

realized profits on fuel sales of $96,648.76 and on fuel transport of $46,066.80. (*See* Doc. 78 at 20–21.) Together with the amount due on the hedge losses as discussed below, this amount is adequate to put Davidson Oil in as good a position as if the City had fully performed.

## 2. Hedge Losses and Additional Interest

Section 55-2-708(2) provides that a seller may receive incidental damages, which are defined as "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." N.M. Stat. Ann. § 55-2-710. At issue is whether the losses on the swap contracts and/or the interest paid on the line of credit fall within that definition. Davidson Oil contends that these losses are recoverable under § 55-2-708(2) as incidental damages. (*See* Doc. 85 at 3–5, 8–9.) The City argues that the hedge losses and interest paid are not incidental damages but are consequential damages, which are not recoverable by sellers under the UCC. (*See* Doc. 81 at 6 (discussing N.M. Stat. Ann. §§ 55-2-708, -713, -715(2)) (subsequent citations omitted).)

### a. The hedge losses are recoverable incidental damages.

First, the City asserts that these losses do not fit within the plain meaning of § 55-2-710's statutory language, as they are not charges, expenses, or commissions. (*Id.*) Davidson Oil asserts that the net hedge losses are commercially reasonable charges that resulted from the City's breach. (Doc. 85 at 4 ("these losses surely arise from the City's breach of contract because Davidson Oil would have not incurred any loss at all on the hedge contracts had the City performed its obligations under the Contract").) Davidson Oil argues that awarding the hedge losses would fit within the purpose of § 55-2-710. (*Id.* (citing *Bill's Coal*, 887 F.2d at 246).) In *Bill's Coal*, the Tenth Circuit noted that "[t]he purpose of section 2-710 is to reimburse the seller for expenses

12

reasonably incurred as a result of the buyer's breach." 887 F.2d at 246. Thus, the Tenth Circuit found that a seller could not recover, as incidental damages, "interest expenses . . . incurred as the result of preparing for [that] litigation." *Id.*

Here, Davidson Oil incurred losses on the swap contracts as a direct result of the City's breach. As the Court found previously, "the City demanded in the RFB that the winning bidder have 'the ability to hedge the volumes stated in the RFB, to permit it to offer a fixed price at the close date.'"[6] (Doc. 68 at 26 (quoting Doc. 53-1-B at 2–5).) Davidson Oil procured hedge contracts to guarantee the fixed price, and thus the hedge losses were "expenses reasonably incurred as a result of the [City's] breach." *See Bill's Coal*, 887 F.2d at 246.

The City next contends that incidental damages may only "result from the breach" if they were incurred due to a seller's stopped delivery, during transport, or where the seller returned or resold the goods. (Doc. 81 at 6–7 (discussing § 55-2-710).) The City argues that the swap contracts have nothing to do with "stopping delivery" of the fuel. (*See id.* at 7.) Yet Davidson Oil would not have incurred the losses on the swap contracts if the City had performed; thus, the hedge losses, which were incurred monthly beginning in July 2020, were arguably incurred in "stopping delivery" of the fuel after the buyer's breach.[7]

The City asserts that the hedge losses are consequential damages because they did "not arise within the scope of the immediate buyer-seller transaction, but rather stem[med] from losses incurred by the nonbreaching party in its dealings" with a third party. (Doc. 81 at 7 (quoting *Jelen*

---

[6] The City quibbles with this finding (Doc. 81 at 9), but the issue is not properly before the Court.

[7] Notably, Davidson Oil never took possession of the fuel under the Contract in order to transport or resell it. Rather, Davidson Oil planned to obtain and deliver the fuel as needed each month. It is curious that the City argues on the one hand that Davidson Oil is a "jobber," defined as "a middleman who never takes possession of the contract goods[,]" *Petroleum Traders Corp. v. Baltimore Cnty., Mary.*, Civ. No. L-06-444, 2009 WL 2982942, at *8 (D. Mary. Sept. 14, 2009), and on the other hand that Davidson Oil can have no incidental damages because it never stopped delivery, returned, or resold goods pursuant to § 55-2-710. (*See* Tr. at 30; Doc. 81 at 6–7.)

*& Son, Inc. v. Bandimere*, 801 P.2d 1182, 1186 (Colo. 1990)).) In *Jelen & Son*, a seller of hazardous chemicals sought to recover "damages for hazardous material clean-up resulting from a spill of the chemicals during delivery but prior to the buyer's rejection . . . ." 81 P.2d at 1182–83. The court found that the damages were consequential and were not recoverable as incidental damages under § 2-710, because they "were not incidental to [the buyer's] refusal to accept delivery of the chemicals, but instead were incurred as a result of improper storage, handling, and transportation of [the] materials and [the seller's] subsequent deadlines with a third party . . . ." *Id.* at 1187. *Jelen & Son* is distinguishable, though, because Davidson Oil entered into the swap contracts before the City's breach, and the hedge contracts "were expressly contemplated by the Contract." (*See* Doc. 85 at 6.)

Other cases have framed the issue in terms of expenses made in reliance on a contract that the buyer repudiated. The decisions in *Bulk Oil v. Sun Oil*, 697 F.2d 481 (2nd Cir. 1983) and *Gray v. West*, 608 S.W.2d 771 (Tex. Civ. App. 1980) "present typical situations when [the] principle [in § 2-710] is applied." *See Stokes v. Roberts*, 711 S.W. 2d 757, 758 (Ark. 1986).

> In both cases the plaintiffs, as sellers, borrowed money to purchase the subject matter of a contract, which the opposing party later breached. When the breach occurred[,] the sellers were left with a debt they would not otherwise have owed but for the contract. Interest had to be paid on the loan until cover was effected. In *Gray*, the court found the actual interest expenses on the money borrowed by the seller to finance the subject matter of the contract, incurred as a result of a buyer's breach, were incidental damages under 2-710. Similarly, in *Bulk Oil v. Sun Oil*, the seller had borrowed $4,000,000 to finance a sale of oil to the buyer, who then defaulted, and the court held interest payments on the loan to be incidental to the breach. . . . The interest expense incurred in those cases was a result of performance made in *reliance* on the contracts.

*Id.*[8] In a similar vein, Davidson Oil entered into the hedge contracts *only because* of its contract

---

[8] In contrast, the seller in *Stokes* made no expenditure in reliance on the contract that the buyer later breached. *See* 711 S.W. 2d at 758. There, the seller obtained a loan that had no relationship to the parties' contract, and it would have been obligated on the loan regardless of the buyer's breach. *See id.*

14

with the City. It would not have incurred hedge losses without the City's breach, because it would not have needed to hedge its position. The net hedge losses, totaling $601,858.99, are incidental damages recoverable under § 55-2-710.[9]

### b.  The additional interest is not recoverable.

The same cannot be said of the additional interest on the line of credit Davidson Oil took out later. Davidson Oil acknowledges that the interest expenses "differ from [the] hedge losses in that the Contract does not expressly refer to the company's financing arrangements." (Doc. 85 at 8.) "Nevertheless," it argues, the interest expenses were "commercially reasonable charges" and were a direct outcome of the City's breach of contract." (*Id.*) The Court disagrees. Davidson Oil took out a line of credit *after* the breach when it was struggling to pay the losses on the hedge contracts. (*See* Doc. 78 at 17.) The decision in *S.C. Gray Inc. v. Ford Motor Co.*, 286 N.W. 2d 34 (Mich. Ct. App. 1979) provides some guidance. In that case, the parties had two contracts. *Id.* at 37. S.C. Gray alleged that Ford Motor Company breached the contracts, forcing S.C. Gray "to borrow money at high interest rates to carry on its business." *Id.* S.C. Gray sued to recover the interest it paid on the loans. *Id.* at 43. The court found that the interest was not an incidental damage under § 2-710. *Id.* at 44. Similarly, Davidson Oil took out a line of credit after the City's breach, due to reasons that were entirely separate from the parties' contract. Accordingly, the Court finds that the interest paid is not a reasonable charge or expense under § 55-2-710.

Nor is the interest recoverable under the common law. Davidson Oil briefly contends that these expenses were "objectively foreseeable by the City that if Davidson Oil was required to bear by itself the considerable expense of paying for one year of the City's estimated fuel requirements,

---

[9] The Court declines to take up Davidson Oil's alternative argument regarding whether the hedge losses are recoverable under the common law. (*See* Doc. 85 at 5–8.)

it would have a substantial adverse financial impact on the company." (Doc. 85 at 9 (citations omitted).) The Court disagrees that Davidson Oil's financial position would have been objectively foreseeable. The interest paid is not recoverable under the common law.

## V.     Conclusion

Davidson Oil is entitled to damages under § 55-2-708(2) totaling $744,574.55:

- Lost profits on fuel sales: $96,648.76

- Lost profits on fuel transport: $46,066.80

- Hedge losses: $601,858.99

**THEREFORE**,

**IT IS ORDERED** that Davidson Oil Company's Motion for Summary Judgment on Damages (Doc. 78) is **GRANTED in part**. The Court finds the City is liable to Davidson Oil for $744,574.55 in damages under N.M. Stat. Ann. § 55-2-708(2).

**IT IS FURTHER ORDERED** that this lawsuit is **DISMISSED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE